Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY
Case No:  0860399-CIV-JORDAN

GREAT LAKES REINSURANCE (UK) PLC,)
                                 )
            Plaintiff,           )
                                 )
vs.                              )
                                 )
ELAINE Y. ROSIN and BANK OF THE  )
WEST,                            )
                                 )
            Defendants.          )
                                 )
------------------------------------x

                              3550 Powerline Road
                              Fort Lauderdale, Florida
                              February 3, 2009
                              10:00 o'clock a.m.


APPEARANCES:

        STEVE GOLDMAN, ESQUIRE
        Appearing on behalf of the Plaintiff.

        JAMES BEAGLE, P.A.
        By:  JAMES BEAGLE, ESQUIRE,
        Appearing on behalf of the Defendants.


                    ----------------


                    DEPOSITION

                        OF

                BERIC ANTHONY USHER

                    ----------------

Page 2

1
                        I N D E X

2
                      EXAMINATION                    PAGE
3    WITNESS

4
     BERIC ANTHONY USHER

5
                  Direct by Mr. Beagle:              3
6

7

8
                  DEFENDANTS' EXHIBITS
9
                                                     PAGE
10   FOR IDENTIFICATION
                                                      6
11   No. 1 - Curriculum Vitae
                                                     52
12   No. 2 - Definitions
                                                     55
13   No. 3 - Cover Note
                                                     62
14   No. 4 - Yacht Application
                                                     76
15   No. 5 - Acord Watercraft Application
                                                     101
16   No. 6 - Complaint
                                                     117
17   No. 7 - First Report/Hutchinson
                                                     129
18   No. 8 - Flat Cancelled From Inception
                                                     145
19   No. 9 - Acord Insurance Binder

20

21

22

23

24

25

Deposition of BERIC ANTHONY USHER, a

1

witness herein, taken on behalf of the Defendants

2

herein, for the purpose of discovery and for use as

3

evidence in the above-entitled cause, wherein GREAT

4

LAKES REINSURANCE (UK) PLC is the Plaintiff and ELAINE

5

Y. ROSIN and BANK OF THE WEST are the Defendants,

6

pending in the United States District Court, Southern

7

District of Florida, in Admiralty before TERRI L.

8

WRIGHT, Shorthand Reporter and Notary Public in and for

9

the State of Florida at Large, at 3550 Powerline Road,

10

Fort Lauderdale, County of Broward, State of Florida,

11

on the 3rd day of February, 2009, commencing at or

12

about 10:00 o'clock a.m.

13

---------

14

THEREUPON:

15

BERIC ANTHONY USHER

16

a witness herein, being of lawful age and being first

17

duly sworn in the above-entitled cause, testified on

18

his oath as follows:

19

DIRECT EXAMINATION

20

BY MR. BEAGLE:

21

Q.    Good morning.  I'm James Beagle, I

22

represent Doctor Elaine Y. Rosin, and she is the

23

nominal defendant in the action of Great Lakes versus

24

Rosin.  Would you please state your name for the

25

1  record?

2          A.     My full name is Beric, B-E-R-I-C, Anthony,

3  A-N-T-H-O-N-Y, Usher, U-S-H-E-R.

4          Q.     I'm sorry, would you please spell your

5  first name again?

6          A.     B-E-R-I-C.

7          Q.     Your date of birth, please?

8          A.     12th of May, 1953.

9          Q.     What is your residence address?

10         A.     Number 16A, Newfield, N-E-W-F-I-E-L-D,

11  Drive, Menston, M-E-N-S-T-O-N, West Yorkshire,

12  Y-O-R-K-S-H-I-R-E.   Zip code is LS296JQ.

13         Q.     What is your business address?

14         A.     My business address is Number 5 to 6,

15  number 5 slash 6, Downsway House, Ilkley, I-L-K-L-E-Y,

16  West Yorkshire, LS299LA.

17         Q.     Mr. Usher, have you ever had your

18  deposition taken before?

19         A.     Yes, I have.

20         Q.     In how many different matters?

21         A.     Approximately 40.

22         Q.     Were they all in the United States?

23         A.     Yes -- No, no.  I've been deposed in the

24  United Kingdom as well, but on United States matters.

25         Q.     How many times were you deposed in the

1   U.K. on U.S. matters?

2        A.    Three times maybe.

3        Q.    Let me explain a few things to you on the

4   record just to refresh your memory in case it's been

5   awhile.  I'm here to ask you a series of questions and

6   for each question you are to supply the answer.  You

7   have Counsel here in the form of Mr. Goldman.  He will

8   make objections on the record as he sees fit.  Just

9   because he makes an objection does not mean that you do

10  not answer the question, however.  If you are not to

11  answer the question Mr. Goldman will make it clear that

12  he is instructing you not to answer.  In general, if an

13  objection is made, it's simply for the record, and then

14  after that objection go ahead and answer my question.

15       A.    I understand.

16       Q.    If I ask any question that you are not

17  clear on the meaning of, please let me know, I'll be

18  glad to rephrase it or explain it; otherwise I'll

19  believe that you do understand it.  Is that all right

20  with you?

21       A.    I understand, yes.

22            MR. BEAGLE:  Very good.  Would you like to

23       enter your name on the record?

24            MR. GOLDMAN:  I think the Court Reporter

25       has my name.  Thank you.

1    MR. BEAGLE:  Also here is Elaine Y. Rosin,

2    M.D.  She is my client.

3         (Whereupon, the following document was

4    marked as Defendant's Exhibit Number 1 for

5    Identification by the Court Reporter.)

6         Q.   (By Mr. Beagle)  Mr. Usher you were kind

7    enough to give me your curriculum vitae, which has been

8    marked for identification as Defendant's Exhibit No. 1;

9    is that correct?

10        A.    That's correct.

11        Q.    Who is your present employer?

12  *     A.    My present employer is Osprey Special

13   Risks, Limited.

14        Q.    Is that L.T.D. or --

15        A.    Yeah, L.T.D.

16        Q.    Did Osprey formerly go by a different

17   name?

18        A.    Yes, it was formally known as T.L. Dallas

19   Special Risks, Limited.

20        Q.    Was that merely a change of name?

21        A.    Yes, it was, but we also subsequently

22   bought ourselves out of the T.L. Dallas group of

23   companies and joined the group called Osprey Holdings.

24        Q.    When you say we bought ourselves out of

25   the T.L. Dallas group of holdings?

1   A.   Yes.

2   Q.   **Who precisely are you referring to?**

3   A.   Me.

4   Q.   **Are you a shareholder in any of these**

5   **entities?**

6   A.   I was a 49 percent shareholder in T.L.

7   Dallas Special Risks and T.L. Dallas Group; and the

8   remaining 51 percent I bought that 51 percent and then

9   I exchanged the 100 percent of Osprey Special Risks for

10  25 percent of Osprey Holdings.

11  Q.   **You said 100 percent of which entity?**

12  A.   Of Osprey Special Risks.

13  MR. GOLDMAN:  Objection.  I think he must

14  have misunderstood you.  Did you ask him whether

15  he owned 100 percent of something?

16  MR. BEAGLE:  No.

17  MR. GOLDMAN:  Okay.

18  Q.   (By Mr. Beagle)  **How long has Osprey**

19  **Holdings been in existence?**

20  A.   Since 1992, I believe – maybe '91.

21  Q.   **When did you first have a formal**

22  **association with Osprey Holdings?**

23  A.   I had an association with Osprey

24  Underwriting Agency, which is a member of the Osprey

25  Holdings group since 1995, but not an involvement from

1  the stockholder position or indeed as an employee

2  position.  They were an underwriting agency that we

3  used as market and represented as market.  They are an

4  underwriting agency that represents Lloyds

5  Underwriters.

6      Q.    Are you referring now to Osprey Holdings

7  or to the other Osprey --

8      A.    Osprey Underwriting Agency.

9      Q.    What was your association with Osprey

10 Underwriting Agency in 1995?

11     A.    They were a market that we dealt with.

12     Q.    So, it was merely an entity that you did

13 business with?

14     A.    That's correct.

15     Q.    Okay.  When did you become more intimately

16 associated with Osprey Underwriting Agency?

17     A.    October the 7th, 2008.

18     Q.    What occurred on that date?

19     A.    That's when I swapped the 100 percent

20 shares in Osprey Special Risks, Limited for the 25

21 percent stock in Osprey Holdings.

22     Q.    When was your first association with

23 Osprey Special Risks?

24     A.    In May, 2008 was when we changed our name

25 from T.L. Dallas Special Risks to Osprey Special Risks.

1    Q.    When you say "we", who are you referring

2    to?

3         A.    T.L. Dallas Special Risks, as a corporate

4    entity.

5         Q.    Was that change of name pursuant to an

6    understanding with Osprey Underwriting Agency or Osprey

7    Holdings?

8         A.    Yes, it was.

9         Q.    From that time there was already a planned

10   merger of some kind among the entities?

11        A.    That's correct.

12        Q.    Does Osprey Special Risks now have all of

13   the business of the former T.L. Dallas?

14        A.    Yes, it does.

15        Q.    Are there any exceptions to that?

16        A.    Well, risks that we haven't renewed, but

17   other than that no, we are still the bonding

18   underwriting agency for Great Lakes.  And we have

19   additional facilities with Lloyds Underwriters, but

20   fundamentally it's exactly the same as it was as T.L.

21   Dallas Special Risks.

22        Q.    To the best of your understanding then is

23   T.L. Dallas now known as Osprey Special Risks?

24        A.    That's correct.

25        Q.    Have you notified your insured entities of

1    that change in name?

2         A.    No.

3         Q.    Okay.

4         A.    We've advised their brokers of the change

5    in name, but of course the security on the policy

6    remains the same.

7         Q.    What is the meaning of the word "security"

8    in that context?

9         A.    Security is exactly what it says, it's the

10   company that is backing the policy or the insurer under

11   the policy.

12        Q.    Do you understand that to be an insurance

13   term or a maritime term or other term of art?

14        A.    Security is a word that's widely used in

15   the financial industry, be it insurance or banking or

16   stocks or whatever, anything to do with financial

17   services.  Security is normally the financial strength

18   that it's backing a particular product and/or insurance

19   policy.

20        Q.    In other words, the entity that is

21   assuming the ultimate liability for any risks?

22        A.    That's correct.

23        Q.    To the best of your understanding is this

24   word security a term of art that's used only in the

25   U.K. or is it used elsewhere in the world?

1          A.     I believe it's used all over the world.

2          Q.     **Have you ever inquired whether it was a**

3  **widely used term of anyone?**

4          A.     I've been doing business around the world

5  for nearly 30 years and I've seen it all around the

6  world.

7          Q.     **Including in the U.S.?**

8          A.     Including in the United States.

9          Q.     **Has anyone in the United States ever**

10 **expressed a confusion about that particular use of the**

11 **term security?**

12         A.     No broker that we've ever dealt with has

13 expressed a confusion.

14         Q.     **Has any insured ever expressed a**

15 **confusion?**

16         A.     Not that I'm aware of.

17         Q.     **What about in the instant action?**

18         A.     I understand having read some of the other

19 depositions that there's been a suggestion that because

20 Great Lakes happens to have within its name the word

21 reinsurance that T.L. Dallas was actually an insurance

22 company and Great Lakes was the reinsurance company,

23 which is simply not the case.  And indeed, as far as

24 the insurance department in Florida is concerned the

25 eligible surplus line insurer, as opposed to reinsurer,

Page 12

1   in the State of Florida is indeed Great Lakes

2   Reinsurance UK PLC.

3         Q.     That's --

4         A.     That's their correct full title, which is

5   why we use it.

6         Q.     What it be all right with you if from now

7   on I refer to Osprey Special Risks as T.L. Dallas just

8   for --

9         A.     I have no problem with that.

10        Q.     -- for convenience sake?

11        A.     Yeah.

12        Q.     Of course, when I say T.L. Dallas I'm also

13   referring to the entity that was T.L. Dallas before it

14   changed names.

15        A.     I understand.

16        Q.     What special permissions or licenses does

17   T.L. Dallas have to operate in the State of Florida?

18        A.     In the State of Florida?

19        Q.     Yes.

20        A.     It doesn't require any licenses.

21        Q.     Okay.

22        A.     We don't have an office in the State of

23   Florida.

24        Q.     To the best of your understanding, does

25   T.L. Dallas require any kind of special permission to

1   issue policies that are enforced in the State of
2   Florida?

3        A.    We can only represent eligible surplus
4   line insurers in the State of Florida.  And we can only
5   deal with brokers that hold a current surplus lines
6   brokers license.

7        Q.    What is the general business of T.L.
8   Dallas?

9        A.    We are marine underwriting agents.
10  Effectively, we represent various insurance companies
11  that provide us with cap capacity to underwrite
12  business on their behalf, manage the business, issue
13  the policies, and deal with the claims.

14       Q.    So, with respect to any insurance policies
15  of which T.L. Dallas has responsibility in the State of
16  Florida, would it be accurate to say that T.L. Dallas
17  performs all functions except acting as the security?

18       A.    That's correct.

19       Q.    I want to ask you a few questions about
20  your own background first.  What is your formal
21  education?

22       A.    I graduated from Sir Walter St. Johns
23  Grammar School in 1971 having achieved advanced level
24  economics, accounts, and art.  And I went immediately
25  into work at the age of 18.  I studied the first two

Page 14

1    years of a formal accountancy examination, which is

2    called the Association of Chartered Accountants.   And

3    then elected to change my career towards the insurance

4    industry.

5           Q.    When did you -- Go ahead.

6           A.    I joined Phoenix Insurance Company in 1972

7    and I was responsible in the financial side of Phoenix

8    Insurance Company.

9                 In 1973 I joined a company called

10   Highlands Underwriting Agency, which was again, an

11   underwriting agency representing Highlands Insurance

12   Company.   And I was still - remained on the financial

13   side.

14                In 1984 I joined a small firm of

15   consultants called Unionam Limited.

16          Q.    When was that?

17          A.    1980.   When I joined Unionam was the first

18   time I had actually been involved in any form of

19   underwriting activity, other than the reporting and

20   statistical aspect of underwriting.

21                And I continued specializing in North

22   American Marine and Protection Indemnity business,

23   which is the liability associated to marine contracts.

24                MR. BEAGLE:   Would you please read back

25          that last statement?

```
 1              (Whereupon, the referred to statement
 2         read back by the Court Reporter as above
 3         recorded.)
 4         Q.    (By Mr. Beagle)  Go ahead, please.
 5         A.    In 1984 I joined another small consultancy
 6    firm called Kasko & Lager, which is the German for
 7    Holland (phonetic).  And again, continued primarily on
 8    commercial business for Marine Holland Liability and
 9    indeed Conger (phonetic).
10              And then in 1988, I think, if you can give
11    me a copy of the exhibit.
12         Q.    If you would like to look at it.  Go right
13    ahead.
14         A.    Yeah, 1987 I joined the company called
15    Berisford Mocatta, which were a Lloyds broker in
16    London.  And I became a producer, which is somebody who
17    generates business, and a broker, again specializing in
18    North American Marine.  And that's when I first
19    developed the yacht contract that we're discussing
20    today.
21              In 1990 the contract was signed off on, I
22    believe, February the 10th, 1990.  And in 1991
23    Berisford Mocatta was taken over by another Lloyds
24    broker called Exall Warren and Darby.  And I didn't get
25    along very well with those people, so I resigned and
```

Page 16

1    joined T.L. Dallas in February 1993.

2                    I took the yacht contract with me and have

3    been operating the yacht contract since that time.

4                    In the early part of my duties with T.L.

5    Dallas it was more diverse.  As the yacht contract grew

6    in size it became more and more exclusive to the yacht

7    business until such an extent that in 1999 T.L. Dallas

8    Special Risks was formed and my duties with exclusively

9    the yacht contract.

10       Q.    **When you say that your duties were**

11   **exclusively the yacht contract, what precisely do you**

12   **mean by that?**

13       A.    Everything to do with the negotiation and

14   operation of the yacht bonding authorities that I

15   negotiated back in 1991.

16       Q.    **Yacht binding --**

17       A.    Binding authorities.

18       Q.    **By binding authorities you mean the**

19   **written contract?**

20       A.    That's correct.

21       Q.    **Do the binding authorities refer to**

22   **anything in addition to the written contracts?**

23       A.    I don't understand your question.

24       Q.    **You said that you had taken on exclusive**

25   **responsibility for yacht binding authorities.  And**

1    since I'm not familiar with that term, I asked if

2    that's - if that is inclusive of the written policies?

3         A.    That's correct, yes.  It's everything to

4    do with underwriting yacht business on behalf of

5    insurers.

6         Q.    Are yacht binding authorities inclusive of

7    any other matter besides the written documents?

8         A.    I still don't understand your question.

9    The written document is a document that gives us

10   specific duties and responsibilities to the insurer.

11   And I'm in control.  I'm the named entity, individual

12   if you'd like, responsible for the management and

13   operation of those contracts.

14            Those contracts grant us authority and

15   make us responsible for specific duties in the

16   underwriting and management of yacht business on behalf

17   of those insurers.

18        Q.    Now, when you say you are the individual

19   responsible for management of these matters, you're not

20   referring to personal financial liability; are you?

21        A.    No.

22        Q.    Going back to yacht binding authorities,

23   are you including in that term legal authorities, such

24   as statutes or other promulgated matters by the state?

25        A.    No.  The insurance company is responsible

Page 18

```
1   for maintaining their licenses within the state and

2   making all returns to the state, including financial

3   returns, and indeed returns on risks that have been

4   bound in the state where tax has been filed.  We are

5   responsible to provide them with the information

6   enabling them to do that, with regard obviously to only

7   the business that we do as opposed to other business

8   they may want.

9        Q.    What is the scope of the information that

10  you provide to the insurance company in that regard?

11       A.    We provide them with a full - what we've

12  refer to as Bordereaux, an electronic report.

13  B-O-R-D-E-R-E-A-U-X.  It has an X on the end if there's

14  more than one bordereau.

15            So, we provide them with an electronic

16  report detailing every single risk that we write on

17  their behalf on a monthly basis.  We provide them with

18  electronic reports of where those risks are written and

19  what tax has been filed and what brokers have filed

20  that tax, which in turn they will reconcile with the

21  state insurance departments.

22            We provide them with reports showing their

23  aggregate exposure in those areas.  We negotiate on

24  their behalf in concert with them appropriate

25  catastrophe reinsurance protection.  We report to them
```

1   all claims matters that have occurred.  We refer to

2   them senior claims matter where litigation is going to

3   be involved because we will be instigating suit in

4   their name.  We refer all complaints to them should we

5   receive them, although invariably the complaints are

6   received directly by them by virtue of their legal

7   representatives in New York.

8         Q.    Who are the legal representatives in New

9   York of Great Lakes?

10        A.    I believe it's -- they have changed their

11  name a number of times, LeBoeuf, Lamb and MacRae, I

12  think, it's certainly --

13        Q.    The last name is what?

14        A.    McCree, M-C-R-E-E, I think.  The last

15  names seemed to have changed a number of times.  It

16  used to be McCreedy, but I think it's now McCree.

17        Q.    Is that a law firm?

18        A.    Yes, it's a law firm.

19        Q.    Bordereaux sounds to me as if it's a

20  trademark name; is that correct?

21        A.    No.

22        Q.    What is Bordereaux?

23        A.    It's a widely-used expression in Europe,

24  and all bordereaux means is list.  It's a French word

25  but it's actually one of the rare French words that's

Page 20

1   used by the - widely throughout the financial industry.

2   And it purely simply means a bordereaux is a list.  And

3   the reason it has an "X" on the end is because that was

4   the traditional French way.

5        Q.    Do you have any formal training in the

6   law?

7        A.    No.

8        Q.    Do you consider yourself to be an expert

9   in any area of the law?

10       A.    No.

11       Q.    On a day-to-day basis, what do you

12   personally do at T.L. Dallas?

13       A.    I monitor the underwriting from a

14   day-to-day basis.  I have a team of five underwriters

15   that deal with day-to-day risks.  In the event that

16   there is anything they're uncomfortable about they will

17   refer to me.  If there's a complex risk, I will deal

18   with it.  If it's a major fleet of vessels or a

19   commercial risk involving numerous passengers, I will

20   normally deal with it because of the liability

21   exposures.

22              And my responsibility is to train and

23   mentor my underwriting team, to assess the terms and

24   conditions we underwrite business upon, and the rights

25   that are going to apply, which are then discussed with

1    the insurance carrier, and make sure everybody is happy

2    with the terms I'm going to impose.  And liaise with

3    the technical division in forming our computer system

4    to ensure the computer always abides with those rates

5    and structures that we've agreed with the insurers.

6    And consult with the claims department on matters of

7    concern.

8        Q.    You will personally do that?

9        A.    Yes.

10        Q.    My claims director will normally refer to

11    me if there's an issue about a particular claim.  And

12    beyond that I negotiate the reinsurance program to

13    protect the book of business, the portfolio of

14    business.  And likewise, liaise with the insurer as to

15    what is the appropriate reinsurance to purchase.

16        Q.    When you say the reinsurer, are you

17    generally speaking of one reinsurer?

18        A.    No, there's a panel of reinsurance

19    companies led by Botcher Hathaway, and largely

20    supported in the Lloyds market.

21        Q.    Have you had the opportunity to look at

22    any of the pleadings in this matter, meaning the

23    Complaint, the Answer, the Counter-claim, things of

24    that nature?

25        A.    Yes.

Page 22

1       Q.     Did you see attached to any of those

2   pleadings the yacht contract that you first developed

3   in 1990?

4       A.     First developed in 1990, no.  I don't

5   believe so, no.

6       Q.     Or any later incarnations of that

7   contract?

8       A.     No.

9       Q.     This yacht contract that you developed in

10  1990, is that generally the contract or policy of

11  insurance that is given to yacht owners?

12      A.     No.

13      Q.     Then, in general, who are the parties to

14  the yacht contract that you developed?

15      A.     Well, it would have started as Berisford

16  Mocatta because I negotiated the contract then, and the

17  insurers, who at the time were Lloyds.  And over a

18  period of time it would have changed, the contract in

19  question with this matter would be a contract between

20  T.L. Dallas Special Risks and Great Lakes.

21      Q.     Would one of the parties to the yacht

22  contract be the reinsurers?

23      A.     No.

24      Q.     So, it was strictly a contract between the

25  security and the entity that's performing the functions

1   of T.L. Dallas?

2        A.    That's correct.

3        Q.    Would it be accurate to say that this

4   yacht contract is reflective of a general business plan

5   that T.L. Dallas has operated under?

6        A.    Yes.

7        Q.    Are you familiar with the policy that was

8   attached to the complaint in this action showing

9   coverage of Doctor Rosin?

10        A.    Yes.

11        Q.    For her boat?

12        A.    Yes.

13        Q.    Do you know who drafted that contract or

14   that policy?

15        A.    T.L. Dallas drafted it.  It was primarily

16   Mark Thomas, my claims director, myself, and one of my

17   colleagues, and also a director who is gentleman called

18   Nick Brown.

19        Q.    What percentage of the yacht business in

20   the United States handled by T.L. Dallas is governed by

21   policies of the type that was attached in the complaint

22   in this case?

23        A.    Nearly all of it.  There are basically

24   only two types of policy for private pleasure vessels.

25   There is what is normally referred to as TLD5PPO, which

Page 24

1    is the policy that was attached to this contract.  And

2    there's another policy which is called PYP, which is

3    premier yacht policy.  I believe that also has a number

4    2 with it as well.  The number is purely the version of

5    the policy.

6           Q.    Under what circumstances would you use the

7    premier yacht policy rather than TLD5PPO?

8           A.    There's specific requirements.  The vessel

9    must be valued in excess of $250,000.  It must have be

10   less than ten years of age.  It must be a standard

11   inboard motor yacht and/or monohull sailboat.  I think

12   that's the basic criteria to qualify for the premier

13   yacht policy option.

14              We always offer both options on those

15   types of vessels whereby - or invariably offer both

16   options on those types of vessels.  The premier yacht

17   policy carries an increased premium.

18          Q.    In general, do you believe the premier

19   yacht policy to be more advantageous to those boat

20   owners who qualify for it?

21          A.    Inasmuch as it's - basically it does not

22   carry depreciation which the other policy does.  The

23   standard policy has elements of depreciation; the

24   premier yacht policy does not.  To that extent it's

25   advantageous.

Page 25

1          Q.     Is that the most significant difference

2    between the two types of policies?

3          A.     Yes.

4          Q.     In general, when T.L. Dallas issues a

5    yacht insurance policy, either TLD5PPO or PYP2, does

6    anyone enter into negotiations with the boat owner with

7    regard to the terms of the policy?

8          A.     Well, to the extent that we discuss it

9    with the boat owner's broker, yes.  We don't have

10   direct discussions with the boat owner.

11         Q.     Do you have direct discussions with the

12   boat owner under any circumstances?

13         A.     Not normally.  Occasionally we would on a

14   claims issue, but certainly not during the negotiation

15   of the policy.

16         Q.     When you refer to a claims issue, are you

17   referring to matters in which a claim has already been

18   denied?

19         A.     Not necessarily, no.  I mean, occasionally

20   we would deal directly with an owner in the

21   negotiations of settlement or interceding on their

22   behalf.

23              There are many occasions when our claims

24   department may have occasion to have discussions with

25   an owner as opposed to with the broker.  Invariably, we

1   appoint a local licensed adjuster and/or surveyor and

2   they will conduct the discussions with the owner.

3        **Q.**    **In what parts of the United States does**

4   **T.L. Dallas issue yacht insurance?**

5        A.    Well, Great Lakes and T.L. Dallas - I

6   would think in - we probably have policies in 40

7   states, 30 states maybe, I don't know.  But widely

8   throughout the United States, albeit that Florida

9   represents a major portion of our business.

10        **Q.**    **What portion does it represent?**

11        A.    About 30 percent overall.

12        **Q.**    **When you say that Great Lakes and/or T.L.**

13   **Dallas issue policies in 30 to 40 states, are there**

14   **territories in which you never go into?**

15        A.    Yes.  New Hampshire and Massachusetts.

16        **Q.**    **And in general why do you never go into**

17   **those two territories?**

18        A.    Those are the only two states in the

19   United States where Great Lakes are not approved as an

20   eligible surplus line insurer.

21        **Q.**    **In states other than New Hampshire,**

22   **Massachusetts and Florida, is T.L. Dallas generally**

23   **licensed to perform that function?**

24        A.    T.L. Dallas is not licensed anywhere in

25   the United States; only Great Lakes.  T.L. Dallas is

1   licensed in the United Kingdom.

2        Q.    Do you know where Great Lakes is licensed

3   in the United States?

4        A.    Everywhere except New Hampshire and

5   Massachusetts.

6        Q.    Okay.

7        A.    Well, sorry, licensed - approved.  They

8   are not licensed as an admitted insurer, which is the

9   terminology that is frequently used, in any states.

10  They are approved eligible surplus lines insurers in 48

11  states.

12       Q.    Does T.L. Dallas have any agents in the

13  United States of any kind?

14       A.    No.

15       Q.    Has it ever had any agents of any kind in

16  the United States?

17       A.    No.

18       Q.    Does it conduct business through what it

19  would consider to be brokers in the U.S.?

20       A.    That's correct.  And as I said earlier,

21  they must have a current surplus lines license enabling

22  them to deal with surplus line market.

23       Q.    To the best of your understanding what is

24  the function of a broker for T.L. Dallas in the United

25  States?

1       A.      Basic just to present risks for us for

2    assessment.  It doesn't actually have any direct

3    responsibilities to us.  There's no contractual

4    relationship between ourselves and the broker.  It has

5    its standard obligations and ethical obligations of the

6    industry to collect and relate information, present

7    information to us, insure the accuracy of the

8    information, collect the premium, and file the tax.

9       Q.      **Is there any agreed upon source of these**

10   **standards and ethical obligations that you're referring**

11   **to?**

12      A.      We do provide them with what we refer to

13   as operating instructions, which is a very brief,

14   two-page document, which spells out the minimum

15   requirements we have in terms of their responsibilities

16   acting as a broker.  And likewise, what they can expect

17   from us as an underwriting agency.

18      Q.      **Do the operating instructions ever serve**

19   **to provide contractual terms for the business done**

20   **between T.L. Dallas and its brokers?**

21      A.      You could argue that it's a contract

22   inasmuch as we require the broker to sign the operating

23   instructions agreeing that they will abide by these

24   rules and regulations.  That would be the extent of the

25   contract.

Page 29

1      Q.     You didn't happen to bring a copy of your

2   operating instructions with you today; did you?

3      A.     No, I didn't.  But I can have one sent to

4   you straightaway.

5      Q.     Do you believe that USI Insurance has

6   executed operating instructions of this type?

7      A.     Yes, they have.

8      Q.     Do you know that for a fact?

9      A.     Yes.  We will not conduct any business

10  with anybody that has not signed on the operating

11  instructions.

12     Q.     How many brokers does T.L. Dallas do

13  business with in the State of Florida?

14     A.     In the State of Florida, I think around

15  15.

16     Q.     What?

17     A.     15.

18     Q.     How are they, in general, geographically

19  distributed?

20     A.     Throughout - there's quite a number of

21  brokers in the Fort Lauderdale area because of the

22  number of vessels located in the Fort Lauderdale area.

23  Obviously, quite a few in the Miami area.  But we also

24  have - we deal with brokers in Tampa, Jacksonville,

25  Saint Augustine, Stuart, Jupiter.  Reasonably well

1    spread.

2        Q.    Do any of your brokers in the United

3    States have exclusive territories within which to deal

4    with T.L. Dallas products in the United States?

5        A.    No.

6        Q.    Okay.

7        A.    There's no exclusivity either way.

8        Q.    No exclusivity of any kind between the

9    brokers and T.L. Dallas?

10       A.    No.  We don't provide them with any

11   exclusive territories or classes of business.  And they

12   don't provide us with exclusive source of business.  We

13   are simply a market place to them.

14       Q.    Other than signing the operating

15   instructions, what are the requirements that you impose

16   on brokers or potential brokers before you do business

17   with them?

18       A.    We ask them to provide us with a copy of

19   their professional indemnity, often referred to as

20   errors and omissions insurance.  We require a copy of

21   their surplus lines license.  And we require details of

22   their financial status.  The application form also asks

23   for a list of other insurers that they deal with, and

24   that enables us to do a fairly cursory background check

25   to establish the current status, if you would like, of

Page 31

1    the broker that we're proposing to deal with.

2         Q.    What is the general purpose of inquiring

3    as to the other insurers that they do business with?

4         A.    To establish the quality of insurer that

5    they do business with.

6         Q.    Do you ever do this to inquire whether

7    there's any conflict of interest between them providing

8    insurance through another insurer and yourselves?

9         A.    No.   There should never be a conflict.

10   The broker is there to act in the interest of the

11   insured and to place their coverage with the best

12   market place.   If we happen to be the best market

13   place, that's fine; if we're not, we're happy for them

14   to place elsewhere.

15        Q.    If a potential broker anywhere in Florida

16   were to forward to you a yacht application for

17   insurance along with a signed set of operating

18   instructions, would you immediately process that

19   application?

20        A.    Unless there were any concerns.   The

21   package would include, as I said, the producer

22   application forms, which gives us details of their

23   financial standing and their standing within the

24   industry, a copy of their professional indemnity

25   policy, a copy of their license and the operating

1    instructions.  Had they supplied us with all those

2    things and there were no issues arising as far as we

3    were concerned, then yes, we would process the

4    application form straightaway.

5              Invariably, the marine insurance market is

6    a very small community.  Normally, we may well make a

7    phone call and ask one of our longer standing producing

8    brokers if they've heard of them and if they consider

9    them to be good people.

10        Q.    Sorry, who would you potentially contact

11   to determine that?

12        A.    One of our more longstanding brokers.  We

13   would therefore look at the geography.  If, for

14   example, it was a Fort Lauderdale broker we might phone

15   a guy called Jim Galladay (phonetic) or a chap called

16   Frank Atlas at Atlas Insurance who have both been in

17   the business for 40 years plus in the Fort Lauderdale

18   area.  If there was a broker conducting marine

19   insurance in the Fort Lauderdale area they would know

20   them.  And we would ask them if they felt they were

21   fairly straight people.

22        Q.    And the purpose have these contacts would

23   never be to determine whether there was any conflict of

24   business interests between the broker you're contacting

25   and the applicant?

Page 33

1          A       No, on the contrary.   There can't be.

2    Some of the brokers that we deal with indeed have

3    bonding authorities with other insurers.  Makes no

4    difference to us whether they have access to other

5    market.

6          Q.    If a boat owner contacted your agency

7    directly in the U.K. from Florida would you consider

8    issuing them a TLD5PPO?

9          A.    No.

10         Q.    Why not?

11         A.    We're not approved to do business in

12   Florida as a broker or an agent.  They have to go

13   through a surplus line approved broker or licensed

14   broker.

15         Q.    Is it your understanding that T.L. Dallas

16   is prohibited from communicating directly with the

17   potential insured?

18         A.    Yes, from the purpose of negotiating

19   insurance or consulting them on the issues of

20   insurance.  We can consult their broker but we cannot

21   consult them.  I believe you have to have a 120 license

22   in the State of Florida in order to do that.

23         Q.    What is your understanding of the scope of

24   ability to negotiate that the brokers in Florida have

25   with regard to the boat owner?

1          A.      Well, they're acting as their broker and

2     therefore must at all times act in their best interest.

3          Q.      In terms of negotiating the terms of a

4     policy, what is the their latitude?

5          A.      They have no latitude.  All they can do is

6     present the risk to us and we provide them with a

7     quotation, which details the terms upon which we're

8     willing to accept the risk.

9               Frequently, there are subjectivities

10    whereby the information presented is acceptable but

11    incomplete.  But they can't negotiate anything other

12    than with us.  And as far as terms are concerned, as I

13    said earlier, we only provide the two basic policies so

14    they can't ask us - or we would never agree anyway to

15    write a policy on a different policy format.  They

16    can't give us a policy and say would you write it on

17    this basis as opposed to your standard policies.

18         Q.      Can you give me at least two examples of

19    the subjectivities that you were referring to?

20         A.      Could be subject to a satisfactory survey

21    and compliance with all the surveyor's recommendations.

22    It could be subject to a confirmation of the loss

23    record.  It could be subject to further details about

24    their navigation in the event of it being a more

25    extended navigation policy.  It could be subject to the

Page 35

1   background and experience of operators.  It could be

2   subject to a photograph of the vessel.  It could be

3   subject to a hurricane plan, depending on the location

4   of the vessel.  It could be subject to anything that is

5   not completed on the application form, indeed, i.e. a

6   purchase price, date purchased, vessel's HIN number,

7   basically anything whereby the information on the

8   application form is acceptable but there's an area that

9   has not been fully completed.  Normally our indication

10  of terms will be subject to that information being

11  supplied and it being satisfactory.

12          Q.    So, do any of these subjectivities arise

13  because someone at T.L. Dallas has examined an

14  application and determined it to be, in some respect,

15  incomplete?

16          A.    That's correct.

17          Q.    Is there someone always at T.L. Dallas who

18  examines the application before the issuance of the

19  policy?

20          A.    Yes.  Before the issuance of the indicated

21  terms I will - for want of a better word - quotation,

22  and then again at the time of the issuance of the

23  policy.

24          MR. BEAGLE:  Would you read that back for

25          me, please so I don't have to ask him to repeat

Page 36

1     himself?

2              (Whereupon, the referred to answer was

3     read back by the Court Reporter as above

4     recorded.)

5     Q.    **(By Mr. Beagle) Who are the members of**

6     **your staff who review yacht applications before the**

7     **issuance of a quotation?**

8     A.    It would be myself, Nick Brown, Matthew

9     McClain, Neil Burton, Tony Barker, or Leum Gilhooly,

10    G-I-L-H-O-O-L-Y.

11    Q.    **Does issuance of quotation require the**

12    **approval of more than one of any of the gentlemen that**

13    **you just named?**

14    A.    Depending on the application form.  If it

15    is a straightforward, what we refer to as vanilla

16    risk - then no.  Any one of those people can issue a

17    quotation based on the application form.

18             If there has been a loss record of any

19    seriousness it would be referred to me.  If there is an

20    issue about an operator being acceptable, it would be

21    referred to me.  If the vessel was a high performance

22    vessel, it would be referred to me.  If the vessel was

23    engaged in commercial activity with more than six

24    passengers on board on a regular basis, it would be

25    referred to me.  If the vessel was more than 25 years

1    of age, it would usually be referred to me.  If it was

2    a wooden construction, it would be referred to me.  So,

3    that's a verbose way of saying if it's of none or

4    little risk it's referred to me.

5         Q.    Would you say that you just described to

6    me the vast majority of circumstances under which a

7    potential policy would fall outside of the vanilla risk

8    category?

9         A.    That I can list from straightforward

10   memory.

11        Q.    In terms of the function of reviewing

12   applications before issuance of the quotation, what

13   categorization would you put all the gentlemen that you

14   just named into?

15        A.    In terms of seniority?

16        Q.    No.  In terms of their capacity of

17   examining applications before issuance of a quotation.

18        A.    They are underwriting assistants as

19   opposed to underwriters.

20        Q.    In the issuance of a quotation for a

21   vanilla risk is any underwriting assistant able to

22   issue the quotation unilaterally without consulting you

23   or some other gentleman?

24        A.    Yes.

25        Q.    At the time of the issuance of the actual

1    **policy who is it that examines the application at that**

2    **time?**

3            A.    The senior people involved there are Susan

4    Usher, who is my wife; Catherine Smith, who is our

5    administration manager; Alexandra Thomas, who's an

6    administration supervisor; Samantha Anslow, who is an

7    administrator.

8            Q.    **How do you spell Anslow?**

9            A.    A-N-S-L-O-W.

10           Q.    **Thank you.**

11           A.    And albeit she's on maternity leave at the

12   moment, Emma Tindall, T-I-N-D-A-L-L.  All those people

13   would be inspecting the application form and linking it

14   to the original application form that was submitted for

15   the potential.  If there were differences or

16   discrepancies it would be referred back to the

17   underwriting department.

18           Q.    **Would it be accurate to say that the**

19   **underwriting department is the one that issues the**

20   **initial quotation and then it would be this separate**

21   **group of people who would examine the application later**

22   **at the time of issuance?**

23           A.    That's correct, yes.  The administration

24   department is responsible for preparing the policy

25   documents.

Page 39

1     Q.    Does the administration department examine

2  the application merely for the purpose of insuring that

3  the policy reflects all of the right data or do they

4  examine it to determine the extent of the risk?

5     A.    They're not there to assess the risk.

6  They're there to ensure that the information is

7  complete.  If new information has been presented, for

8  example, which I referred to as a discrepancy between

9  the original application, they will highlight anything

10  that appears unusual and refer it back to the

11  underwriting department to ensure that that is

12  acceptable from an underwriting prospective, and

13  obviously it's the underwriting department that

14  assesses the risk.

15     Q.    Would you say in general terms the

16  administration department merely performs a ministerial

17  task in reviewing the application at the time of

18  issuance?

19     A.    Yes.

20     Q.    Do you know which member or members of the

21  underwriting department examined Doctor Rosin's

22  application at the time of the issuance of the

23  quotation?

24     A.    I believe that it was was Neil Burton.

25     Q.    How do you know that?

1   A.   Because from my underwriting I believe he

2   was the name of at the top of the quotation that was

3   initially issued.  He may well have referred it to me

4   at the outset because there was a claim disclosed,

5   which was a minor claim, arising from Hurricane Wilma

6   and I may have well turned around and said that's okay

7   to quote and he would have taken it away and quoted it

8   accordingly.

9   Q.   Had you indeed examined the application at

10  the time of the quotation because of that previous

11  casualty?

12  A.   I don't recall reviewing it at the time of

13  the quotation.  It's just likely that it was presented

14  to me because there was a loss disclosed on the

15  application.

16  Q.   Was there any record that you reviewed

17  prior to you coming here today to determine whether you

18  looked at the application at that time?

19  A.   No, and I don't indeed make a log of the

20  applications that I review because certainly at that

21  time we were receiving some 200 a day.  And I wouldn't

22  have had time to initial each one or makes notes on

23  whether I had seen it or not.

24  MR. BEAGLE:   Okay.  I think that this

25  might be a good time for a brief break.

1          (Whereupon, a brief recess was taken.)

2     **Q.    (By Mr. Beagle)  Picking up where we left**

3  **off.  Mr. Usher, I believe that before we had a break**

4  **you said that you were processing perhaps 200**

5  **applications a day at the time that Doctor Rosin's**

6  **application came in?**

7     A.    I would figure around that, yes.

8  Probably -- because we were putting out around 200 to

9  220 quotes a day of which maybe 40, 50 would be

10  renewals and the remainder would be applications for

11  new business.  So, we would be reviewing some 160 to

12  170 applications.

13     **Q.    Was that an extraordinary rate of**

14  **applications coming in for your business?**

15     A.    Certainly, that was one of the busiest

16  times that we ever had.

17     **Q.    In the history of your company?**

18     A.    That's correct.

19     **Q.    What was the reason that it was so busy at**

20  **that time?**

21     A.    A number of domestic markets had withdrawn

22  from the - from writing yacht insurance, primarily

23  because of the event of Hurricane Wilma so was less

24  competition and we were therefore seeing more

25  applications.

1      Q.    Did you view this as an opportunity to

2    expand your market share?

3      A.    It was incidental.  Our basis for

4    remuneration is not based on the volume of premium we

5    transact.  We receive a flat management fee from Great

6    Lakes to handle the underwriting, which is based on a

7    cost-plus basis.  And then in addition to that we

8    receive a share of the underwriting profit.

9      Q.    How frequently are underwriting profits

10   determined?

11     A.    Annually.

12     Q.    Okay.

13     A.    But a year in arrears to allow the account

14   to develop.

15     Q.    Is this a general relationship that T.L.

16   Dallas has with all of the insurance companies that it

17   represents or just Great Lakes?

18     A.    Great Lakes is the only insurer that pays

19   us a flat management fee.  The other insurers pay us a

20   percentage of premium plus a share of the underwriting

21   profits.  However, Great Lakes is the core company that

22   we represent versus all the other insurers - all the

23   other insurers that we represent write business

24   alongside Great Lakes as opposed to instead of Great

25   Lakes.

Page 43

1       Q.      What precisely do you mean when you say

2   the other companies are writing insurance virtually

3   alongside Great Lakes?

4       A.      If, for example, the value of the vessel

5   exceeds one million dollars we have a contract with

6   Royal & SunAlliance that will write a share of the

7   risks alongside Great Lakes.

8               We have a Lloyds facility that writes

9   liability risks, whereby Great Lakes writes the hull

10  and Lloyds writes the liability.

11              We have a facility that writes excess

12  liability where Great Lakes writes either the primary

13  liability or Lloyds writes the liability alongside

14  Great Lakes writing the hull.  And the Lloyds

15  underwriters will write the excess liability.

16              So, there are no policies issued by T.J.

17  Dallas and/or now Osprey Special Risks that has no

18  involvement from Great Lakes, which is therefore our

19  core carrier.

20      Q.      How long has that been the case?

21      A.      Since 2005.  Prior to that Great Lakes was

22  our principal carrier, but we had a facility with

23  Alliance (phonetic) Insurance Company, which purely

24  wrote higher valued vessels.  Occasionally that did not

25  involve Great Lakes.

Page 44

1      Q.      Does Alliance still issue that kind of

2  policy in the United States?

3      A.      No.

4      Q.      So it's --

5      A.      Oh, sorry.  I don't know.  Not through us.

6      Q.      Did you ever discuss with anybody at all

7  Alliance the withdrawal from the U.S. market?

8      A.      No, that was their decision.  In all

9  honesty, following Hurricane Katrina because of the

10  losses they suffered on their reinsurance account and

11  their energy insurance account, not their yacht loss.

12      Q.      When there are other insurers that insure

13  alongside of Great Lakes, is that fact reflected on the

14  policy itself?

15      A.      Yes.  It's shown on the security as to the

16  insurers that are providing the security for either

17  their respective share or their respective section of

18  the policy.

19      Q.      Is there any firm or individual that's

20  responsible for coordinating the issuance of insurance

21  between Great Lakes and these other insurers that would

22  issue alongside?

23      A.      No, it's not required.  Great Lakes - each

24  underwriter writes for their own share, so the

25  liability is several.  So, in the event that there was

1  a loss – and for example, Great Lakes agreed to pay

2  their share but Alliance or Royal & SunAlliance didn't

3  agree to pay their share, then the security will be

4  split.  It's not what we refer to as a pooling

5  arrangement.

6      Q.   Is there anyone who coordinates the

7  allocation of risks among Great Lakes and these other

8  insurers?

9      A.   There are set rules and patterns, which is

10  why I'm stressing that it's not an alternative.  We

11  don't have a situation whereby we can either place it

12  with Great Lakes or Royal & SunAlliance, or place it

13  with Great Lakes or Alliance, or indeed Lloyds.

14          There are set parameters as to the

15  business that will be placed with Great Lakes.  And

16  it's only in the event that it exceeds that authority,

17  in terms of limit or type of risk, that we would invite

18  other or use our other authorities to co-insure with

19  them.

20      Q.   Are the set rules and parameters of

21  allocation provided to you by Great Lakes?

22      A.   Agreed to.  Agreed to by Great Lakes.  We

23  put forward to them the details of the kinds of risks

24  that would involve other insurers.  The primary

25  contract that we have with Great Lakes is mutually

Page 46

1  exclusive.

2       Q.    Is this partly a product of your

3  statistical section at --

4       A.    Not statistical, no.  It's purely and

5  simply by way of portfolio apportionment.  The maximum

6  limit we can expose Great Lakes to is one million

7  dollars on the hull and one million dollars on the

8  liability.  In the event that the vessel exceeds one

9  million dollars of hull value then we have to bring

10  other insurers on.  And there's a set formula as to how

11  that will happen.  It was in the event that the

12  liability limit required is exceeds one million dollars

13  then it would trigger the excess liability facility.

14       Q.    Are these set formulas agreed to by Great

15  Lakes, T.L. Dallas, and the other insurers?

16       A.    That's correct.

17       Q.    So everybody knows in advance which

18  formulas are being applied and when?

19       A.    That's correct.

20       Q.    Do you know why the name Great Lakes is

21  Great Lakes Reinsurance?

22       A.    Great Lakes Reinsurance is a 100 percent

23  owned subsidiary of Munich Reinsurance Company.  The

24  correct title, in fact - this is going to give us a

25  spelling problem is Munchener, M-U-N-C-H-E-N-E-R, Ruck,

1   R-U-C-K, Versicherung, V-E-R-S-I-C-H-E-R-U-N-G.

2              MR. GOLDMAN:  That's one word.

3        A.     Ruckversicherung is one word.

4   Ruckversicherung is the German for reinsurance.  Under

5   German insurance and reinsurance charters a reinsurance

6   company may not write insurance business, and an

7   insurance company may not write reinsurance business.

8              Under a British charter, which Great Lakes

9   is a British company, any company can write any kind of

10  business.  So effectively, Great Lakes Reinsurance,

11  which originally - back in 1968 - was a Canadian

12  insurance company that was purchased by Munich Re,

13  which is the abbreviated form of Munchener

14  Ruckversicherung.  And it was used purely - or

15  primarily, sorry, to write insurance business that

16  Munich Re could otherwise not write.

17             You'll find it's a fairly common corporate

18  set-up in Germany where most of the major German

19  reinsurance companies also own a company that can write

20  insurance business.  So, the ultimate risk taker in

21  actual fact was the parent company, which is Munich Re

22  as opposed to Great Lakes that doesn't retain risks per

23  se, it's more of a compliance office.

24        Q.    So, a company like Munich Re would be the

25  reinsurer in the strictest sense of the term for its

1    own subsidiary?

2         A.    Correct.  It provides all the financial

3    strength of Great Lakes.  Although Great Lakes, in its

4    own right, is rated by A.M. Best as an A plus 15

5    insurer, which is the highest rating you can obtain.

6    And has an asset base in excess of two billion pounds,

7    which would be around close to three billion dollars.

8         Q.    **Which agency has graded Great Lakes as an**

9    **A plus 15 insurer?**

10        A.    A.M. Best.

11        Q.    **So, the word reinsurance appearing in the**

12   **name Great Lakes Reinsurance is just a relic of its**

13   **former business?**

14        A.    That's correct.  In fact, today I don't

15   believe that the reinsurance content of Great Lakes'

16   business represents more than one percent.  It's 99

17   percent insurance and one percent reinsurance.

18        Q.    **Has anybody ever suggested it should**

19   **change its name to something else that more reflects**

20   **its business patterns?**

21        A.    It does have a trading name and trades in

22   the United Kingdom and throughout Europe and the Far

23   East as simply Great Lakes U.K.  But when it made its

24   application to the various insurance departments it

25   used its full legal title, which was Great Lakes

1  Reinsurance U.K. P.L.C.

2            And unfortunately, if you file a risk with

3  the insurance department and there is one letter wrong

4  between the name on the policy and the name they have

5  registered as the eligible surplus line insurer, they

6  will reject the risk.  It's also extremely difficult,

7  it would appear, to get the various insurance

8  departments to acknowledge a name change.  So they

9  simply haven't done it.

10       **Q.    In layman's terms, what is the difference**

11  **between insurance and reinsurance?**

12       A.    Insurance is original risk; reinsurance is

13  effectively laying off part of that risk, sharing that

14  risk with a partner behind the scenes.

15       **Q.    That's particularly useful when a**

16  **catastrophe is foreseen such as Wilma or Katrina?**

17       A.    Yes, it's widely used in terms of

18  protection against major catastrophic exposure, but

19  also where a risk represents a greater overall hazard

20  than a single company can afford to bear, or feels it

21  can afford to bear.

22       **Q.    Mr. Usher, did you see the Notice of**

23  **Taking Deposition that was issued by my office in order**

24  **to arrange this deposition?**

25       A.    Yes.

Page 50

1      Q.    Okay.  Was there somebody at Great Lakes

2   who asked you to appear on its behalf today?

3      A.    No.   I'm appearing as the representative

4   of Great Lakes and the person that knows more about

5   this business than anybody else, and certainly more

6   than anybody at Great Lakes would know.

7      Q.    Did you essentially make an executive

8   decision that you would be the one who would be here to

9   represent Great Lakes?

10     A.    We would have contacted Great Lakes the

11  moment we instigated proceedings in their name.  From

12  that point onwards they would have granted us authority

13  to conduct the matter, and also approve the appointment

14  of Counsel.

15     Q.    Is that pursuant to a written agreement

16  between yourselves and Great Lakes?

17     A.    It's part of the contract that we have

18  with Great Lakes that in the event that we are going to

19  either act as a Defendant or as a Plaintiff in any kind

20  of legal action that we advise them of the action being

21  taken and they have the right to approve it or

22  disapprove it.

23     Q.    Is that part of the yacht contract that

24  you first developed in 1990?

25     A     No.  The format of the contract today -

Page 51

1    and indeed over the last four or five years - is

2    slightly different in format than the contract I

3    originally negotiated with the other insurers back in

4    1990.

5         Q.    When was the last time that there was a

6    material change to that contract?

7         A.    January, 2007.

8         Q.    What in general terms was the subject of

9    that change?

10        A.    It was a more extensive contract in terms

11   of detailing all the various responsibilities and so

12   on.  And also insuring compliance with the United

13   Kingdom Financial Services Authority where as the prior

14   contract was a much briefer affair, if you'd like.  The

15   contract previous to that was probably only 16 pages

16   long and the contract is now some 57 pages long.

17        Q.    Okay.

18        A.    Benefit of regulation.

19             (Whereupon, an off the record discussion

20        was had.)

21        Q.    (By Mr. Beagle)  I would like to show you

22   a document that was attached to the Complaint by

23   Counsel.  And I do believe that it bears the notation

24   at the bottom, TLD/5/PPO.

25             (Whereupon, the referred to document was

UNITED REPORTING, INC.
954-525-2221

Page 52

1              marked as Defendant's Exhibit Number 2 for

2              Identification by the Court Reporter.)

3         Q.    (By Mr. Beagle)   Mr. Usher, I'll ask you

4    to take a look at Defendant's Exhibit 2 and ask you if

5    you recognize it?

6         A.    Yes, I do.

7         Q.    Can you please identify it in general

8    terms?

9         A.    Yes.   This is our standard yacht policy

10   which is detailed at the bottom as TLD/5/PPO.   It was

11   the policy wording that we were issuing on the bulk of

12   the policies that we wrote from November 2005 until

13   November 2008 when we put a revamp policy into the

14   market place with no massive material changes.

15              The five does not refer to the year, it's

16   just simply the version.   It's just coincidence that it

17   happened to be brought out in 2005.   This was drafted

18   by T.L. Dallas.   As mentioned earlier, the people

19   involved were myself, Mark Thomas and Nick Brown, and

20   presented to insurers for discussion and approval as

21   the start of the policy that we would issue on their

22   behalf on the business we wrote on their behalf on our

23   yacht account.

24        Q.    And the exceptions to the use of that form

25   would be PYP2 policies; correct?

Page 53

1          A.     That's correct, which is an abbreviation

2      of Premier Yacht Policy, which was used on higher

3      valued modern vessels.

4          Q.     **When you issue this kind of policy to an**

5      **insured, is it on a take-it or leave-it basis?**

6          A.     Yes.

7          Q.     **Is that document complete in and of**

8      **itself, that exhibit that is?**

9          A.     Yes.

10         Q.     **There's no part of that that's missing**

11     **from what you have?**

12         A.     No.   That's what I was checking earlier

13     when I would check that I recognized it.

14         Q.     **Is there any part of that that was**

15     **modified on behalf of the insured to reflect which**

16     **particular vessel is being insured, for example?**

17         A.     There would have been a policy schedule

18     that would have been at the front of this document.

19     This would have been attached to the policy schedule,

20     which would detail all the details about the vessel

21     itself, the premium that was being charged, the

22     deductible being imposed, the navigation limits, and

23     any other specific warranties not addressed within the

24     main body of the policy.

25         Q.     **Is that policy schedule expressly**

1   incorporated into that document, Exhibit 2?

2          A.    Yes, it's collectively the policy

3   document.

4          Q.    Can you tell me where in the policy it

5   expressly incorporates the policy schedule?

6          A.    It would be issued with the policy

7   schedule.  I believe it also incorporates the

8   application form.  But I shall read through and tell

9   you where it is.

10         Q.    Okay.  Take your time, please.

11         A.    It's in Section C of General Conditions 9.

12  It states:  This insuring agreement incorporates in

13  full your application for insurance and together with

14  any endorsements issued herein constitutes the entire

15  contract between us.  At your request, various

16  provisions of this insuring agreement may be varied by

17  us but only by our prior written agreement.

18         Q.    Were there any endorsements that were

19  issued along with this policy --

20         A.    If you --

21         Q.    -- in the case of Doctor Rosin?

22         A.    If you can show me the policy schedule it

23  will detail if there were any endorsements.

24         Q.    Can I take a quick look at that?

25         A.    Sure.

Page 55

1          Q.      Thank you.

2                  (Whereupon, the following document was

3          marked as Defendant's Exhibit Number 3 for

4          Identification by the Court Reporter.)

5          Q.      (By Mr. Beagle)  I'm going to show you

6   what I'll call Composite Exhibit 3, which is actually

7   the three remaining pages of Exhibit B to the Complaint

8   herein.  And I ask you to look at those three pages and

9   tell me if you recognize them?

10         A.      Yes, I do.

11         Q.      Is any part of that composite exhibit the

12  policy schedule that you were referring to?

13         A.      Yes.  Page 1 and 2 is the policy schedule.

14  It's a document headed Cover Note, which is our way of

15  expressing policy schedule.  It details the name of the

16  insured, the name of the broker, details about the

17  vessel, the value of the vessel or sum insured, the

18  deductible, the premium.

19                 On Page 2 it details the navigational

20  limits of the vessel, the conditions, which is

21  TLD/5/PPO, warranted private pleasure use only.  And

22  then warranties, which are warranted that the vessel

23  will not navigate south of the Tropic of Cancer; and

24  warranted no known or reported losses as of the 8th of

25  February, 2007.  There were no other endorsements

Page 56

1    referred to on the original policy schedule.

2              Page 3 is endorsement number one.  That

3    was issued some five months after the original policy,

4    which is naming Bank of the West in Cincinnati, Ohio as

5    a loss payee.

6         Q.    May I take a look at that?  Judging from

7    the contents of Composite Exhibit 3, does the policy as

8    a whole issued to Doctor Rosin consist solely of

9    Exhibit 3 and Exhibit 2 together?

10        A.    That's correct.

11        Q.    If you could take a quick look at Page 3

12   of that exhibit.  Why was it necessary to issue that

13   policy endorsement on July 9th rather than at the time

14   of the original issuance?

15        A.    Because that's when we were approached by

16   the broker requesting it.

17        Q.    Do you know why the broker approached you

18   about that?

19        A.    No.  Presumably that it comes to light

20   that the Bank of the West required to be named as a

21   loss payee.

22        Q.    Did that new circumstance present a

23   problem to T.L. Dallas or Great Lakes?

24        A.    No, it doesn't extend coverage.  It's only

25   noting them that in the event of a claim that they have

Page 57

1       to be noted on the payment.

2              Q.     Or it doesn't increase your liability in

3       any way?

4              A.     No.

5              Q.     Would the absence of that endorsement

6       increase your liability in any way?

7              A.     No.

8              Q.     Did you take any steps to prepare for this

9       deposition other than speaking with Mr. Goldman or any

10      other attorney?

11             A.     I read the reports from Nautilus

12      Investigations.  I read the depositions of Doctor

13      Rosin, Paul Rosin, and Joe Kolisch of U.S.A. - and

14      beyond that, no.

15             Q.     So, the documents that you just named, the

16      deposition transcripts and the Nautilus report are the

17      only things that you reviewed before coming here today?

18             A.     I believe so, yes.

19             Q.     Did you speak to anyone other than Mr.

20      Goldman in preparation for today's deposition?

21             A.     Don't believe so, no.  I may have had a

22      comment with Mark Thomas, who is my claims director.  I

23      don't recall it, but you know, that may have been two

24      or three weeks ago when I told him I was coming over

25      here to do a deposition.  But beyond that, no.  I don't

Page 58

1    recall discussing it with anyone.

2         Q.    Are you aware that there was a mediation

3    of this case within the last month?

4         A.    Yes.

5         Q.    Are you aware that there was a

6    representative of T.L. Dallas on the phone?

7         A.    That's correct.  That would have been Mark

8    Thomas.

9         Q.    Did Mark Thomas tell you the events that

10   happened in the course of the mediation?

11        A.    No.

12        Q.    Was there any other individual that you

13   consulted inside or outside of T.L. Dallas in

14   preparation for this deposition?

15        A.    No.

16        Q.    A moment ago you referenced the Nautilus

17   report.  What precisely did you mean by that?

18        A.    When the incident occurred I believe we

19   initially appointed Stewart Hutchinson, who was a local

20   surveyor, to look at the boat.  And then we appointed

21   Nautilus to investigate the circumstances surrounding

22   the loss.

23              Their investigation encompassed the

24   circumstances of the incident, and background checks on

25   the individuals involved, and also an interview with

Page 59

1    the operator at the time of the incident, and those are

2    the papers that I reviewed.

3         Q.    Do you recall how lengthy the report was?

4         A.    I tended to review the summaries rather

5    than all the associated attached documents.  Probably

6    in all there was some, just guessing, 130, 140 pages.

7    I reviewed probably 30 or 40 of those.  I didn't look

8    at the attachments behind them because summaries of

9    what was attached was included in the summary in front.

10        Q.    When did you have an opportunity to review

11   those documents?

12        A.    I read those last night.

13        Q.    Okay.

14        A.    But I had reviewed them some time ago.

15        Q.    When was the previous time you reviewed

16   them?

17        A.    I can't remember the date.

18        Q.    Was it more than six months ago?

19        A.    Probably.

20        Q.    I'll get back to some of those matters.

21              Are you aware of anyone being instructed

22   not to alter, lose, delete, or otherwise modify the

23   documentation regarding this claim at T.L. Dallas?

24        A.    We have a specific procedure in the event

25   that -- I will stress that we never modify or whatever

1  documents, regardless.  But in the event of litigation

2  the file is immediately protected by Mark Thomas, who

3  is also a qualified lawyer, and immediately dispatched

4  to Counsel in its entirety without any interference,

5  even to the extent of not placing it in chronological

6  order which causes a few problems to our Counsel

7  occasionally.  But effectively, it's the equivalent of

8  putting a police tape around it.

9       Q.    I assume that when you reviewed the

10 Nautilus reports they were photocopies of the

11 originals?

12      A.    That's correct.  I think they may well

13 have been transmitted to us electronically and printed

14 off as opposed to photocopies, but they were certainly

15 clear copies.

16      Q.    Is there a general policy that governs the

17 management of records at T.L. Dallas such as the kind

18 we're discussing here?

19      A.    Yes.  There's a general policy as regards

20 to maintenance of files and records from a general

21 administrative prospective; and a separate policy with

22 regards to anything involving litigation.

23      Q.    What in general terms is the separate

24 policy regarding matters involving litigation?

25      A.    Effectively, what we're doing is locking

Page 61

1   the file off, so you can't add to it, subtract from it,

2   amend it, or adjust it.

3        Q.    And are you referring to electronic files

4   in addition to paper files?

5        A.    Electronic files are - automatically can't

6   be amended.  We have a scanner system which precludes

7   any amendment of documents, and also locks the file

8   off.  And we also have a computerized logging system

9   where anybody accessing the file is recorded

10  immediately as the individual, time, and date of

11  access.

12       Q.    Did you at any time note who had consulted

13  the files regarding Doctor Rosin's claims?

14       A.    It was locked off in favor of Mark Thomas,

15  so nobody could access that file without his approval.

16       Q.    Is Mark Thomas what we would call in this

17  country the general counsel of T.L. Dallas?

18       A.    No.  He's the claims director, he just

19  happens to be a qualified lawyer.  He's what we refer

20  to in the U.K. as an L.L.B. Honors.

21       Q.    Ons?

22       A.    Honors, with honors.

23       Q.    With regard to his functions at T.L.

24  Dallas, does he function as a lawyer?  Does he provide

25  legal counsel?

Page 62

1    A.    He manages litigation with local counsel

2 or counsel appointed by or approved by Great Lakes.

3 But he doesn't act as a lawyer.  He just has legal

4 training.

5    Q.    Next, I will show you what was Exhibit A

6 in its entirety to the Complaint in this action.

7         MR. BEAGLE:  Please mark this as Exhibit

8         No. 4.

9         (Whereupon, the referred to document was

10        marked as Defendant's Exhibit Number 4 for

11        Identification by the Court Reporter.)

12   Q.    (By Mr. Beagle)  Does that document appear

13 to be complete?

14   A.    Actually no, it should have a fourth page,

15 but it's not particularly relevant.  All it is is an

16 alert by individual states about making fraudulent

17 statements and so on on application forms.  But from an

18 information prospective, yes, it is.

19   Q.    Would that exhibit contain all the

20 information that is particular to this matter?

21   A.    That's correct.

22   Q.    Can you describe in general terms what

23 that is?

24   A.    It's a yacht application form that was

25 designed by ourselves for the purpose of submitting

Page 63

1    information for assessment and determining if

2    appropriate for a quotation.  And would provide us

3    with – if fully completed – adequate information for us

4    to provide an invitation of premium and/or terms that

5    we would be willing to entertain the risk of.

6         Q.    Is there any printed notation on that form

7    that reflects that it is a proprietary product of T.L.

8    Dallas?

9         A.    I wouldn't describe it as proprietary

10   inasmuch as we do not preclude other people from using

11   it.  We likewise don't put our logo on, which enables

12   brokers to put their logo on, if they want to use it

13   for advertising or whatever.  It is the application

14   form we insist on but we would be quite happy if

15   another insurance company accepted this type of

16   application form.  So, it's not a copyrighted document.

17   It is not proprietary in that way.

18        Q.    How long has that particular yacht

19   application form been in use by T.L. Dallas?

20        A.    I think we may have made a few minor

21   amendments over the years.  This one certainly has been

22   in use for four or five years.

23        Q.    Okay.

24        A.    But fundamentally it's not changed in 15

25   years.

Page 64

1          Q.    Can you tell me which specific portions of

2    the form have actually changed in the last 15 years?

3          A.    No.   I just believe it's artwork more than

4    content.   I can't think of a question that we -- Oh,

5    yes.   I can now.   On Page 3, which you'll see is Page 3

6    of 4 and the fourth page being the alert about

7    misrepresentation and fraudulent statement, you'll see

8    guidance notes.   These particularly relate to

9    chartering the vessel, racing the vessel, using the

10   vessel for any other kind of commercial purpose, and

11   the employment of paid crew.   Those are new additions

12   and trigger supplementary sheets on the application

13   form if the insured was engaged in any of those

14   activities.

15         Q.    May I see that for a moment?   Do you

16   recall who originally drafted that form?

17         A.    Again, it almost certainly would have been

18   myself, Mark Thomas, and Nick Brown, the authors of the

19   policy wording.   Probably with some input from the

20   administration department and certainly with input from

21   them as regards to the artwork and getting it to fit an

22   American A4 machine as opposed to a British A4 machine

23   as our paper is slightly larger.

24         Q.    Have any of the changes that occurred in

25   the last 15 years been the result of any litigation

UNITED REPORTING, INC.
954-525-2221

1   that had been engaged in by Great Lakes or T.L. Dallas?

2        A.    Not that I recall.  I believe we brought

3   out a new application form recently, but it's hard for

4   me to say.  Mark Thomas' input may well be as a result

5   of his review of litigation, but I can't think of

6   anything here certainly of a material nature that is as

7   a result of litigation.

8        Q.    Would Mark Thomas have told you about any

9   changes that he made to the form as a result of

10  litigation?

11       A.    Well, he wouldn't necessarily refer to it

12  as a result of litigation.  He would say I recommend we

13  do this and if it made sense to us we would have done

14  it.

15       Q.    Were any of the changes made as a result

16  of confusion of terminology in the interpretation by

17  insureds?

18       A.    Sorry, I don't recall.

19       Q.    Has anyone ever told you that there were

20  aspects of this particular application that were

21  unclear to those who were filling it out?

22       A.    Some people have tried to argue that it is

23  unclear.  I remember one instance under the question

24  about losses:  Have you or any named operator been

25  involved in a marine loss in the last ten years,

1    insured or not, somebody tried to argue that because

2    his boat had caught fire that it didn't constitute a

3    marine loss.  But beyond that I can't think of anything

4    else.  That one stuck in my mind for some reason.

5         Q.    Probably the absurdity of it.

6               (Whereupon, an off the record discussion

7         was had.)

8         Q.    (By Mr. Beagle)  Do all of your brokers

9    use this application when they are gathering

10   information for the issuance of T.L. Dallas or Great

11   Lakes insurance?

12        A.    We are frequently willing to indicate

13   terms based on other application forms, but we will not

14   issue a policy until this application form has been

15   completed and signed.

16        Q.    So, you will accept others for

17   informational purposes only?

18        A.    Correct.

19        Q.    Does T.L. Dallas or any of its brokers

20   issue any explanatory sheets that further explain the

21   meaning of the terms in the application?

22             MR. GOLDMAN:  Object to the form.

23        A.    Not in the application form.  We ask them

24   to read through the policy form and the policy

25   coverages, and ensure that they are fully conversant

1   with all the coverage aspects and invite them to ask

2   any questions where they are unclear as to what we

3   mean.   And part of the operating instructions is an

4   undertaking that they have read and they have

5   understood and they have asked any questions that they

6   have.   I don't think we've ever asked them to go as

7   specifically as regards to the application form, but

8   there's certainly a strong implication that we require

9   the broker to understand exactly what we're doing, what

10   our terminology is, and how an account will operate

11   before we conduct any business with them.

12        **Q.    So, part of the purpose of the operating**

13   **instructions is to ensure that the brokers themselves**

14   **understand any term that's provided in the yacht**

15   **application?**

16        A.    That's correct.  We also provide them with

17   a manual which details all our terminology where we use

18   phraseology or whatever.  It details exactly what that

19   phraseology means.

20             For example, current survey.  It will be

21   ambiguous to just say current survey, so we detail what

22   we mean by a current survey; how old it can be, how

23   modern it has to be, anything to do with the operation

24   of the contract.  We provide them with a manual giving

25   them guidance so that they're able to provide us with

Page 68

1    all the information we require.

2           Q.    So, the manual is a separate document from

3    the operating instructions?

4           A.    Yes.  But we don't require them to sign

5    that, we just issue it.  It's for guidance purposes.

6           Q.    Did you provide that manual to USI

7    Insurance?

8           A.    Yes.

9           Q.    How are you certain of that?

10          A.    Because I hand delivered it to them in

11   October, I think the 19th, 2005.  I know it was about

12   five days before Hurricane Wilma.

13          Q.    Who did you hand that to?

14          A.    Joseph Kolisch.

15          Q.    Were you aware that Joseph Kolisch had his

16   own insurance agency before being associated with USI?

17          A.    I believe he did, yes.

18          Q.    In general, is your – are your business

19   dealings with Joseph Kolisch direct or do you do

20   anything using the USI head office as an intermediary?

21          A.    In that office we tend to deal with Joe

22   Kolisch and/or one of his assistants.  But I believe we

23   also deal with the USI office in Tampa.

24          Q.    Does Mr. Kolisch have any association with

25   the USI office in Tampa as far as you know?

1       A.      Not that I'm aware of.

2       Q.      In general, do you regard the business

3  association of Joseph Kolisch to be totally separate

4  from that with the office in Tampa?

5       A.      Yes.

6       Q.      Would you say the same thing regarding the

7  USI office in the midwest?

8       A.      Yes, if we deal with the office in the

9  midwest.

10      Q.      So, Mr. Kolisch is the person you would

11 approach with the vast majority of your concerns

12 regarding policies that are written through his office?

13      A.      Yes.  If I was going to discuss the

14 business transactions between ourselves and this office

15 of USI it would be Joe Kolisch I would speak to.

16      Q.      Do you recall the names of the associates

17 with whom you might deal in Mr. Kolisch's office other

18 than Mr. Kolisch himself?

19      A.      I vaguely remember there was an Annamarie.

20      Q.      Annamarie Schultz perhaps?

21      A.      Annamarie.  I don't actually recall the

22 names of anybody else.  Primarily - I mean, I was

23 introduced to them but I didn't conduct much in the way

24 of conversations with them.

25      Q.      How many times have you met with Mr.

1    Kolisch face-to-face?

2        A.    Five, maybe six.

3        Q.    Do you recall when those times were?

4        A.    There was one occasion in London, but I'm

5    trying remember when that was.  Mostly it was in

6    October when I was attending the Fort Lauderdale

7    Mariner's Conference.  We used to normally go to his

8    office in Miami on our way up to Fort Lauderdale.  We

9    may certainly have visited his office on other

10   occasions, but I come to the United States probably

11   five times a year.  I do not see Joe Kolisch every time

12   I come here.  So, I would say maybe once a year, but

13   not every year.

14       Q.    When you say you went to the Fort

15   Lauderdale Mariner's Conference, was that October of

16   2008?

17       A.    Yes, and 2007, and every year back until

18   1993.

19       Q.    When was the last time you visited the

20   United States prior to this occasion?

21       A.    In October 2008.

22       Q.    And prior to that do you recall when you

23   were here?

24       A.    I was here in July 2008, April 2008,

25   February 2008.  Prior to that October 2007.  Now you're

Page 71

1    testing me.

2         Q.    What are your purposes for this visit into

3    the United States other than attending this deposition?

4         A.    Vacation.

5         Q.    On Exhibit No. 4 I'll ask you to take a

6    look at the second page.  About midway down the page

7    there is a section that says:  Operators - always list

8    insured as operator number one, et cetera.

9         A.    Correct.

10        Q.    Are you familiar with that section of the

11   application?

12        A.    Yes.

13        Q.    Have there been any changes in that

14   section of the application in the last 15 years?

15        A.    Not that I'm aware of.  I think we might

16   have changed the - expanded the space for operators but

17   basically the same questions are being asked as were

18   being asked previously; so a change only to the

19   artwork.

20        Q.    But, as far as you know in the last 15

21   years there's been no change in the wording of that

22   section of the application; is that correct?

23        A.    Not that I can recall.

24        Q.    Forgive me if I asked you this before, but

25   who was it in the underwriting department that examined

Page 72

1   Doctor Rosin's application at the time of issuing the

2   quotation?

3          A.    It was Neil Burton, I believe.

4          Q.    Is there anything in that application or

5   any of the other documents that you've seen this

6   morning that shows it was Neil Burton?

7          A.    Not in the documents I've seen, but I just

8   recall from my underwriting file that the initial

9   quotations that we issued had Neil Burton's name on it.

10         Q.    Do you believe that he was the only

11  underwriter who examined at the time of the quotation

12  issuance?

13         A.    As I said earlier, it may well be that he

14  brought it to me because there was a disclosure of a

15  loss on the application form.  I don't recall having

16  seen it, but he may well have provided or asked me to

17  have a look at it.  It may well be that he felt

18  sufficiently comfortable with a hurricane loss of only

19  $4000 that he was content to write it without reference

20  to me.

21         Q.    Do the underwriters in general pay

22  particular attention to the operator section of the

23  application?

24         A.    Yes.

25         Q.    For what purpose?

1      A.    It's essential as far as we're concerned

2  to determine who the operators of the vessel are, their

3  appropriate experience, age, background, and so on.  As

4  far as we're concerned in determining risk exposure

5  there are fundamental areas of concern; and obviously

6  the type of the vessel, the age of the vessel, the

7  location of the vessel, where the vessel is going to

8  go, and who's going to take it there.

9            (Whereupon, a brief recess was taken.)

10     Q.    (By Mr. Beagle)  Back on.  A few questions

11 to follow-up on what we spoke about before the break.

12 Are you familiar with USI's operation in the midwest?

13     A.    Not closely, no.

14     Q.    Is there anybody at T.L. Dallas that is?

15     A.    If we do any direct business – let's say

16 we transact business directly with their midwestern

17 office there would be somebody in my office that is.  I

18 wasn't aware that we did.

19     Q.    I'm not aware of it either, that's why I'm

20 asking.  You wouldn't happen to know where the head

21 office of USI Midwest would be; would you?

22     A.    No.  I'm guessing it to be Texas, but I

23 don't know.

24            MR. BEAGLE:  Off the record.

25            (Whereupon, an off the record discussion

1    was had.)

2        Q.    (By Mr. Beagle)  Did you check at any

3    point to see if Doctor Rosin had been a previous

4    insured of T.L. Dallas or Great Lakes or --

5              MR. GOLDMAN:  Object to the form.

6        Q.    -- or any of the associated companies

7    particularly through USI Midwest?

8        A.    Probably.  I didn't personally check it.

9    We normally have a procedure where we check on an

10   insured's name to establish whether we have afforded

11   the risk to anybody else or if there is a live policy,

12   but it would depend how far back it went.

13             The database that we're currently

14   operating - because we changed the operating platform

15   of our database in 2003 - would only go back to 2003.

16   We would have to look at our archive documents, and

17   because that wouldn't be a live risk then we wouldn't

18   normally check our archive documents when we're

19   presented with a new application form.  What we are

20   primarily checking for is to see if we have written the

21   account in the last couple three years, but more

22   importantly, whether we have a live quote or live

23   policy for that insured.

24       Q.    Did anyone at any time at T.L. Dallas

25   check to see if Doctor Rosin had been an insured prior

Page 75

1    to 2003?

2         A.    No.

3         Q.    So, as we sit here we really don't know?

4         A.    No.

5         Q.    If she had been an insured through Royal &

6    SunAlliance – do I have that name right – would that

7    have been a policy that would have been administered by

8    T.L. Dallas?

9         A.    No.

10        Q.    A little while ago when we were discussing

11   the operating discussions in the manual you mentioned

12   that T.L. Dallas recommends that questions be asked

13   regarding the contents of the application and the

14   meaning of it; correct?

15        A.    Contents of the policy wording.  We don't

16   specifically ask them to review the application form.

17   But we would expect if a broker had any concerns about

18   the nature of the questions we were asking or what we

19   meant by the questions we were asking, we would expect

20   them to raise it.

21        Q.    With T.L. Dallas directly?

22        A.    With us, yes.

23        Q.    What if a potential insured had a question

24   about the policy contents?

25        A.    They should ask their broker.

1          Q.     What if a potential insured has a question

2     about the significance of any term in the application?

3          A.     Ask the broker.

4          Q.     What are the consequences if the broker

5     answers the insured's question and gets it wrong from

6     T.L. Dallas' point of view?

7          A.     The insured would have recourse against

8     the broker.

9          Q.     I'd like to show you a previous insurance

10    application that had been completed by Doctor Rosin in

11    around 2004.  And it might take awhile for me to locate

12    it.  This is --

13               MR. BEAGLE:  Actually, I'm going to ask

14          you to mark this as Defendant's 5.

15               (Whereupon, the referred to document was

16          marked as Defendant's Exhibit Number 5 for

17          Identification by the Court Reporter.)

18          Q.     (By Mr. Beagle)  I'll show it to Mr. Usher

19    and his Counsel.  I'll note for the record, that the

20    Bate number notation of this exhibit is USI/Rosin 0099

21    through 100.  And the significance of that is that this

22    document was provided to us by USI Insurance in the

23    course of its deposition.

24               Have you ever seen that document before,

25    Mr. Usher?

Page 77

1    A.    I don't believe so, no.

2    Q.    **Have you ever seen a form that's similar**

3    **to it?**

4    A.    I've seen the Acord Watercraft Application

5    Forms.

6    Q.    **Is that a form that is frequently used in**

7    **the industry?**

8    A.    Not by us, but I believe it's used –

9    there's a number of forms that – I think it's just

10   available from printing firms, I think, or whatever.

11   Q.    **Do you have any idea if there is a**

12   **copyright on that form?**

13   A.    I don't believe there's a copyright.

14   Although it says Acord Corporation 1992, but I don't

15   think that they -- because Acord is not an insurance

16   company or anything like that, it's a printer of some

17   kind.  I think Acord forms are used for various types

18   of insurance in the United States and accepted by some

19   insurance companies.  Most insurance companies have a

20   more proprietary form.

21   Q.    **Did Joe Kolisch or his agency ever submit**

22   **to you a Watercraft Application on behalf of any**

23   **potential insured in the general format that's**

24   **represented by Exhibit 5?**

25            MR. GOLDMAN:  Object to the form of the

1       question.

2       A.     I don't know.  It's quite possible that

3    they would have - that they sent us an Acord Watercraft

4    Application form and it's quite possible that we were

5    given a rough indication of our terms or the terms that

6    we would apply subject to an acceptable Yacht

7    Application Form.

8              MR. BEAGLE:   May I ask what the exact

9         nature of the objection of the objection form

10        is?

11             MR. GOLDMAN:   Yeah, I think your question

12        was extremely vague and general.  I think you

13        asked him whether - some words to the effect of

14        whether he had ever seen or seen something

15        generally like this.

16             Let me hear the question back and I'll be

17        more precise for Counsel.

18             (Whereupon, the referred to question was

19        read back by the Court Reporter as above

20        recorded.)

21             MR. GOLDMAN:   Objection to the use of that

22        term general format.  I think that's vague and

23        subject to all kinds of confusion.  And that's

24        why I object to the form of the question,

25        Counsel.

Page 79

1           MR. BEAGLE:  Thank you.

2           MR. GOLDMAN:  What does general format

3      mean?

4           MR. BEAGLE:  You don't know?

5           MR. GOLDMAN:  No.  That's why I objected.

6      Do you?

7           MR. BEAGLE:  I said it, so I --

8           MR. GOLDMAN:  I'm sure you know what it

9      means.

10          **Q.    (By Mr. Beagle)  Mr. Usher, did you**

11     **understand what I meant by general format?**

12          A.    Yeah, I think you meant had we received

13     similar types of Watercraft Application Forms from

14     Kolisch in the past.  And the possibility is that we

15     have.

16          **Q.    Okay.  On Exhibit No. 5, I asked you to**

17     **look at the second page and the second section there it**

18     **says:  Operators, in all caps, and then it says in**

19     **parenthesis:  List all residents and dependents**

20     **licensed or not and regular operators.  Actually,**

21     **that's in brackets.  Do you see that section I'm**

22     **referring to?**

23          A.    Yes, it's in double brackets, poor artwork

24     I would assume.

25          **Q.    Do you believe that there's a substantial**

Page 80

1   difference between the information that's sought by

2   Exhibit 5 and the information that is sought by the

3   form represented by Exhibit 4 in the "operators"

4   section?

5        A.    Well, it simply used the expression

6   regular operators, which I would think is somewhat

7   ambiguous.  We just use the word "operator".

8        Q.    When you use the term "operators" in your

9   application, what are you referring to?

10       A.    Anybody that's going to operate the boat,

11   that is intending to operate the boat.

12       Q.    Anybody who's intended to operate the

13   boat?

14       A.    Yes, anybody that the insured wants

15   approval and coverage to operate the vessel.  That's

16   why we say all operators must be detailed.

17       Q.    Is the definition of operator provided in

18   the manuals that are provided by T.L. Dallas to Mr.

19   Kolisch?

20       A.    Most certainly we refer to what do we mean

21   by operating a boat.  But as far as the application

22   form is concerned, I don't think we require any - or I

23   don't think we were given any further guidance than

24   stating that all operators must be detailed.

25       Q.    So, for the purpose of your application

1   would the general definition of operator be one who

2   operates a boat?

3          A.    Correct, somebody at the helm of the boat,

4   in command of the boat.

5          Q.    And can you tell me precisely what you

6   mean by being in command of the boat?

7          A.    Being in command, being in charge of the

8   navigation of the vessel.

9          Q.    The navigation would include the

10  destination of the vessel?

11               MR. GOLDMAN:   Object to the form.

12         A.    What do you mean by the destination of the

13  vessel?

14         Q.    Strike that.  What precisely do you mean

15  by the navigation of the vessel?

16         A.    Any time the vessel is underway, moving

17  under its own power.

18         Q.    Would you consider it to be in navigation

19  at a time that it's in an active shipping channel but

20  essentially stationary?

21         A.    If it is underway and under its own power

22  and it's in the water then yes, that's navigating or

23  operating the vessel.

24               The only time the vessel would be moving

25  when it is not being operated by an operator is when

1    it's being towed.

2         Q.    So, would you consider it to be in

3    navigation at all times when it is not in the dock and

4    not being towed?

5         A.    Correct.

6         Q.    In the yacht application do you expect the

7    applicant to anticipate everyone who is going to

8    operate the boat?

9         A.    Yes.

10        Q.    Under all circumstances?

11        A.    Yes.  The only time when we would make an

12   announce is in the event of an impending hurricane.  If

13   the vessel was an absentee owner that they could

14   normally within the hurricane plan detail another

15   person that could move the vessel for its own safety.

16   Beyond that all operators have to be listed.

17        Q.    Is that explanation in writing any place?

18        A.    In the application form - all operators

19   must be detailed.

20        Q.    I mean the part about operators under all

21   circumstances except for an impending hurricane?

22        A.    The aspect of moving the vessel for an

23   impending hurricane would be in the hurricane plan, not

24   in the original application form, that's supplementary

25   information we may request, whereby part of the

1    hurricane plan is in the event that you are not going

2    to move the vessel away from an impending storm, and

3    that is part of your plan.

4              For example, the vessel is not in storage,

5    the vessel is not in a marina that is part of a

6    hurricane club where the vessel is going to be hauled.

7    So if part of your hurricane plan is, for example, to

8    move the vessel up river and you are an absentee owner

9    then you list on your hurricane plan who it is you

10   intend to move the vessel if you're not there.

11        Q.    Do you require a hurricane plan of all

12   insureds who are located within Florida?

13        A.    No.

14        Q.    What provisions for safety would you

15   expect someone who has not submitted a hurricane plan

16   to use in case of a hurricane?

17        A.    Just take prudent measures, whatever you

18   do to protect their own equipment.  Likewise the

19   hurricane plan isn't a warranty, it's only a suggestion

20   as to this is what we would like you to do.  It's

21   supposed to promote thought, not supposed to be a

22   warranty because we know that people cannot always we

23   home for the hurricane plan.

24        Q.    Is it equally true that there are other

25   kinds of emergencies that cannot be anticipated other

Page 84

1    than hurricanes?

2         A.    Oh, certainly, yes.  The vessel could

3    become distressed at sea and the services of a salvage

4    may be employed.  Like I said, there are other

5    emergencies.

6         Q.    Okay.  Can you think of any others off the

7    top of your head?

8         A.    Primarily it's going to be salvage.

9         Q.    What about incapacity of the regular

10   operator?

11        A.    Oh, yes, of course.  If lost at sea, had a

12   heart attack or fell and injured themselves, or

13   whatever, then again, it would be prudent for somebody

14   else to take over to bring the vessel in, and indeed

15   the injured party.

16        Q.    And under those circumstances if someone

17   did take over, would T.L. Dallas deny coverage?

18        A.    Probably not.

19        Q.    Probably not?

20        A.    Probably not.

21        Q.    Why not?

22        A.    Because we believe that under those

23   extraordinary circumstances it was the most appropriate

24   action to take.  At the end of the day we always use an

25   expression that every insured should act as a prudent

1   uninsured.  What would you do if you did not have an

2   insurance policy.

3            Of course, if you are out at sea and you

4   injure yourself and you happen to be out with your 11

5   year old child who's never operated a boat in their

6   life before, then the prudent activity would be in fact

7   to call for salvage or call for immediate assistance

8   because clearly the 11 year old child would be

9   incapable of operating the boat.

10       Q.    The statement that you just gave me:

11   **Every insured should act as a prudent uninsured.**

12       A.    Correct.

13       Q.    Is **that a phrase that was coined by you or

14   somebody at your agency, or is that --**

15       A.    It's widely used in the marine insurance

16   industry.

17       Q.    **Who determines what the prudent acts would

18   be?**

19       A.    Unfortunately, that's a point of

20   conjecture after the incident as to whether it was

21   prudent.  And what we normally do is advise - for

22   example, in the event that there's a salvage issue and

23   the person is at sea and they can't contact their

24   insurance broker or an insurer or whatever to get

25   advice, then the general standing advice is act as a

1    prudent uninsured.  What would you do if you didn't

2    have an insurance policy.

3         Q.    Would you say this is a guiding principle

4    for your determination of whether claims are going to

5    be paid?

6         A.    No, not as regards coverage.  It's just a

7    standing advice to every marine insured.

8         Q.    Okay.

9         A.    That confronted with a disaster scenario

10   that you should act prudently as though you didn't have

11   an insurance policy.

12        Q.    Does that standing advice have any impact

13   on the actual coverage that is observed by the

14   insurance company?

15        A.    Not normally, no.  Effectively,

16   providing -- normally speaking, what it's referring to

17   is that would you abandon the vessel if you didn't have

18   an insurance policy?

19             For example, you have incidents whereby

20   the insured takes actions because he has got an

21   insurance policy, so he doesn't care about the boat so

22   much because the insurance company will buy the boat.

23   So, what we're asking is what would you do if you

24   didn't have an insurance policy?  That's acting as a

25   prudent uninsured.

Page 87

1      Q.     As an insurer or a representative of an

2  insurer, do you anticipate that every operator of a

3  yacht should prudently have on board somebody who can

4  take over in the event of an emergency?

5      A.     Depends on the nature of the voyage.

6      Q.     Okay.

7      A.     If you're just cruising down the

8  intracoastal then I dare say you can attract somebody's

9  attention to render you assistance quite easily.  If

10  you happen to be 50 miles off shore on your way to the

11  Bahamas I would not think it was very prudent to travel

12  on your own.

13      Q.     Is it your understanding that U.S. Coast

14  Guard or the Parasquadron or other agencies recommend

15  to boaters in general that they not operate boats

16  without someone to take over in the event of an

17  emergency?

18      A.     I'm not aware of the -- depending again,

19  on the navigation.  There are plenty of boats traveling

20  around that are single operated.

21      Q.     And would you consider that to be prudent

22  from an insurers' point of view?

23      A.     As I said, it depends on the navigation.

24      Q.     What about when the operator has to take a

25  bathroom break?

1      A.     Stop the boat.  Obviously, you shouldn't

2   be underway while you're not at the helm.  Again,

3   depends on your navigation and where you are.  If your

4   bathroom break is only going to be 90 seconds to two

5   minutes long and you're in mid-ocean somewhere where

6   you have clear visibility for 16, 18 miles in any one

7   direction, I should imagine it's very safe to take a

8   toilet break.

9          If you're navigating down the

10  intracoastal, for example, and even if you're only

11  doing seven or eight knots or four or five knots, it

12  would be inappropriate to take a bathroom break.  You

13  have to bring the vessel to a halt.

14     Q.     **In general, would you anticipate that a**

15  **boat owner would have somebody on board to take the**

16  **helm for the bathroom break, for lunch, for**

17  **emergencies, for any other circumstances in which they**

18  **would not physically be at the helm?**

19     A.     I wouldn't consider lunch an emergency,

20  normally.  But again, depends on the extent of the

21  navigation.  If it's going to be a prolonged journey

22  then it probably is appropriate to have somebody else

23  on board.  If you're just going down to a local

24  restaurant or something, four miles down the

25  intracoastal then I don't suppose it makes any

1    difference whether you have anybody else on board.

2         Q.    When you or your underwriters are

3    examining an application, such as Exhibit 4, do you

4    make a mental note of the fact that there is a single

5    operator that's listed there?

6         A.    Yes.

7         Q.    What does that mean to you?

8         A.    Again, we will limit the navigation.

9         Q.    Limit the navigation?

10        A.    Yes.

11        Q.    In what respect?

12        A.    Well, for example, in this instance we

13   said that the vessel could not exceed 75 miles off

14   shore, and could not go south of the Tropic of Cancer

15   because as far as we're concerned that allows it three

16   hours at 25 miles an hour.

17        Q.    Where do you see those navigation

18   restrictions?

19        A.    On the policy schedule:  Navigational

20   limits are East Coast U.S.A., Gulf of Mexico, Florida,

21   and the Bahamas, not to exceed 75 miles off shore.

22        Q.    Are navigational limits ever stated when

23   there's more than one operator listed in the

24   application?

25        A.    Yes.

1        Q.    Is it ever stated in writing to the

2  insured that the navigational limits depend on who is

3  identified as operator?

4        A.    Normally speaking our restrictions regards

5  single operator is single operating at night, at

6  nighttime.

7        Q.    Would you repeat that answer?

8        A.    We do not normally approve overnight

9  operation on a single handed basis.

10       Q.    Is that noted anywhere in this cover note?

11       A.    No.

12       Q.    So, by the terms of the policy, as this

13  cover note is included, it would have covered Doctor

14  Rosin as a single operator operating at night?

15       A.    It would have done.

16       Q.    Are there any other aspects or notations

17  on this cover note that are a direct result of there

18  having been one operator listed?

19       A.    No.

20       Q.    Without having known the specifics of this

21  case, would you look at the second page of the cover

22  note and the navigational limits and infer from that

23  that there was only one operator?

24       A.    No, not from the schedule.  We would have

25  done it from the policy.

Page 91

1       Q.      **Which part of the policy reflects that?**

2       A.      The Section C, covered person.  Covered

3    person means you and/or any person detailed on your

4    application form which has been submitted and approved

5    by us provided that person has been declared to us as

6    an operator of the scheduled vessel.

7              I think it's also important to note that

8    the fact that there's a named operator that's been

9    disclosed on the application form does not mean that

10   that is the only person allowed on the vessel.

11   Providing the named operator is on board, obviously you

12   can have as many guests as you want within the safety

13   limits of the vessel is concerned.  It's just that that

14   operator must be on board.

15      Q.      **Does it say anywhere in the policy that**

16   **the named operator must be on board?**

17      A.      Only inasmuch as they're the only covered

18   person.  We are not providing coverage unless that

19   named operator or one of the named operators is on

20   board.

21      Q.      **Does the phrase single operator appear**

22   **anywhere in the policy?**

23      A.      No, I don't believe so.

24      Q.      **So, would it be correct to say that single**

25   **operator is a term that you use to describe the effects**

Page 92

1    of the policy rather than anything written specifically

2    in the policy?

3          A.    You're talking about single handed

4    navigation?

5          Q.    No.   I'm talking about single operator.

6          A.    Could you rephrase the question or repeat

7    the question?

8          Q.    Would it be correct to say that the term

9    single operator is a term that you're using to describe

10   the effects of the policy rather than a term that's

11   actually used in the policy?

12         A.    Yes, I believe so.   Yes.

13         Q.    Is there a term - another term or phrase

14   in the policy that just as well conveys the concept of

15   single operator?

16         A.    I don't believe so, no.   There's a term

17   that defines what operating means.

18         Q.    Where is that in the policy?

19         A.    That's under Section - under definitions.

20   Definition Q:   Operating means to navigate or to be in

21   physical control or to be at the helm of the scheduled

22   vessel.

23         Q.    When you drafted that policy did you

24   intend those three terms to mean three different things

25   or are they all one in the same?

Page 93

1       A.    It's all one word, all one thing.  You

2  mean operating?

3       Q.    I mean navigation, being in control, and

4  being at the helm?

5       A.    All those things mean to operate the

6  vessel.  For example, you can be captaining the vessel

7  and in command of the vessel and somebody else could be

8  at the helm.

9       Q.    Okay.  Being in command and being at the

10  helm could be two totally different things?

11      A.    Yes, because you could be giving

12  instructions, you could be standing right next to them

13  saying, you can take the wheel for a brief period of

14  time while I'm standing here.  You're still in command.

15      Q.    If an insured such as Doctor Rosin became

16  sick during the voyage, sick in the British sense of

17  the word, and asked someone to take the helm

18  temporarily, she could still be in control at the time;

19  correct?

20      A.    Yes, she could.

21      Q.    And at that moment would there not be two

22  operators?

23      A.    No, there's still the one operator because

24  one operator was in command.

25      Q.    So, being at the helm is not a separate

Page 94

1    definition from being in control?

2         A.    I don't believe so.  I think that at the

3    end of the day if you're on board the vessel, in

4    command of the vessel, and in control of the vessel at

5    all times, you don't have to be physically with your

6    hands on the wheel.

7         Q.    So, someone other than the operator can

8    actually have their hands on the wheel?

9         A.    Providing the operator is on board, yes;

10   an approved operator.

11        Q.    When the application was made what was the

12   term of the policy being sought?

13        A.    The period?

14        Q.    Yes.

15        A.    If this was the application form that we -

16   that was submitted to us at the time of the quotation

17   it shows a term of the 1st of February 2007 to the 1st

18   of February 2008.

19        Q.    Is that application form ever used for any

20   longer periods or terms?

21        A.    No.

22        Q.    Do you not offer longer periods or terms?

23        A.    Not normally.  We have a policy of what we

24   call odd days, which is normally not exceeding 30 days

25   above one year, but occasionally we do have requests

Page 95

1    for policies for shorter periods.

2         Q.    So, after the initial term or period

3    expires you require a new application to be completed?

4         A.    We normally - if it's an existing risk to

5    us we would normally require what's called a renewal

6    questionnaire form to be completed.

7         Q.    On an annual basis?

8         A.    On an annual basis.

9         Q.    Does that renewal questionnaire have a

10   section that requests the name of operators?

11        A.    Yes.

12        Q.    In the application that is the form

13   represented by Exhibit 4, do you anticipate that the

14   person who fills out the application will know every

15   person who's going to be operating the boat for the

16   next year?

17        A.    Yes.

18        Q.    Why do you assume that?

19        A.    I would want to know, it's my boat.

20        Q.    You would want to know?

21        A.    Who's going to be operating it.  As an

22   owner of the boat I would want to know, and as the

23   insurer of the boat I certainly want to know.

24        Q.    If circumstances change and new operators

25   are to be added, do you expect an amendment to the

1    application?

2         A.    Yes, an endorsement would be issued naming

3    an additional operator.

4         Q.    **Do you expect that to be completed under**

5    **urgent circumstances?**

6         A.    Yes.

7         Q.    **Even --**

8         A.    Well, before you start permitting people

9    to operate your vessel — when you say under urgent

10   circumstances - obviously, not in a situation whereby

11   there's an emergency and somebody has just become

12   seriously ill we don't expect them to make a cell phone

13   call to their broker to contact us to get approval for

14   the person to take the helm.  We do expect them

15   however, to approach us to name any operator that is

16   going to be operating the boat with your permission.

17        Q.    **Is that expressed in any writing to the**

18   **insured?**

19        A.    It's expressed to their broker inasmuch as

20   their broker is fully apprised that this is a named

21   operator policy and the only coverage that we afford is

22   to the named and approved operators.  The broker

23   therefore should advise the insured that in the event

24   there are other people intending to operate the vessel

25   that they should immediately contact them with their

Page 97

1    full details, background, and experience to seek and

2    obtain approval from the underwriters in order that

3    coverage could be extended to include them.

4          Q.    Based on the knowledge that you have

5    today, is there anything materially incorrect in

6    Exhibit 4, the yacht application?

7          A.    Yes, it fails to disclose another

8    operator; in fact, potentially two other operators.

9          Q.    Who are they?

10         A.    Mr. Paul Rosin and a Harvey something or

11   other that was a cousin.

12         Q.    Do you consider that failure to disclose

13   to be a misrepresentation on Doctor Rosin's part?

14         A.    Yes.

15         Q.    Even if she didn't know that she was to

16   list such operators?

17              MR. GOLDMAN:  Object to the form of the

18         question.

19         A.    She should have known.

20         Q.    How should she have known?

21         A.    Her broker should have told her.

22         Q.    No, how should she have known that Paul

23   Rosin and Harvey were to operate the boat?

24         A.    Oh, I see, you mean, that Paul Rosin and

25   Harvey were operating the boat without Mrs. Rosin's

Page 98

1   permission?  You mean, effectively stealing the boat

2   or --

3        Q.    No, no.  That sometime after the date of

4   the application they would be operating the boat?

5        A.    Because it says you must list all named

6   operators.  And because the broker should have advised

7   that it was a named operator policy written, then the

8   broker should have been contacted with details of

9   additional operators that were required to be named so

10  coverage would be extended and afforded to them once

11  they were operating the boat.

12       Q.    So, do you believe the application is not

13  self explanatory as to which operators will be listed?

14       A.    It says all operators must be detailed.

15       Q.    I think you also said the broker should be

16  informing the applicant.

17       A.    The application form is clear and

18  unambiguous, all operators must be detailed.  What

19  you're referring to is that in the event that

20  subsequent to the application form a decision has been

21  made to permit other people to operate the vessel.  So,

22  at the time of this application form, let's accept for

23  the moment that at this time there were no other

24  operators intended to operate the vessel, sometime

25  subsequent to this other operators were intended to

Page 99

1    operate the vessel.  At that time they should have

2    contacted the broker and advised them that additional

3    operators needed to be named on the contract, otherwise

4    in accordance with the policy wording, coverage would

5    not be afforded them.

6           Q.    Do you rely on the broker to make this

7    clear to the applicant?

8                 MR. GOLDMAN:  Object to the form of the

9           question.

10          A.    Yes, he's the only person that has contact

11   with the applicant.

12          Q.    Do you believe that Doctor Rosin

13   intentionally misrepresented who the operators would be

14   of the vessel?

15                MR. GOLDMAN:  Object to the form of the

16          question.  You know very well that's not

17          asserted in the litigation.

18          A.    Makes no difference to me really.

19                MR. BEAGLE:  That was a speaking

20          objection.

21                MR. GOLDMAN:  That's right.

22          A.    At the end of the day the issue is that we

23   were misled, so it was misrepresented to us.  Whether

24   it was deliberate, accidental.  I don't know if Doctor

25   Rosin was aware that her son would be operating the

1   vessel.  I don't know at the time when this application

2   form was signed by Doctor Rosin whether she was aware

3   that her son would be operating the vessel.

4          Q.      Okay.

5          A.      I don't know when he started operating the

6   vessel.

7          Q.      Has anybody associated with T.L. Dallas

8   made a determination as to whether any such

9   misrepresentation would have been intentional?

10         A.      No, we're not required to do that.

11         Q.      Has anyone that T.L. Dallas has consulted

12  made a determination that such a misrepresentation

13  would have been intentional?

14         A.      How would you establish whether it was

15  intentional?  Fortunately we don't have to.

16         Q.      In your understanding what is the

17  distinction between a warranty and a representation in

18  an insurance policy?

19         A.      A warranty is a specific promise not to do

20  something or to do something; and a breach of warranty

21  is absolute.  A representation must be material in

22  order for it to void the policy - or misrepresentation

23  should I say must be material in order for it to void

24  the policy.

25         Q.      Do you consider the contents of the block

UNITED REPORTING, INC.
954-525-2221

1   that says operators to be a warranty or a

2   representation?

3        A.    A representation.

4        Q.    Not a warranty?

5        A.    No.  It's a named operator policy, so it's

6   a condition of the policy.  The only named operators

7   will operate the vessel if coverage is to be afforded.

8        Q.    And once again, the phrase "named operator

9   policy" does not appear anywhere in the policy?

10       A.    The phrase may not -- Well, it does

11   inasmuch as it states - I'll repeat - covered person

12   means you and/or any person detailed on your

13   application form which has been submitted and approved

14   to us provided the person has been declared to us as a

15   named operator of the scheduled vessel.

16       Q.    So, named operator appears but not named

17   operator policy; correct, as far as you know?

18       A.    Not in the same sentence, no.

19             MR. BEAGLE:  Let's take a brief break.

20             (Whereupon, a brief recess was taken.)

21             MR. BEAGLE:  Please mark this as

22        Defendant's Exhibit 6.

23             (Whereupon, the referred to document was

24        marked as Defendant's Exhibit Number 6 for

25        Identification by the Court Reporter.)

Page 102

1       Q.     (By Mr. Beagle)  Let me show you Exhibit

2   6, which is the complaint, without the exhibits, that

3   was filed on behalf of Great Lakes.  Do you recognize

4   this document?

5       A.     Yes, I believe so.

6       Q.     You recall a portion of that document that

7   refers to a regular operator of the vessel?

8       A.     That's correct on Paragraph 17.  Do you

9   want me to read it in?

10       Q.     If you would like, sure.

11       A.     The said investigation undertaken by the

12   Plaintiff established that at the time of the

13   submission of the application for marine insurance

14   coverage the Defendant, Elaine Y. Rosin failed to

15   disclose the fact that Paul Rosin was to going to be a

16   regular operator of the vessel to be insured under

17   Plaintiff's Policy No. 200/658/91059.

18       Q.     To the best of your knowledge are the

19   facts alleged in that paragraph correct?

20       A.     It's hard to determine.  Our investigator

21   conducted an interview, a recorded interview with Mr.

22   Paul Rosin where he disclosed that he had operated the

23   vessel 40 or 50 times.  Subsequently I read in his

24   deposition he changed that to two or three times, and

25   alleged that the earlier statement was an

UNITED REPORTING, INC.
954-525-2221

Page 103

1    exaggeration - which is one hell of an exaggeration.

2        Q.    What does the term - as it's used in this

3    paragraph - what does the term regular operator mean?

4        A.    That he was frequently or regularly

5    operating the vessel.  Don't mean to say by that

6    regularly every Tuesday afternoon at 3:00.  We don't

7    mean by that necessarily every July or October, not

8    necessarily within a regular time table, but regularly

9    enough to be operating the vessel - to have been known,

10   so it wasn't an emergency situation, for example.  It

11   was always intended that Mr. Rosin would operate the

12   vessel.

13       Q.    Within your understanding of the purposes

14   of the application, would you presume that if an

15   individual were to operate the vessel two to three

16   times that that would make them a regular operator of

17   the vessel?

18       A.    If you were aware in advance that any

19   individual was going to operate the vessel then --

20       Q.    Two to three times.  Sorry.

21       A.    Two to three times --

22       Q.    I'm sorry.  I shouldn't have interrupted

23   you.  Sorry.  Go ahead.

24       A.    Once.

25       Q.    If you know that they're going to operate

Page 104

1   it once at the time that the application is completed?

2        A.    At any time during the coverage of the

3   policy.

4        Q.    So, does the definition of the term

5   "regular operator" depend on the number of times that

6   the vessel is operated?

7        A.    No, it's a regular operator because

8   they've been approved in advance to operate the vessel.

9        Q.    So, a regular operator is only such by

10  virtue of having been approved by the insurer?

11       A.    Yes.  An operator - effectively what we

12  were talking about earlier on, for example, was like an

13  emergency situation where somebody took over control of

14  the vessel due to an accident or a salvage issue or an

15  illness on board or whatever that was not pre-planned.

16            Whereas if, for example, you had a

17  situation whereby under this policy - if for example,

18  your son or cousin or whatever wanted to take the boat

19  out for the day, even be it only once, next weekend,

20  for example, then you should contact the broker and

21  advise them that somebody else is going to operate the

22  boat.

23       Q.    And so, which of those circumstances would

24  render an operator a regular operator within the

25  meaning of Paragraph 17 of the complaint?

Page 105

1          A.     Yeah, I think at the end of the day

2     anybody - as far as I'm concerned, the terminology was

3     guided by the interview that we took.  As far as I'm

4     concerned, the wording that prevails is the application

5     form "all operators".  Effectively, anybody that you

6     intend to operate the boat.

7                 Obviously not somebody you didn't give

8     permission to operate the boat, obviously not following

9     an emergency circumstance where the vessel would be in

10    distress because of illness or accident, but somebody

11    that you are granting approval to take the boat and

12    operate the boat should be approved in advance.

13         **Q.     For the purpose of the determining whether**

14    **a claim is going to be paid, does the term regular**

15    **operator have any significance?**

16         A.     Not really, no.  It's pure and simply to

17    establish who was operating the boat at the time of the

18    incident.  Was that person a disclosed and approved

19    operator.

20         **Q.     So, the identity of a given person that's**

21    **a regular operator or not is irrelevant to coverage?**

22         A.     Excuse me.  Could you repeat that?

23         **Q.     Yes.  Is it accurate to say then that**

24    **whether a person is a regular operator or not is**

25    **irrelevant to coverage?**

Page 106

1          A.     Inasmuch as we're saying that it wouldn't

2    make any difference how many times they operated the

3    boat, then no.  As far as we're concerned if he's not a

4    named operator, an approved operator, then there would

5    be no coverage.

6          Q.     So, part of your inquiry in order to

7    determine whether a claim is going to be paid does not

8    include whether the person at the helm was a quote,

9    regular operator, end quote?

10         A.     Not really.  It was establishing - as far

11   as we're concerned, how frequently it happened.  We're

12   in a situation, of course, at the end of the day when

13   we conduct an investigation to determine whether - from

14   an issue of materiality - as to whether we consider it

15   sufficient to void coverage.  We're always in a

16   position where we can waive a breach of warranty or we

17   could waive a misrepresentation.

18                So, what we're looking to do in the course

19   of the investigation is to establish whether it would

20   be appropriate to waive that, waive our position and

21   our defenses.  In this instance we decided it was not

22   appropriate to waive.

23         Q.     Okay.  Do you consider that to be within

24   the sole discretion of T.L. Dallas?

25         A.     Yes.

1      Q.     Just to confirm my understanding, the

2    frequency of operation of a vessel by a given

3    individual is only relevant to T.L. Dallas to the

4    extent that it may elect to waive a misrepresentation?

5           A.    That's correct.

6           Q.    Is that entirely accurate what I just

7    said?

8           A.    I think so.   Repeat it for the sake of the

9    record.

10             MR. BEAGLE:   Can you read it back so I

11          don't misstate it?

12             (Whereupon, the referred to question was

13          read back by the Court Reporter as above

14          recorded.)

15          A.    Yeah.   To elaborate, effectively, the

16    purpose and the reason that we embarked upon an

17    investigation was to establish all the circumstances,

18    to determine whether we felt it was appropriate for us

19    to waive our position.   Otherwise, at the initial point

20    we could have simply said, there's an unnamed operator

21    operating the vessel at the time of the incident,

22    there's no coverage, no investigation, and we just

23    decline the claim.

24          Q.    So, would it be likewise accurate to say

25    that the results of the investigation were irrelevant

1    to your determination?

2         A.    No, they were not irrelevant.  The results

3    of the investigation were highly relevant to our

4    determination as to whether we were going to waive our

5    position.

6         Q.    I see.  To the best of your knowledge, is

7    this, what you've described, is this standard operating

8    procedure with regards to most marine insurers?

9              MR. GOLDMAN:  Object to the form.  Is what

10             standard operating procedure?

11             MR. BEAGLE:  Thank you.

12             MR. GOLDMAN:  What are you talking about?

13        Q.    (By Mr. Beagle)  Do you know what I'm

14   talking about?

15        A.    No, I don't.  Are you saying what to

16   investigate the case before you make a determination?

17        Q.    The whole constellation of things that you

18   just told me in terms of the materiality of whether

19   somebody is a regular operator, having an investigation

20   to determine whether you want to waive the

21   misrepresentation.

22        A.    I think it's a duty of all insurers to do

23   a detailed investigation to establish the full facts

24   before making any determination as regards coverage, if

25   there is indeed a coverage issue at the outset.  I

Page 109

1  don't know how many insurers observe that.  I think it

2  would be unethical not to observe that.

3      Q.    Thank you.  When was the first time that

4  anybody at T.L. Dallas or Great Lakes learned of the

5  accident involving the Queen of Hearts?

6      A.    We received a notification, I believe,

7  from Kolisch shortly after the incident, but I would

8  have to refer to the claims file to give you precisely

9  what date.  But there was no undue delay in reporting

10  the incident.

11      Q.    Do you know how Mr. Kolisch would have

12  reported the incident?

13      A.    Almost certainly by e-mail.  I don't know

14  whether he used one of our incident or claims report

15  forms, or whether he used an Acord claim report form,

16  or whether he just simply sent us an e-mail with script

17  saying this is what happened.

18      Q.    Is it significant for your purposes which

19  of those ways of communication he chose?

20      A.    No, as long as we were advised of the

21  claim we're not concerned.

22      Q.    What was the first course of action taken

23  by T.L. Dallas as soon as it received the notification

24  from Mr. Kolisch?

25      A.    I believe we initially dispatched a

1    surveyor to investigate the circumstances of the loss

2    and the damage to the vessel.

3              I believe the surveyor determined who was

4    operating the vessel at the time of the incident.

5    Where upon we immediately appointed Nautilus

6    Investigations to investigate the circumstances around

7    the incident, the details of who was operating the

8    vessel, and do a complete background check on the

9    people involved.

10        Q.    **Is there something about the results of**

11   **the report by the initial surveyor that led you to**

12   **employ Nautilus Investigations?**

13        A.    The non named operator.

14        Q.    **What specifically about the presence of a**

15   **non named operator would lead you to employ Nautilus**

16   **Investigations?**

17        A.    Because it's now going to be a coverage

18   issue.

19        Q.    **What was the purpose of hiring Nautilus**

20   **Investigations now that there was a coverage issue?**

21        A.    Pure and simply to research and

22   investigate all the circumstances surrounding the

23   incident, to conduct interviews, to establish

24   witnesses, and to do background checks on the

25   individuals that the surveyor would not be qualified to

1   do.

2         Q.    And is this largely to determine whether

3   you want to waive the misrepresentation in the policy

4   or the application?

5         A.    That's correct, yes.

6         Q.    Is there any other purpose you would have

7   had to hire Nautilus Investigations at the time?

8         A.    No.  Pure and simply to collect all

9   relevant information.

10        Q.    Have you hired Nautilus Investigations on

11  previous occasions?

12        A.    On numerous occasions, yes.

13        Q.    Is that something that you -- How many

14  times have you hired Nautilus Investigations to perform

15  that kind of investigation, if you can estimate?

16        A.    Over a hundred.

17        Q.    Always in the State of Florida?

18        A.    No.

19        Q.    Are they nationwide?

20        A.    Not really.  We also use them in the

21  Caribbean, Central America.  I have extensive contacts,

22  but their only office is based in Florida, although

23  they do conduct interviews in other areas.  Normally

24  speaking, it would be in Florida, but I can't say

25  exclusively.  We may well have appointed them in other

Page 112

1    areas to go and investigate something.

2         Q.    Was there a particular person at T.L.

3    Dallas who was designated to handle the claim after it

4    came in from Mr. Kolisch?

5         A.    Yes, Mark Thomas.

6         Q.    Was there any particular reason why he was

7    designated for the claim?

8         A.    He's a senior claims director.

9         Q.    Did he in turn delegate to somebody else

10   any aspect of the claims investigation?

11        A.    Only to Nautilus Investigations and

12   originally I believe Stewart Hutchinson, who was the

13   surveyor originally appointed.  But he didn't delegate

14   to anybody else in our office.

15        Q.    So, Mr. Thomas was the person at T.L.

16   Dallas in the U.K. that basically handled every aspect

17   of the claims handling?

18        A.    Yes.

19        Q.    How soon after the incident was Mr.

20   Hutchinson hired?

21        A.    I don't recall but it was very soon

22   afterwards.

23        Q.    How many times previous to that occasion

24   had Mr. Hutchinson been hired by T.L. Dallas?

25        A.    We certainly used him on a number of

1    occasions before, but I can't honestly tell you.  Not

2    as many times as we've appointed Nautilus, for example.

3    I would think maybe 15, 20, 25, it depends.  I mean,

4    for example, during hurricanes there are hundreds of

5    claims and he may well have been one of the field

6    surveyors we used to establish damage on hurricanes.

7    So, I could be wildly inaccurate in the number of times

8    we appointed him.

9         Q.    And what were the instructions that Mr.

10   Thomas gave Mr. Hutchinson in the course of his survey?

11        A.    Establish the circumstances of the

12   incident and the extent of damage to the vessel.

13        Q.    Did Mr. Hutchinson do those things?

14        A.    Yes.  I mean, with regards to

15   circumstances he told us what had occurred, what the

16   damage to the vessel was, and who was operating the

17   vessel at the time the incident occurred.

18        Q.    Did he interview anyone in order to make

19   those determinations?

20        A.    I don't recall.  He certainly didn't

21   conduct any formal recorded interviews, he would have

22   just asked around, I guess, and spoken to perhaps

23   Doctor Rosin as the insured and established who was the

24   operator at the time of the incident.  He may well have

25   asked the people at the marina, for example, who was

1   operating the boat at the time.

2        Q.    Would Mr. Thomas have expected Mr.

3   Hutchinson to have interviewed Doctor Rosin?

4        A.    Not necessarily an interview situation.

5   Provided - he wouldn't be required to speak to the

6   insured if he can gain all the information he can.

7   Remember, as I said earlier, once we'd established

8   there was an unnamed, unapproved operator at the helm

9   at the time of the incident, it immediately would have

10  been passed to Nautilus Investigations and they would

11  have taken on the conduct of the matter from that time

12  forward.  So Stewart Hutchinson's involvement could

13  have been literally cursory.

14       Q.    Is it your understanding that Mr.

15  Hutchinson merely presented a series of issues that

16  would later be determined and more detailed by Nautilus

17  later?

18       A.    His focus initially would have been on

19  what actually happened and what the extent of the

20  damage was as a result of what happened.  Once we

21  established that there was an issue about the operator,

22  then as I said, his involvement would be terminated and

23  Nautilus would take over from that point on.

24       Q.    Did Stewart Hutchinson work for a larger

25  agency?

Page 115

1    A.    Not that I recall.  He may have.

2    Q.    **Do you think he was probably an**

3 **independent contractor?**

4    A.    They're all independent contractors.  But

5 he may well have been an independent -- he may well

6 have done surveys on his own behalf and also on behalf

7 of other people.

8    Q.    **But he was retained directly by T.L.**

9 **Dallas?**

10    A.    I don't recall.  I'd have to check the

11 claims form.

12    Q.    **What sort of licenses did Stewart**

13 **Hutchinson have at the time that he performed his**

14 **investigation?**

15    A.    I think he was an accredited SAMS

16 surveyor, which is the Society of American Marine

17 Surveyors.  I think he may also have been a NAMS

18 surveyor, which is the National Association of Marine

19 Surveyors.  But he wouldn't be required to have a

20 license in terms of like an adjuster's license because

21 we were never going to ask him to adjust the claim.

22    Q.    **Can you state in detail what an adjuster**

23 **would be asked to do if they were adjusting the claim?**

24    A.    Basically to review the policy coverage

25 and to adjust the claim in conformity with the coverage

Page 116

1    afforded under the policy.

2         Q.    Is that usually a function that is

3    performed by employees of T.L. Dallas?

4         A.    No.  We normally use a licensed adjuster

5    to handle the adjustment.  The only time we get

6    involved in doing an adjustment is when there's no real

7    adjusting involved.  For example, it's a theft of

8    tender or something like that, a minor claim where

9    there's nothing to inspect and nothing to adjust.

10        Q.    I'm sorry, what?

11        A.    Nothing to inspect because it's been

12   stolen as opposed to damaged, and nothing to adjust

13   because it's a total loss.

14             Generally speaking, when there's damage to

15   a vessel you could allow the licensed adjuster to take

16   over from that stage and to make his recommendation of

17   payment and the amount indeed to be paid in accordance

18   with the policy.

19        Q.    Did Mr. Hutchinson reach a conclusion as

20   to the amount or the value of the damages to the

21   vessel?

22        A.    I don't recall.  I'd have to, again, look

23   at my claims file.

24        Q.    Was there an adjuster in this case?

25        A.    No.

1          Q.     At no time?

2          A.     I don't believe so.

3                 MR. BEAGLE:   Please mark this as

4          Defendant's 7.

5                 (Whereupon, the referred to document was

6          marked as Defendant's Exhibit Number 7 for

7          Identification by the Court Reporter.)

8          Q.     (By Mr. Beagle)  Before you start

9    examining Exhibit 7, were you aware that Doctor Rosin

10   requested to speak to an adjuster several times?

11         A.     No.  I, personally, because I didn't deal

12   with the day-to-day claims handling.  I don't know if

13   our office would.

14         Q.     Do you recognize Exhibit 7?

15         A.     No.

16         Q.     No?

17         A.     No.

18         Q.     You've never seen it?

19         A.     I don't recall seeing it.  It may be in

20   our claims file.

21         Q.     I would represent to you that it was

22   produced to us, I believe, by your Counsel as the

23   report of Stewart Hutchinson dated November 8, 2007.

24   Is that the kind of report that you would customarily

25   receive from Mr. Hutchinson?

Page 118

```
 1          A.     Quite possibly.  Again, I don't deal with
 2    the day-to-day claims.  I don't read the claims reports
 3    on a day-to-day basis.  I only make an assessment if
 4    there's a problem.
 5          Q.     Have you ever seen any of Mr. Hutchinson's
 6    reports, not only in this matter, but in others?
 7          A.     I don't recall.
 8          Q.     Can you take a look at Page 2 of that
 9    exhibit and look about three quarters down where it
10    says Estimated Costs of Repair?
11          A.     Yes.
12          Q.     Do you see where it says $160,000?
13          A.     Yes, unsurprising.
14          Q.     Unsurprising?
15          A.     The vessel, as far as I'm aware, was
16    partially submerged, 90 percent of the value of that
17    vessel will be electronics and the engines and so on,
18    which probably aren't going to survive being submerged.
19    It's going to be close to a total loss.
20          Q.     Has anyone at T.L. Dallas had reason to
21    doubt Mr. Hutchinson's estimate?
22          A.     No.
23          Q.     Has T.L. Dallas made any determination as
24    to the damages, apart from Mr. Hutchinson's estimate,
25    in his report?
```

1       A.      No.

2       Q.      **Is there any reason for that?**

3       A.      Because we're denying the coverage.

4       Q.      **Once you deny coverage the amount of**

5   **damages is irrelevant; correct?**

6       A.      Yes.

7       Q.      **Did Mr. Thomas or anyone else at T.L.**

8   **Dallas compile the documentation of Mr. Hutchinson's**

9   **qualifications to serve as a surveyor?**

10      A.      Don't believe so, but he may well have

11  done.

12      Q.      **Would it surprise you if he hadn't?**

13      A.      I believe Stewart Hutchinson has been

14  known to Mark Thomas for many years.  I don't know

15  whether he checked whether or not he had an adjuster's

16  license because I don't think it was ever in Mr.

17  Thomas' mind to appoint Stewart Hutchinson as an

18  adjuster.  He was certainly, as far as he was

19  concerned, an eminently capable surveyor.

20      Q.      **What were the instructions that Mr. Thomas**

21  **gave to Nautilus Investigations?**

22      A.      I can't tell you verbatim because I didn't

23  read the instructions, but it would be investigate the

24  circumstances and the background behind Mr. Paul Rosin,

25  who was operating the vessel at the time.  He would

Page 120

1     have sent Nautilus Investigations a copy of the

2     application form, a copy of the policy form, a copy of

3     the claims report, and would have instructed, as indeed

4     has been the case here, for Stewart Hutchinson to send

5     a copy of his report to Nautilus Investigations.  And

6     then commence and conduct their investigation

7     surrounding the matter.

8          Q.    Would Mr. Thomas have relied on Nautilus

9     Investigations to make its own determination as to the

10    appropriate scope of its investigation?

11         A.    I think Mr. Thomas would have given them

12    some kind of outline as to areas of concern that they

13    should address within their investigation.  I don't

14    think he would necessarily confine them if they thought

15    that other elements were relevant, he wouldn't say I

16    don't want you to look at this or I don't want you to

17    look at that.  But he would say I certainly want your

18    investigation to address these issues.

19              MR. GOLDMAN:  At this point I'm going to

20         interfere or interrupt Counsel's questions.  I'm

21         going to permit him the wide latitude called for

22         under the Federal Rules of Civil Procedure.  I'm

23         going to put a standing objection on the record

24         to all further inquiry with respect to the post

25         incident investigation since under the

1    applicable case law and applicable juris

2    prudence discovery into the post incident

3    investigation of a marine insurer is not

4    permitted.

5         Mr. Beagle would not be permitted to

6    compel production, for example, of the claim

7    file or of the Nautilus Investigation reports by

8    subpoena or otherwise.  But again, I do not wish

9    to interfere with Counsel's questions.  I will

10   permit wide latitude, but my objection is on the

11   record that this an inappropriate and improper

12   subject for discovery.

13         That having been said, have at it.

14         Again, I think it's pretty clear on the

15   record also that this individual is not

16   acquainted with the claims investigation.  That

17   having been said, go on.

18         MR. BEAGLE:  You mean the deponent is not

19   familiar?

20         MR. GOLDMAN:  I said this witness.  I said

21   this witness.

22         THE WITNESS:  Individual you actually

23   said.

24   Q.    (By Mr. Beagle)  At the time that Nautilus

25   Investigations began its work, had T.L. Dallas made a

Page 122

1      determination about whether to deny the claim?

2                  MR. GOLDMAN:  Objection.  That is

3             against - that's as classic an example of an

4             inappropriate question that could possibly be

5             considered and in that sense it's emblematic of

6             the inappropriate nature of your entire inquiry

7             at this point.  Again, even with wide latitude

8             we're going to have to come to some crash point

9             here where further inquiry along these lines is

10            simply not going to be done.  I'll allow you to

11            continue for now.

12                  MR. BEAGLE:  Are you instructing him not

13            to answer the question?

14                  MR. GOLDMAN:  No, I'm not.  But we may

15            well get there.

16       Q.     (By Mr. Beagle}  Go ahead, please.

17       A.     No, as far as we're concerned we were

18     aware that there was a coverage issue.  The purpose of

19     the investigation was to establish whether the

20     circumstances would make it appropriate for us to waive

21     the coverage issue.

22       Q.     Okay.  Another definition of term.  When

23     you say coverage issue, do you mean that it had already

24     been determined that according to the literal

25     interpretation of the policy that you were entitled to

Page 123

1    deny coverage?

2         A.    That's correct.

3         Q.    Do you know what precise actions Nautilus

4    Investigations took to perform its work?

5         A.    I do have an action log as to the things

6    they did, so I think it's fair to answer that I know

7    the bulk of what they did in order to investigate the

8    matter.

9         Q.    Do you recall whether the action log --

10   strike that.

11              Do you know whether Nautilus

12   Investigations interviewed Doctor Rosin?

13        A.    I don't believe Nautilus Investigations

14   interviewed Doctor Rosin, no.

15        Q.    Do you know whether anybody did?

16        A.    In deposition.  I'm not aware of any

17   interview that took place with Doctor Rosin or

18   involving Doctor Rosin.

19        Q.    From the point of view of T.L. Dallas, was

20   it significant what Doctor Rosin had to say regarding

21   the coverage issue?

22        A.    Not really, no.

23        Q.    Do you know why Paul Rosin was driving the

24   vessel on this particular occasion?

25        A.    I understand he was taking it to a marina

1    to have some bottom work done including a repaint.

2         Q.    Did T.L. Dallas make a determination as to

3    the urgency of having that kind of work done on this

4    vessel?

5         A.    No.

6         Q.    Did T.L. Dallas consider that to be

7    relevant to its coverage, the purpose that is?

8         A.    No, it was clear it wasn't following an

9    incident or whatever, it was a planned delivery.  I

10   understand in one of the depositions indeed the vessel

11   had been at Mr. Paul Rosin's property for at least a

12   week before he took it to the marina.  I believe the

13   booking for the paint job was made some two to three

14   weeks before the date of the incident, so this was

15   obviously not an emergency situation.

16        Q.    I ask you to look again at Exhibit 6,

17   that's the complaint.  And I'm going to find and direct

18   your attention to the portions that talk about Mr.

19   Rosin's actions.  Can you please take a look at

20   Paragraph 13 of the complaint?

21        A.    Yes.

22        Q.    And if you would please read out loud for

23   us the final sentence in that paragraph.  Starts with

24   at the said time and date.

25        A.    At the said time and date, while being

Page 125

1    operated by Paul Rosin in a canal in Broward County,

2    the vessel is alleged to have struck a rock and

3    subsequently to have sunk.

4         Q.    Is there any portion of that sentence

5    that -- strike that.

6              Is there any reason for T.L. Dallas to

7    believe that the vessel had not struck a rock and sunk

8    subsequently?

9         A.    No.

10        Q.    Has T.L. Dallas made a determination as to

11   why the rock was struck?

12        A.    No.

13        Q.    Once again, that's irrelevant to your

14   decision?

15        A.    Yeah.

16        Q.    I ask you to take a look at Paragraph 15.

17   And I direct your attention to the final phrase of that

18   paragraph where it refers to the alleged disappearance

19   and theft of the vessel.

20        A.    Yes.

21        Q.    Was anybody at T.L. Dallas under the

22   belief that there had been an alleged disappearance or

23   theft of the vessel?

24             MR. GOLDMAN:  It's a typo, Counsel.

25             THE WITNESS:  It's a typing mistake.

Page 126

1           MR. BEAGLE:  A typo?

2           MR. GOLDMAN:  That's correct.  It's an

3       attorney's error, scrivener's error.

4           MR. BEAGLE:  Oh, an attorney's error.

5       Okay.

6           MR. GOLDMAN:  It's my mistake.  Not the

7       first one I've made nor the first time that Mr.

8       Usher has been quizzed on something like that.

9           THE WITNESS:  I'm just checking that I

10      didn't sign it.

11          MR. GOLDMAN:  Off the record.

12          (Whereupon, an off the record discussion

13      was had.)

14      Q.    (By Mr. Beagle)  Please take a look at

15  Paragraph 18 of the complaint.  Are you familiar with

16  the latter part of that paragraph that refers to the

17  quote, full disclosure of the criminal background and

18  the driving record and history of violations of Paul

19  Rosin?

20      A.    Yes.

21      Q.    Was the criminal background of Paul Rosin

22  influential in T.L. Dallas's determination as to

23  whether to waive the misrepresentation that it

24  perceived?

25      A.    It was not only that inasmuch as - as I

Page 127

1   say, part and parcel of our normal procedure in a claim

2   such as this is to conduct a full investigation.   That

3   would involve a background check of the person who was

4   operating the vessel.   Part of Nautilus' investigation

5   involved a full criminal background check of everybody

6   involved.   And I'm pleased to say Doctor Rosin has no

7   criminal background.

8           Unfortunately, her son does have a

9   criminal background.   So therefore, it was material in

10  my mind in determining whether we were going to waive

11  our position because having read the background check

12  on Mr. Rosin I decided — it was my determination that I

13  would not have chosen to insure him as an operator.

14      Q.    **Do you recall any of the details of the**

15  **criminal background that were disclosed to T.L. Dallas?**

16      A.    It was over a period of 20 years from 1987

17  to 2007.   Most recent arrest being in, I believe, July

18  2007.   There were a series of driving while under the

19  influence of alcohol and/or drugs; possession of drugs;

20  reckless boating; physical violence towards his wife;

21  breach of probation; breach of restraining order.

22  Those are the only ones I recall.   Some of them were

23  multiple citations.

24      Q.    **Did anyone at T.L. Dallas express the**

25  **belief that this criminal background — this alleged**

1    criminal background had caused the accident?

2         A.    No.

3         Q.    Did you ever suspect that it might have

4    caused the accident in some way?

5         A.    It was a suggestion initially by the

6    investigator that Mr. Rosin may have been drinking, but

7    there was inadequate evidence to allege that or support

8    that.  So suspicious, yes.  Are we alleging, no.

9         Q.    Would you also say that you haven't

10   reached a conclusion as to the possible causation of

11   the accident resulting from his driving record?

12        A.    No.

13        Q.    Pardon me for reviewing this complaint as

14   I sit here, I'm trying to go through it as quickly as

15   possible.  It's designed to make the overall deposition

16   go faster.  I'm eliminating possible questions as I go

17   along.

18             Going to a different subject matter.  Who

19   paid USI Insurance?

20        A.    Who paid USI Insurance?

21        Q.    Correct.

22        A.    Technically Doctor Rosin did.

23        Q.    Okay.

24        A.    Part of the premium that was paid or

25   charged to Doctor Rosin was deducted before it was sent

1   to the insurance company.  There's an allowed

2   commission, but it's granted to all brokers that

3   present business to insurance companies.

4              MR. BEAGLE:  Please mark this as Exhibit

5         No. 8.

6              (Whereupon, the referred to document was

7         marked as Defendant's Exhibit Number 8 for

8         Identification by the Court Reporter.)

9         Q.    (By Mr. Beagle)  Let me show you Exhibit 8

10   and I ask you to take a look at the two pages first

11   off, and tell me whether you know if that's a single

12   document, the two pages, or whether it's two separate

13   documents.

14        A.    I'm guessing it's two separate documents,

15   but it's not our document.

16        Q.    Do you recognize those documents at all?

17        A.    No.

18        Q.    Can I borrow this for a moment?  Thank

19   you.

20              I would represent to you that this

21   document Exhibit 8 was provided as some point by USI

22   Insurance to Doctor Rosin or to me.  I would ask that

23   you take a look at the final paragraph on the first

24   page of that.  And by the way, we will call that a

25   composite because we have no way of knowing whether

UNITED REPORTING, INC.
954-525-2221

1    it's a single document or not.

2          A.    Yes, I read the paragraph.

3          Q.    Has T.L. Dallas ever communicated to USI

4    that it should communicate in turn to its own insured

5    the information contained in that final paragraph that

6    says information concerning our fees?

7          A.    No.

8          Q.    Is there anything in the manual or any

9    other documentation provided by T.L. Dallas to USI that

10   specifies who is considered to be the payor of any fees

11   collected by USI?

12         A.    No.

13         Q.    Would it be accurate to say therefore that

14   it's open to interpretation as to who was actually

15   paying those fees?

16               MR. GOLDMAN:   Object to the form.

17         A.    I don't believe so, but I'm not the author

18   of this document, so I have no idea what their thought

19   process was.  There are elements in the paragraph that

20   I can understand their thought process.  It became

21   found upon in the U.S. market place for brokers to

22   receive contingent commissions, commissions on volume

23   of business, and so on.

24               Following the Spritzer Report in New York

25   back in 2004 or five, I believe it was, where certain

Page 131

1    wrongdoing was alleged against Marshall McLennan, and I

2    believe also AON.

3                   Effectively they obviously felt that by

4    disclosing this to their clients they were somehow

5    obtaining their authority to receive such commissions.

6    We don't pay any commissions of that nature and indeed

7    we are precluded from paying commissions of that

8    nature.

9                   The traditional way that insurance is

10   placed in the global market place is whereby the broker

11   is permitted or granted the deduction of a percentage

12   of the premium.

13                  Occasionally, which I do not believe

14   happens very much in the United States, what the broker

15   will do is negotiate a lower premium, which is the net

16   premium, and then charge the insured a fee for placing

17   the coverage.  That's normally done on larger

18   contracts.

19        Q.     You wouldn't consider Doctor Rosin's

20   policy to be one of those larger contracts; would you?

21        A.     No, no, this was not done on the basis of

22   net premium fee.

23        Q.     So, how precisely was USI compensated?

24        A.     By deducting 15 percent of the premium.

25        Q.     Has there ever been any communication

Page 132

1  between USI and T.L. Dallas as to who was considered to

2  be the real payor of that 15 percent?

3       A.    No.

4       Q.    And that's not included in your manual

5  either?

6       A.    No.

7       Q.    Okay.

8       A.    The only thing included is the fact they

9  must act in the interest of their insured or their

10  client.

11      Q.    Are you familiar with a gentleman named

12 Gill Colon, C-O-L-O-N?

13      A.    No.

14      Q.    Never heard that name?

15      A.    I don't believe so.  I understand he was

16 from Nautilus Investigations, but it's not someone I've

17 ever spoken to from Nautilus Investigations.

18      Q.    Is it your understanding that anyone ever

19 tape recorded Paul Rosin in the course of investigating

20 the claim?

21      A.    Yes, I believe Mr. Colon of Nautilus

22 Investigations recorded the interview.

23      Q.    Are you familiar with the circumstances

24 under which that tape recording took place?

25      A.    No, only the location and the time.

Page 133

1      Q.      What did you understand the location and

2    the time to be?

3      A.      I can't recall, but it was recorded on the

4    statement as to where it was recorded and what time it

5    was recorded.

6      Q.      The one that we don't have access to, of

7    course?

8      A.      That's correct.

9      Q.      Did anybody transcribe the tape?

10     A.      Yes.

11     Q.      Did you read the transcript?

12     A.      Yes.

13     Q.      Did you listen to the tape yourself?

14     A.      No.

15     Q.      In the transcript do you recall Mr. Colon

16   making a statement to Mr. Rosin as to what his purposes

17   were in making the tape recording?

18     A.      I don't recall.

19     Q.      Do you recall in the transcript whether

20   Mr. Colon may have made any kind of warnings to Mr.

21   Rosin, such as you may want to consult an attorney?

22     A.      I don't recall.  I believe -- I mean,

23   there was certainly -- it was a voluntary interview.

24     Q.      Was that reflected by the transcript?

25     A.      I believe it was reflected by the

1 transcript.

2     MR. GOLDMAN:  Counselor, you're treading

3    dangerously close and you've crossed over the

4    line to improper questioning on this subject

5    that you know is entitled to protection under

6    the work product exception.  And I'm going to

7    ask you to refrain from any further questioning

8    on the substance of the recorded statement of

9    Paul Rosin.

10     MR. BEAGLE:  Well, I don't agree that it's

11    established that it's work product, but I

12    appreciate your --

13     MR. GOLDMAN:  Bring it up to the court.

14     MR. BEAGLE:  I'm mostly interested in what

15    you're instructing your client not to answer.

16     MR. GOLDMAN:  Well, you keep asking and

17    you'll find out.

18     MR. BEAGLE:  Sounds like a speaking

19    objection to me.

20     I'd like to take a 15 minute break.

21    (Whereupon, another reporter came in and the

22    following proceedings were had.)

23

24

25

Page 135

1     Q.     (By Mr. Beagle) I'm at that spot where I'm

2     tying up the loose ends.

3            Has there been any question in the minds

4     of anybody associated with T.L. Dallas as to whether

5     the incident was an accident or whether it was

6     purposeful?

7     A.     We assumed it was an accident.

8     Q.     Has there ever been an issue in the mind

9     of anyone associated with T.L. Dallas with regard to

10    the truthfulness of Dr. Rosin?

11    A.     That's a difficult question to answer.   It

12    goes back to the application form as to whether we

13    believe there was a deliberate misrepresentation or

14    whether it was just admitting carelessness.   We

15    can't tell that.

16           In Ms. Rosin's deposition, we have to

17    accept what Ms. Rosin says -- I'm sorry, Dr. Rosin

18    says, despite being substantially at odds with her

19    son's testimony, at least in the recording --

20    recorded interview.

21           We are not alleging that Dr. Rosin is

22    dishonest.

23           Does that answer your question?

24    Q.     Partially, yes.   Thank you.

25           Was T.L. Dallas completely satisfied with

1    the cooperation of Dr. Rosin in the course of the

2    investigation?

3         A.    I believe so, although, as I stated

4    earlier, I don't think that Dr. Rosin formed an

5    integral part in the investigation, bear in mind

6    that Dr. Rosin was out of the state at the time of

7    the incident, therefore could not provide any

8    additional information concerning the incident

9    itself, wasn't operating the vessel at the time of

10   the incident; therefore, there was very little that

11   Dr. Rosin could add to the investigation.

12        Q.    I'll ask you to look at Page 13 of the

13   complaint, which I believe is Exhibit --

14        A.    Number 6.

15        Q.    Six, thank you.

16              I'm sorry.  I said Paragraph 13, and I'm

17   mistaken, it is Page 13.

18        A.    You said Page 13.

19              MR. GOLDMAN:  You said Page 13.

20        Q.    Then, in that case --

21        A.    I'm on Page 13.

22        Q.    Paragraph 48, which is on Page 13.

23        A.    Yes.

24        Q.    Okay.  This paragraph alleges that the

25   defendant, Elaine Y. Rosin, never at any time sought

Page 137

1    or requested any additional insurance coverage of

2    the type that might have provided additional

3    coverage for any party named in plaintiff's policy

4    of marine insurance as a simple loss payee, period,

5    end quote.

6            Is that -- do you still believe that to be

7    the case based on the documents that you have taken

8    a look at today?

9        A.    Yes.  There was an endorsement issued that

10   named back in the west, I think it was, as a loss

11   payee, but did not extend the policy to include any

12   breach of warranty coverage and/or lender's loss

13   payable coverage to protect the bank.  All it

14   named -- all it did was name the bank as a bare loss

15   payee.  It effectively meant that in the event the

16   claim was paid under the policy, that the bank

17   should be named as a payee, only payment under the

18   policy.  If there was no payment under the policy,

19   the bank would not be granted any further protection

20   than the original insured.

21       Q.    Thank you.

22            Mr. Usher, were you aware that Dr. Rosin

23   had asked personnel at USI Insurance whether it was

24   appropriate to list her son, Paul, on the

25   application for insurance?

Page 138

1       A.    No.

2       Q.    You were not aware of that?

3       A.    No.

4       Q.    No one ever informed you of that?

5       A.    No.

6       Q.    Would that -- with knowing that affect

7   your decision-making process in terms of waiving

8   what you consider to be a misrepresentation?

9       A.    No.

10      Q.    And that would be your answer even if you

11  knew that USI Insurance had told Dr. Rosin that it

12  was not necessary to name Mr. Rosin on the

13  application?

14      A.    It wouldn't change my decision because it

15  wouldn't be our error, it would be their error.

16      Q.    I'm going to show you a document that I am

17  going to have marked as Exhibit 9, and I would ask

18  you to take a very careful look at this because

19  there is no application in this case, so I would ask

20  you specifically to pay attention to who the insured

21  is.

22      A.    Yes, I looked at it.

23      Q.    Okay.  Not that I have -- not that I think

24  you have any reason to be familiar with it, but are

25  you familiar with that document?

1    A.   No.

2         Q.   I ask you to look at the producer

3    identified under that insurance binder and ask you

4    who that is.

5         A.   It's Royal Marine Insurance Group, who I'm

6    familiar with.  They're based in Miami.

7         Q.   Is that a company that performs a function

8    that is similar to that of USI Insurance?

9         A.   They are a broker, yes.

10        Q.   Are they a broker that you -- that T.L.

11   Dallas does a lot of business with?

12        A.   Yes.

13        Q.   Would Royal Marine have prepared that

14   insurance binder itself?

15        A.   Presumably, yes.

16        Q.   And who is identified as the, quote,

17   company, end quote, at the top of the binder?

18        A.   In this document, it says the company is

19   T.L. Dallas & Company, Limited.

20        Q.   And as far as if you can determine by

21   looking at that insurance binder, would that be an

22   accurate statement that the company in question is

23   T.L. Dallas?

24        A.   No.  The company should be Aviance.

25        Q.   How frequently do the brokers that you

Page 140

1    deal with make that sort of error in their insurance

2    binders?

3           A.    Brokers are not supposed to issue

4    insurance bonds.  We issue a bond.

5           Q.    So if that document is what it appears to

6    be, it should have never been issued in the first

7    place?

8           A.    That's correct.

9           Q.    Okay.  Thank you.

10          Did you or anybody at T.L. Dallas have an

11    interest in directly talking to Dr. Rosin regarding

12    the circumstances of her claim?

13          A.    No.

14          Q.    Do you have any interest in doing that

15    today, with leave of your counsel?

16          A.    Not really.  I can't see there is anything

17    I can say.  I'm sorry.

18                MR. BEAGLE:  Off the record.

19                (Discussion off the record.)

20          Q.    Mr. Usher, were you aware that Gil Colon

21    was hired by Nautilus Investigations about three

22    days before the incident?

23          A.    No.

24          Q.    Were you aware that he was fired within

25    two weeks after taking Mr. Rosin's statement?

1          A.    No.

2          Q.    Do you have any idea why he would have had

3    such a brief tenure at Nautilus Investigations?

4          A.    No.

5          Q.    Were you aware at any time that Dr. Rosin

6    was repeatedly seeking contact with an adjuster with

7    regard to this claim?

8          A.    I believe you asked that earlier.  I'm not

9    aware, no.

10         Q.    Within the last three years, what would

11   you estimate is the percentage of claims denied by

12   T.L. Dallas in the state of Florida?

13         A.    3.96.

14         Q.    Is that the percentage for all three years

15   or --

16         A.    That's the average for a little over three

17   years.  It slightly increased in 2007 because of the

18   increased number of thefts, but it's due to the

19   local economy.  Other than that, it was inside four

20   percent of claims for the period 2006-2007.  As I

21   said, the 2007 year declined in 2008.  That has

22   shown a marked increase up today's seven percent.

23         Q.    So just to confirm that I understood you

24   correctly, over more than the last three years, only

25   3.86 percent of all the claims were denied by T.L.

1   Dallas in the state of Florida?

2       A.   Oh, average, yes.  I can't say in the

3   state of Florida.  I was just telling you overall

4   for all claims.  We maintain records under the

5   Financial Service Authority, and to assist Great

6   Lakes, we maintain records of all claims recorded, a

7   percentage of numbers of policies written and all

8   claims declined.

9       Q.   The Financial Services Authority, is that

10  a UK agency?

11      A.   Yes.  It is the government agency

12  responsible for all financial transactions in the

13  United Kingdom, be it insurance, banking, whatever.

14      Q.   So would the 3.86 percent be inclusive of

15  claims that were made within the UK?

16      A.   We don't write any UK business.

17      Q.   So would that be exclusively the United

18  States?

19      A.   No.  We write United States, Canada, the

20  Caribbean, Far East, Middle East.  Just not United

21  Kingdom.

22      Q.   Do you have a separate percentage only

23  applied to the United States?

24      A.   No.

25      Q.   Has anyone at T.L. Dallas made the

1    assumption that a woman would not be able to handle

2    the vessel that is in question here?

3        A.    No.

4        Q.    Can you be certain of that?

5        A.    Absolutely.  It is an instruction to all

6    my stuff.  They may not discriminate on gender, sex,

7    religion or color.

8        Q.    The last word was?

9        A.    Color.

10       Q.    Do you believe in practical terms the risk

11   to Great Lakes was increased by Paul Rosin at any

12   time handling the boat?

13       A.    Yes.

14       Q.    What are your considerations that you make

15   that conclusion?

16       A.    His background, the fact that obviously

17   the vessel was being used more frequently.  We're

18   not sure what to make of the information given.  I

19   think he was fully familiar with the vessel because

20   he used it 40 or 50 times, when he was totally

21   unfamiliar with the vessel because he had only used

22   it two or three times.  That's yet to be determined.

23             So there is no doubt that it increased the

24   hazard as far as the insured is concerned, the fact

25   that Paul Rosin was using the vessel.

Page 144

1          MR. BEAGLE:   I think I'm pretty close to

2      being done.   I just want to consult with my

3      client.

4              {Whereupon, a recess was had.}

5      Q.    (By Mr. Beagle) Back on.   I only have one or

6  two questions.

7              Do you recall this morning when you said

8  that in general an insured boater should treat their

9  vessel in the same way that the prudent uninsured

10 owner would?

11     A.    Yes.

12     Q.    Okay.   To your knowledge, did anyone ask

13 Dr. Rosin whether she had treated the vessel in the

14 same way that a prudent uninsured owner would have?

15     A.    No, because the circumstances didn't

16 arise.   There is a question you would normally ask

17 someone who, for example, was in a distress

18 position, unsure as to what to do, concerned about

19 prejudicing their insurance, and the standard

20 instruction of all insureds is to act as a prudent

21 uninsured.   If you can't sink or obtain guidance as

22 to what to do, then act as though you were

23 uninsured.   And, invariably, in the vast majority of

24 cases, that is acceptable through their insurance

25 company.

1              That wasn't the situation here.

2         Q.    Nevertheless, did anyone ask her that

3    question?

4         A.    No.

5              MR. BEAGLE:  That's all I have.

6              MR. GOLDMAN:  We waive reading and

7         signing.

8              MR. BEAGLE:  Ordering.

9              MR. GOLDMAN:  A copy.

10             (Thereupon, the insurance binder referred

11        to was marked for Identification as Defendant's

12        Exhibit 9.)

13             AND FURTHER DEPONENT SAITH NAUGHT

14                     STIPULATION

15        It is stipulated by and between the parties that

16   signature of the witness be and is hereby waived.

17             (Deposition concluded at 3:30 p.m.)

18

19

20

21

22

23

24

25

1                        STIPULATION

2              It is hereby stipulated by and between

3    counsel for the respective parties and the witness that

4    the reading and signing of the foregoing deposition and

5    notice be, and the same are hereby waived.

6              AND FURTHER DEPONENT SAITH NOT

7                   ---------------

8

9                        CERTIFICATE

10

11   STATE OF FLORIDA )

12                    )   SS:

13   COUNTY OF BROWARD)

14

15             I, TERRI L. WRIGHT, Certified Shorthand

16   Reporter, certify that I was authorized to and did

17   stenographically report the foregoing deposition; and

18   that the transcript is a true record of the testimony

19   given by the witness.

20

21             I FURTHER CERTIFY that I am not a

22   relative, employee, attorney, or counsel of any of the

23   parties, nor am I a relative or employee of any of the

24   parties' attorney or counsel connected with the action,

25   nor am I financially interested in the action.

Page 147

1            Dated this 12th day of February, 2009.

2

3

      _____
4                TERRI L. WRIGHT,
                 Certified Shorthand Reporter
5

6

7                   _____
8                CERTIFICATE OF OATH
9    STATE OF FLORIDA )
                      SS
10   COUNTY OF BROWARD)
11            I, the undersigned authority, certify
     that BERIC ANTHONY USHER personally appeared before me
12   and was duly sworn.
13            WITNESS my hand and official seal this
     12th day of February, 2009.
14

15

      _____
16               TERRI L. WRIGHT, Notary Public,
                 State of Florida
17               My Commission No.: DD 508762
                 Expires: April 30, 2010
18

19

20

21

22

23

24

25

**A**

abandon 86:17
abbreviated 47:13
abbreviation 53:1
abide 28:23
abides 21:4
ability 33:24
able 37:21 67:25
    143:1
above-entitled 3:4
    3:18
absence 57:5
absentee 82:13 83:8
absolute 100:21
Absolutely 143:5
absurdity 66:5
accept 34:8 66:16
    98:22 135:17
acceptable 34:10
    35:8 36:20 39:12
    78:6 144:24
accepted 63:15
    77:18
access 33:4 61:11
    61:15 133:6
accessing 61:9
accident 104:14
    105:10 109:5
    128:1,4,11 135:5
    135:7
accidental 99:24
account 42:13
    44:10,11 52:23
    67:10 74:21
accountancy 14:1
Accountants 14:2
accounts 13:24
accredited 115:15
accuracy 28:7
accurate 13:16 23:3
    38:18 105:23
    107:6,24 130:13
    139:22
achieved 13:23
acknowledge 49:8
Acord 2:15,19 77:4
    77:14,15,17 78:3
    109:15
acquainted 121:16
act 31:10 34:2
    50:19 62:3 84:25
    85:11,25 86:10
    132:9 144:20,22
acting 13:17 28:16
    34:1 86:24
action 3:24 11:17

23:8 50:20,20
62:6 84:24 109:22
123:5,9 146:24,25
actions 86:20 123:3
    124:19
active 81:19
activities 64:14
activity 14:19 36:23
    85:6
acts 85:17
actual 37:25 47:21
    86:13
add 61:1 136:11
added 95:25
addition 16:22 42:7
    61:4
additional 9:19
    96:3 98:9 99:2
    136:8 137:1,2
additions 64:11
address 4:9,13,14
    120:13,18
addressed 53:23
adequate 63:3
adjust 61:2 115:21
    115:25 116:9,12
adjuster 26:1
    115:22 116:4,15
    116:24 117:10
    119:18 141:6
adjuster's 115:20
    119:15
adjusting 115:23
    116:7
adjustment 116:5,6
administered 75:7
administration
    38:5,6,23 39:1,16
    64:20
administrative
    60:21
administrator 38:7
Admiralty 1:2 3:8
admitted 27:8
admitting 135:14
advance 46:17
    103:18 104:8
    105:12
advanced 13:23
advantageous
    24:19,25
advertising 63:13
advice 85:25,25
    86:7,12
advise 50:20 85:21
    96:23 104:21

advised 10:4 98:6
    99:2 109:20
affair 51:14
affect 138:6
afford 49:20,21
    96:21
afforded 74:10
    98:10 99:5 101:7
    116:1
afternoon 103:6
age 3:17 13:25
    24:10 37:1 73:3,6
agencies 87:14
agency 7:24 8:2,4,8
    8:10,16 9:6,18
    14:10,11 28:17
    33:6 48:8 68:16
    77:21 85:14
    114:25 142:10,11
agent 33:12
agents 13:9 27:12
    27:15
aggregate 18:23
ago 57:24 58:16
    59:14,18 75:10
agree 34:14 45:3
    134:10
agreed 21:5 28:9
    45:1,22,22 46:14
agreeing 28:23
agreement 50:15
    54:12,16,17
ahead 5:14 14:5
    15:4,13 103:23
    122:16
albeit 26:8 38:11
alcohol 127:19
alert 62:16 64:6
Alexandra 38:5
allege 128:7
alleged 102:19,25
    125:2,18,22
    127:25 131:1
alleges 136:24
alleging 128:8
    135:21
Alliance 43:23 44:1
    44:7 45:2,13
allocation 45:7,21
allow 42:13 116:15
    122:10
allowed 91:10
    129:1
allows 89:15
alongside 42:24
    43:3,7,13 44:13

44:22
alter 59:22
alternative 45:10
ambiguous 67:21
    80:7
amend 61:2
amended 61:6
amendment 61:7
    95:25
amendments 63:21
America 111:21
American 14:22
    15:18 64:22
    115:16
amount 116:17,20
    119:4
and/or 10:18 24:11
    26:1,12 43:17
    63:4 68:22 91:23
    101:12 127:19
    137:12
Annamarie 69:19
    69:20,21
announce 82:12
annual 95:7,8
Annually 42:11
Anslow 38:6,8
answer 5:6,10,11
    5:12,14 21:23
    36:2 90:7 122:13
    123:6 134:15
    135:11,23 138:10
answers 76:5
Anthony 1:23 2:4
    3:1,16 4:2 147:11
anticipate 82:7 87:2
    88:14 95:13
anticipated 83:25
anybody 29:10 44:6
    48:18 50:5,6 61:9
    69:22 73:14 74:11
    80:10,12,14 89:1
    100:7 105:2,5
    109:4 112:14
    123:15 125:21
    133:9 135:4
    140:10
anyway 34:14
AON 131:2
apart 118:24
appear 49:7 50:2
    62:12 91:21 101:9
APPEARANCES
    1:14
appeared 147:11
appearing 1:16,18

48:11 50:3
appears 39:10
    101:16 140:5
applicable 121:1,1
applicant 32:25
    82:7 98:16 99:7
    99:11
application 2:14,15
    30:22 31:16,19,22
    32:4 35:5,8,14,18
    36:14,17 38:1,13
    38:14,21 39:2,9
    39:17,22 40:9,15
    40:18 41:6 48:24
    54:8,13 62:17,24
    63:13,16,19 64:12
    65:3,20 66:9,13
    66:14,21,23 67:7
    67:15 71:11,14,22
    72:1,4,15,23
    74:19 75:13,16
    76:2,10 77:4,22
    78:4,7 79:13 80:9
    80:21,25 82:6,18
    82:24 89:3,24
    91:4,9 94:11,15
    94:19 95:3,12,14
    96:1 97:6 98:4,12
    98:17,20,22 100:1
    101:11 102:13
    103:14 104:1
    105:4 111:4 120:2
    135:12 137:25
    138:13,19
applications 36:6
    37:12,17 40:20
    41:5,10,12,14,25
applied 46:18
    142:23
apply 20:25 78:6
appoint 26:1
    119:17
appointed 58:19,20
    62:2 110:5 111:25
    112:13 113:2,8
appointment 50:13
apportionment
    46:5
appreciate 134:12
apprised 96:20
approach 69:11
    96:15
approached 56:15
    56:17
appropriate 18:24
    21:15 63:2 73:3

84:23 88:22
106:20,22 107:18
120:10 122:20
137:24
approval 36:12
52:20 61:15 80:15
96:13 97:2 105:11
approve 50:13,21
90:8
approved 26:19
27:7,10 33:11,13
62:2 91:4 94:10
96:22 101:13
104:8,10 105:12
105:18 106:4
Approximately
4:21
April 70:24 147:17
archive 74:16,18
area 20:9 29:21,22
29:23 32:18,19
35:8
areas 18:23 73:5
111:23 112:1
120:12
argue 28:21 65:22
66:1
arising 32:2 40:5
arrange 49:24
arrangement 45:5
arrears 42:13
arrest 127:17
art 10:13,24 13:24
artwork 64:3,21
71:19 79:23
asked 17:1 50:2
67:5,6 71:17,18
71:24 72:16 75:12
78:13 79:16 93:17
113:22,25 115:23
137:23 141:8
asking 73:20 75:18
75:19 86:23
134:16
asks 30:22
aspect 14:20 82:22
112:10,16
aspects 65:20 67:1
90:16
asserted 99:17
assess 20:23 39:5
assesses 39:14
assessment 28:2
63:1 118:3
asset 48:6
assist 142:5

assistance 85:7 87:9
assistant 37:21
assistants 37:18
68:22
associated 8:16
14:23 59:5 68:16
74:6 100:7 135:4
135:9
associates 69:16
association 7:22,23
8:9,22 14:2 68:24
69:3 115:18
assume 60:9 79:24
95:18
assumed 135:7
assuming 10:21
assumption 143:1
Atlas 32:16,16
attached 22:1 23:8
23:21 24:1 51:22
53:19 59:5,9
attachments 59:8
attack 84:12
attending 70:6 71:3
attention 72:22
87:9 124:18
125:17 138:20
attorney 57:10
133:21 146:22,24
attorney's 126:3,4
attract 87:8
Augustine 29:25
author 130:17
authorities 16:14
16:17,18,21,25
17:6,22,23 33:3
45:18
authority 17:14
45:16 50:12 51:13
131:5 142:5,9
147:11
authorized 146:16
authors 64:18
automatically 61:5
available 77:10
average 141:16
142:2
Aviance 139:24
aware 11:16 58:2,5
59:21 68:15 69:1
71:15 73:18,19
87:18 99:25 100:2
103:18 117:9
118:15 122:18
123:16 137:22
138:2 140:20,24

141:5,9
awhile 5:5 76:11
A-N-S-L-O-W 38:9
A-N-T-H-O-N-Y
4:3
a.m 1:12 3:13 48:4
48:10
A4 64:22,22

_____ B _____

B 55:7
back 14:24 15:2
16:15 17:22 35:24
36:3 38:16 39:10
47:11 51:3 59:20
70:17 73:10 74:12
74:15 78:16,19
107:10,13 130:25
135:12 137:10
144:5
background 13:20
30:24 35:1 58:24
73:3 97:1 110:8
110:24 119:24
126:17,21 127:3,5
127:7,9,11,15,25
128:1 143:16
backing 10:10,18
Bahamas 87:11
89:21
bank 1:7 3:6 56:4
56:20 137:13,14
137:16,19
banking 10:15
142:13
bare 137:14
Barker 36:9
base 48:6
based 36:17 42:4,6
66:13 97:4 111:22
137:7 139:6
basic 24:12 28:1
34:13
basically 23:23
24:21 35:7 71:17
112:16 115:24
basis 18:17 20:11
20:14 34:17 36:24
42:3,7 53:5 90:9
95:7,8 118:3
131:21
Bate 76:20
bathroom 87:25
88:4,12,16
Beagle 1:17,18 2:6
3:21,22 5:22 6:1,6

7:16,18 14:24
15:4 35:24 36:5
40:24 41:2 51:21
52:3 55:5 62:7,12
66:8 73:10,24
74:2 76:13,18
78:8 79:1,4,7,10
99:19 101:19,21
102:1 107:10
108:11,13 117:3,8
121:5,18,24
122:12,16 126:1,4
126:14 129:4,9
134:10,14,18
135:1 140:18
144:1,5 145:5,8
bear 49:20,21 136:5
bears 51:23
began 121:25
behalf 1:16,18 3:2
13:12 17:4,16
18:17,24 25:22
50:2 52:22,22
53:15 77:22 102:3
115:6,6
belief 125:22
127:25
believe 5:19 7:20
11:1 15:22 19:10
22:5 24:3,18 29:5
33:21 39:24 40:1
41:3 48:15 51:23
54:7 57:18,21
58:18 64:3 65:2
68:17,22 72:3,10
77:1,8,13 79:25
84:22 91:23 92:12
92:16 94:2 98:12
99:12 102:5 109:6
109:25 110:3
112:12 117:2,22
119:10,13 123:13
124:12 125:7
127:17 130:17,25
131:2,13 132:15
132:21 133:22,25
135:13 136:3,13
137:6 141:8
143:10
Benefit 51:18
Beric 1:23 2:4 3:1
3:16 4:2 147:11
Berisford 15:15,23
22:15
best 9:22 10:23
12:24 27:23 31:11

31:12 34:2 48:4
48:10 102:18
108:6
better 35:21
beyond 21:12 57:14
57:25 66:3 82:16
billion 48:6,7
binder 2:19 139:3
139:14,17,21
145:10
binders 140:2
binding 16:16,17,18
16:21,25 17:6,22
birth 4:7
block 100:25
board 36:24 87:3
88:15,23 89:1
91:11,14,16,20
94:3,9 104:15
boat 23:11 24:19
25:6,9,10,12 33:6
33:25 58:20 66:2
80:10,11,13,21
81:2,3,4,6 82:8
85:5,9 86:21,22
88:1,15 95:15,19
95:22,23 96:16
97:23,25 98:1,4
98:11 104:18,22
105:6,8,11,12,17
106:3 114:1
143:12
boater 144:8
boaters 87:15
boating 127:20
boats 87:15,19
body 53:24
bond 140:4
bonding 9:17 16:14
33:3
bonds 140:4
book 21:13
booking 124:13
bordereau 18:14
bordereaux 18:12
19:19,22,24 20:2
borrow 129:18
Botcher 21:19
bottom 51:24 52:10
124:1
bought 6:22,24 7:8
bound 18:4
brackets 79:21,23
breach 100:20
106:16 127:21,21
137:12

**break** 40:25 41:3
73:11 87:25 88:4
88:8,12,16 101:19
134:20
**brief** 28:13 40:25
41:1 73:9 93:13
101:19,20 141:3
**briefer** 51:14
**bring** 29:1 46:9
84:14 88:13
134:13
**British** 47:8,9 64:22
93:16
**broker** 11:12 15:15
15:17,24 25:9,25
27:24 28:4,16,22
31:1,10,15 32:14
32:18,24 33:12,13
33:14,20 34:1
55:16 56:16,17
67:9 75:17,25
76:3,4,8 85:24
96:13,19,20,22
97:21 98:6,8,15
99:2,6 104:20
131:10,14 139:9
139:10
**brokers** 10:4 13:5,6
18:19 27:19 28:20
29:12,21,24 30:2
30:9,16,16 32:8
32:12 33:2,24
63:12 66:8,19
67:13 129:2
130:21 139:25
140:3
**brought** 52:17 65:2
72:14
**Broward** 3:11
125:1 146:13
147:10
**Brown** 23:18 36:8
52:19 64:18
**bulk** 52:11 123:7
**Burton** 36:9 39:24
72:3,6
**Burton's** 72:9
**busiest** 41:15
**business** 4:13,14
8:13 9:13 11:4
13:7,12,12 14:22
15:8,17 16:7 17:4
17:16 18:7,7
20:24 21:13,14
23:4,19 26:9
27:18 28:19 29:9

29:13 30:11,12,16
31:3,5 32:17,24
33:11 41:11,14
42:23 45:15 47:6
47:7,10,15,20
48:13,16,20 50:5
52:22 67:11 68:18
69:2,14 73:15,16
129:3 130:23
139:11 142:16
**busy** 41:19
**buy** 86:22
**B-E-R-I-C** 4:2,6
**B-O-R-D-E-R-E-...**
18:13
.....

— C —

**C** 54:11 91:2
**call** 32:7 55:6 61:16
85:7,7 94:24
96:13 129:24
**called** 6:23 14:2,9
14:15 15:6,14,24
23:17 24:2 32:15
32:15 95:5 120:21
**Canada** 142:19
**Canadian** 47:11
**canal** 125:1
**Cancelled** 2:18
**Cancer** 55:23 89:14
**cap** 13:11
**capable** 119:19
**capacity** 13:11
37:16
**caps** 79:18
**captaining** 93:6
**care** 86:21
**career** 14:3
**careful** 138:18
**carelessness** 135:14
**Caribbean** 111:21
142:20
**carrier** 21:1 43:19
43:22
**carries** 24:17
**carry** 24:22
**case** 1:3 5:4 11:23
23:22 43:20 54:21
58:3 83:16 90:21
108:16 116:24
120:4 121:1
136:20 137:7
138:19
**cases** 144:24
**casualty** 40:11
**catastrophe** 18:25

49:16
**catastrophic** 49:18
**categorization**
37:13
**category** 37:8
**Catherine** 38:4
**caught** 66:2
**causation** 128:10
**cause** 3:4,18
**caused** 128:1,4
**causes** 60:6
**cell** 96:12
**Central** 111:21
**certain** 68:9 130:25
143:4
**certainly** 19:12
25:14 40:20 41:15
50:5 60:14 63:21
64:17,20 65:6
67:8 70:9 80:20
84:2 95:23 109:13
112:25 113:20
119:18 120:17
133:23
**CERTIFICATE**
146:9 147:8
**Certified** 146:15
147:4
**certify** 146:16,21
147:11
**cetera** 71:8
**change** 6:20 9:5
10:1,4 14:3 48:19
49:8 51:6,9 71:18
71:21 95:24
138:14
**changed** 8:24 12:14
19:10,15 22:18
63:24 64:2 71:16
74:14 102:24
**changes** 52:14
64:24 65:9,15
71:13
**channel** 81:19
**chap** 32:15
**charge** 81:7 131:16
**charged** 53:21
128:25
**charter** 47:8
**Chartered** 14:2
**chartering** 64:9
**charters** 47:5
**check** 30:24 53:13
74:2,8,9,18,25
110:8 115:10
127:3,5,11

**checked** 119:15
**checking** 53:12
74:20 126:9
**checks** 58:24
110:24
**child** 85:5,8
**chose** 109:19
**chosen** 127:13
**chronological** 60:5
**Cincinnati** 56:4
**circumstance** 56:22
105:9
**circumstances** 24:6
25:12 37:6 58:21
58:24 82:10,21
84:16,23 88:17
95:24 96:5,10
104:23 107:17
110:1,6,22 113:11
113:15 119:24
122:20 132:23
140:12 144:15
**citations** 127:23
**Civil** 120:22
**claim** 21:11 25:17
40:4,5 56:25
59:23 105:14
106:7 107:23
109:15,21 112:3,7
115:21,23,25
116:8 121:6 122:1
127:1 132:20
137:16 140:12
141:7
**claims** 13:13 19:1,2
21:6,10 23:16
25:14,16,23 57:22
61:13,18 86:4
109:8,14 112:8,10
112:17 113:5
115:11 116:23
117:12,20 118:2,2
120:3 121:16
141:11,20,25
142:4,6,8,15
**classes** 30:11
**classic** 122:3
**clear** 5:11,17 60:15
88:6 98:17 99:7
121:14 124:8
**clearly** 85:8
**client** 6:2 132:10
134:15 144:3
**clients** 131:4
**close** 48:7 118:19
134:3 144:1

**closely** 73:13
**club** 83:6
**Coast** 87:13 89:20
**code** 4:12
**coincidence** 52:16
**coined** 85:13
**colleagues** 23:17
**collect** 28:6,8 111:8
**collected** 130:11
**collectively** 54:2
**Colon** 132:12,21
133:15,20 140:20
**color** 143:7,9
**come** 70:10,12
122:8
**comes** 56:19
**comfortable** 72:18
**coming** 40:17 41:14
57:17,24
**command** 81:4,6,7
93:7,9,14,24 94:4
**commence** 120:6
**commencing** 3:12
**comment** 57:22
**commercial** 15:8
20:19 36:23 64:10
**commission** 129:2
147:17
**commissions**
130:22,22 131:5,6
131:7
**common** 47:17
**communicate** 130:4
**communicated**
130:3
**communicating**
33:16
**communication**
109:19 131:25
**community** 32:6
**companies** 6:23
13:10 21:19 42:16
43:2 47:19 74:6
77:19,19 129:3
**company** 10:10
11:22,22 14:6,8,9
14:12 15:14 17:25
18:10 41:17 42:21
43:23 46:23 47:6
47:7,9,9,12,19,21
47:24 49:20 63:15
77:16 86:14,22
129:1 139:7,17,18
139:19,22,24
144:25
**compel** 121:6

compensated 131:23
competition 41:24
compile 119:8
complaint 2:16
21:23 23:8,21
51:22 55:7 62:6
102:2 104:25
124:17,20 126:15
128:13 136:13
complaints 19:4,5
complete 39:7 53:7
62:13 110:8
completed 35:5,9
63:3 66:15 76:10
95:3,6 96:4 104:1
completely 135:25
complex 20:17
compliance 34:21
47:23 51:12
composite 55:6,11
56:7 129:25
computer 21:3,4
computerized 61:8
concept 92:14
concern 21:7 73:5
120:12
concerned 11:24
32:3 34:12 73:1,4
80:22 89:15 91:13
105:2,4 106:3,11
109:21 119:19
122:17 143:24
144:18
concerning 130:6
136:8
concerns 31:20
69:11 75:17
concert 18:24
concluded 145:17
conclusion 116:19
128:10 143:15
condition 101:6
conditions 20:24
54:11 55:20
conduct 26:2 27:18
29:9 50:13 67:11
69:23 106:13
110:23 111:23
113:21 114:11
120:6 127:2
conducted 102:21
conducting 32:18
Conference 70:7,15
confine 120:14
confirm 107:1

141:23
confirmation 34:22
conflict 31:7,9
32:23
conformity 115:25
confronted 86:9
confusion 11:10,13
11:15 65:16 78:23
Conger 15:9
conjecture 85:20
connected 146:24
consequences 76:4
consider 20:8 27:19
32:8 33:7 81:18
82:2 87:21 88:19
97:12 100:25
106:14,23 124:6
131:19 138:8
considerations
143:14
considered 122:5
130:10 132:1
consist 56:8
constellation
108:17
constitute 66:2
constitutes 54:14
construction 37:2
consult 21:6 33:20
33:21 133:21
144:2
consultancy 15:5
consultants 14:15
consulted 58:13
61:12 100:11
consulting 33:19
37:22
contact 32:10 85:23
96:13,25 99:10
104:20 141:6
contacted 33:6
50:10 98:8 99:2
contacting 32:24
contacts 32:22
111:21
contain 62:19
contained 130:5
content 48:15 64:4
72:19
contents 56:7 75:13
75:15,24 100:25
context 10:8
contingent 130:22
continue 122:11
continued 14:21
15:7

contract 15:19,21
16:2,3,5,9,11,19
22:2,7,9,10,14,16
22:18,19,22,24
23:4,13 24:1
28:21,25 43:5
45:25 50:17,23,25
51:2,6,10,14,15
51:16 54:15 67:24
99:3
contractor 115:3
contractors 115:4
contracts 14:23
16:22 17:13,14
131:18,20
contractual 28:3,19
contrary 33:1
control 17:11 92:21
93:3,18 94:1,4
104:13
convenience 12:10
conversant 66:25
conversations
69:24
conveys 92:14
cooperation 136:1
coordinates 45:6
coordinating 44:20
copies 60:15
copy 15:11 29:1
30:18,20 31:24,25
120:1,2,2,5 145:9
copyright 77:12,13
copyrighted 63:16
core 42:21 43:19
corporate 9:3 47:17
Corporation 77:14
correct 6:9,10 8:14
9:11,24 10:22
12:4 13:18 16:20
17:3 19:20 23:2
27:20 35:16 38:23
41:18 46:16,19,24
48:2,14 52:25
53:1 56:10 58:7
60:12 62:21 66:18
67:16 71:9,22
75:14 81:3 82:5
85:12 91:24 92:8
93:19 101:17
102:8,19 107:5
111:5 119:5 123:2
126:2 128:21
133:8 140:8
correctly 141:24
Costs 118:10

cost-plus 42:7
counsel 5:7 50:14
51:23 60:4,6
61:17,25 62:1,2
76:19 78:17,25
117:22 125:24
140:15 146:3,22
146:24
Counselor 134:2
Counsel's 120:20
121:9
Counter-claim
21:23
country 61:17
County 3:11 125:1
146:13 147:10
couple 74:21
course 10:5 12:12
58:10 76:23 84:11
85:3 106:12,18
109:22 113:10
132:19 133:7
136:1
court 1:1 3:7 5:24
6:5 15:2 36:3
52:2 55:4 62:11
76:17 78:19
101:25 107:13
117:7 129:8
134:13
cousin 97:11 104:18
cover 2:13 55:14
90:10,13,17,21
coverage 23:9
31:11 56:24 67:1
80:15 84:17 86:6
86:13 91:18 96:21
97:3 98:10 99:4
101:7 102:14
104:2 105:21,25
106:5,15 107:22
108:24,25 110:17
110:20 115:24,25
119:3,4 122:18,21
122:23 123:1,21
124:7 131:17
137:1,3,12,13
coverages 66:25
covered 90:13 91:2
91:2,17 101:11
co-insure 45:18
crash 122:8
crew 64:11
criminal 126:17,21
127:5,7,9,15,25
128:1

criteria 24:12
crossed 134:3
cruising 87:7
current 13:5 27:21
30:25 67:20,21,22
currently 74:13
curriculum 2:11
6:7
cursory 30:24
114:13
customarily 117:24
C-O-L-O-N 132:12

D

D 2:1
Dallas 6:18,22,25
7:7,7 8:25 9:3,13
9:21,23 11:21
12:7,12,13,17,25
13:8,15,16 16:1,5
16:7 20:12 22:20
23:1,5,15,20 25:4
26:4,5,13,22,24
26:25 27:12,24
28:20 29:12 30:4
30:9 33:15 35:13
35:17 42:16 43:17
46:15 52:18 56:23
58:6,13 59:23
60:17 61:17,24
63:8,19 65:1
66:10,19 73:14
74:4,24 75:8,12
75:21 76:6 80:18
84:17 100:7,11
106:24 107:3
109:4,23 112:3,16
112:24 115:9
116:3 118:20,23
119:8 121:25
123:19 124:2,6
125:6,10,21
127:15,24 130:3,9
132:1 135:4,9,25
139:11,19,23
140:10 141:12
142:1,25
Dallas's 126:22
damage 110:2
113:6,12,16
114:20 116:14
damaged 116:12
damages 116:20
118:24 119:5
dangerously 134:3
Darby 15:24

dare 87:8
data 39:3
database 74:13,15
date 4:7 8:18 35:6
  59:17 61:10 98:3
  109:9 124:14,24
  124:25
dated 117:23 147:1
day 3:12 40:21 41:5
  41:9 84:24 94:3
  99:22 104:19
  105:1 106:12
  147:1,13
days 68:12 94:24,24
  140:22
day-to-day 20:11
  20:14,15 117:12
  118:2,3
DD 147:17
deal 13:5,13 20:15
  20:17,20 25:20
  27:22 29:24 30:3
  30:23 31:1 33:2
  68:21,23 69:8,17
  117:11 118:1
  140:1
dealings 68:19
dealt 8:11 11:12
decided 106:21
  127:12
decision 44:8 50:8
  98:20 125:14
  138:14
decision-making
  138:7
declared 91:5
  101:14
decline 107:23
declined 141:21
  142:8
deducted 128:25
deductible 53:22
  55:18
deducting 131:24
deduction 131:11
defendant 3:24
  50:19 102:14
  136:25
Defendants 1:8,18
  2:9 3:2,6
Defendant's 6:4,8
  52:1,4 55:3 62:10
  76:14,16 101:22
  101:24 117:4,6
  129:7 145:11
defenses 106:21

defines 92:17
definition 80:17
  81:1 92:20 94:1
  104:4 122:22
definitions 2:12
  92:19
delay 109:9
delegate 112:9,13
delete 59:22
deliberate 99:24
  135:13
delivered 68:10
delivery 124:9
denied 25:18
  141:11,25
deny 84:17 119:4
  122:1 123:1
denying 119:3
department 11:24
  21:6 25:24 38:17
  38:19,24 39:1,11
  39:13,16,21 49:3
  64:20 71:25
departments 18:21
  48:24 49:8
depend 74:12 90:2
  104:5
dependents 79:19
depending 35:3
  36:14 87:18
depends 87:5,23
  88:3,20 113:3
deponent 121:18
  145:13 146:6
deposed 4:23,25
deposition 1:21 3:1
  4:18 49:23,24
  57:9,16,20,25
  58:14 71:3 76:23
  102:24 123:16
  128:15 135:16
  145:17 146:4,17
depositions 11:19
  57:12 124:10
depreciation 24:22
  24:23
describe 62:22 63:9
  91:25 92:9
described 37:5
  108:7
designated 112:3,7
designed 62:25
  128:15
despite 135:18
destination 81:10
  81:12

detail 53:20 54:23
  67:21 82:14
  115:22
detailed 52:10
  80:16,24 82:19
  91:3 98:14,18
  101:12 108:23
  114:16
detailing 18:16
  51:11
details 30:21 31:22
  34:7,23 45:23
  53:20 55:15,16,19
  67:17,18 97:1
  98:8 110:7 127:14
determination 86:4
  100:8,12 108:1,4
  108:16,24 118:23
  120:9 122:1 124:2
  125:10 126:22
  127:12
determinations
  113:19
determine 32:11,23
  39:4 40:17 73:2
  102:20 106:7,13
  107:18 108:20
  111:2 139:20
determined 35:14
  42:10 110:3
  114:16 122:24
  143:22
determines 85:17
determining 63:1
  73:4 105:13
  127:10
develop 42:14
developed 15:19
  22:2,4,9,14 50:24
difference 25:1
  33:4 49:10 80:1
  89:1 99:18 106:2
differences 38:15
different 4:20 6:16
  34:15 51:2 92:24
  93:10 128:18
difficult 49:6
  135:11
direct 2:6 3:20
  25:10,11 28:2
  68:19 73:15 90:17
  124:17 125:17
direction 88:7
directly 19:6 25:20
  33:7,16 73:16
  75:21 115:8

140:11
director 21:10
  23:16,17 57:22
  61:18 112:8
disappearance
  125:18,22
disapprove 50:22
disaster 86:9
disclose 97:7,12
  102:15
disclosed 40:4,14
  91:9 102:22
  105:18 127:15
disclosing 131:4
disclosure 72:14
  126:17
discovery 3:3 121:2
  121:12
discrepancies 38:16
discrepancy 39:8
discretion 106:24
discriminate 143:6
discuss 25:8 44:6
  69:13
discussed 20:25
discussing 15:19
  58:1 60:18 75:10
discussion 51:19
  52:20 66:6 73:25
  126:12 140:19
discussions 25:10
  25:11,24 26:2
  75:11
dishonest 135:22
dispatched 60:3
  109:25
distinction 100:17
distress 105:10
  144:17
distressed 84:3
distributed 29:19
District 1:1,1 3:7,8
diverse 16:5
division 21:3
dock 82:3
Doctor 3:23 23:9
  39:21 41:5 54:21
  56:8 57:12 61:13
  72:1 74:3,25
  76:10 90:13 93:15
  97:13 99:12,24
  100:2 113:23
  114:3 117:9
  123:12,14,17,18
  123:20 127:6
  128:22,25 129:22

131:19
document 6:3 17:9
  17:9 28:14 51:22
  51:25 53:7,18
  54:1,3 55:2,14
  62:9,12 63:16
  68:2 76:15,22,24
  101:23 102:4,6
  117:5 129:6,12,15
  129:21 130:1,18
  138:16,25 139:18
  140:5
documentation
  59:23 119:8 130:9
documents 17:7
  38:25 57:15 59:5
  59:11 60:1 61:7
  72:5,7 74:16,18
  129:13,14,16
  137:7
doing 11:4 60:25
  67:9 88:11 116:6
  140:14
dollars 43:5 46:7,7
  46:9,12 48:7
domestic 41:21
double 79:23
doubt 118:21
  143:23
Downsway 4:15
Dr 135:10,17,21
  136:1,4,6,11
  137:22 138:11
  140:11 141:5
  144:13
drafted 23:13,15
  52:17 64:16 92:23
drinking 128:6
Drive 4:11
driving 123:23
  126:18 127:18
  128:11
drugs 127:19,19
due 104:14 141:18
duly 3:18 147:12
duties 16:4,8,10
  17:10,15
duty 108:22

———— E ————
E 2:1
earlier 27:20 34:13
  52:18 53:12 72:13
  102:25 104:12
  114:7 136:4 141:8
early 16:4

easily 87:9
East 48:23 89:20
  142:20,20
economies 13:24
economy 141:19
education 13:21
effect 78:13
effectively 13:10
  47:10 49:13 60:7
  60:25 86:15 98:1
  104:11 105:5
  107:15 131:3
  137:15
effects 91:25 92:10
eight 88:11
either 25:5 30:7
  43:12 44:16 45:11
  50:19 73:19 132:5
elaborate 107:15
Elaine 1:7 3:5,23
  6:1 102:14 136:25
elect 107:4
elected 14:3
electronic 18:12,15
  18:18 61:3,5
electronically 60:13
electronics 118:17
elements 24:23
  120:15 130:19
eligible 11:25 13:3
  26:20 27:10 49:5
eliminating 128:16
embarked 107:16
emblematic 122:5
emergencies 83:25
  84:5 88:17
emergency 87:4,17
  88:19 96:11
  103:10 104:13
  105:9 124:15
eminently 119:19
Emma 38:12
employ 110:12,15
employed 84:4
employee 8:1
  146:22,23
employees 116:3
employer 6:11,12
employment 64:11
enables 30:24 63:11
enabling 18:6 27:21
encompassed 58:23
endorsement 56:2
  56:13 57:5 96:2
  137:9
endorsements

ends 135:2
energy 44:11
enforced 13:1
engaged 36:23
  64:13 65:1
engines 118:17
ensure 21:4 39:6,11
  66:25 67:13
enter 5:23 25:6
entertain 63:5
entire 54:14 122:6
entirely 107:6
entirety 60:4 62:6
entities 7:5 9:10,25
entitled 122:25
  134:5
entity 7:11 8:12 9:4
  10:20 12:13 17:11
  22:25
equally 83:24
equipment 83:18
equivalent 60:7
error 126:3,3,4
  138:15,15 140:1
errors 30:20
ESQUIRE 1:15,18
essential 73:1
essentially 50:7
  81:20
establish 30:25 31:4
  74:10 100:14
  105:17 106:19
  107:17 108:23
  110:23 113:6,11
  122:19
established 102:12
  113:23 114:7,21
  134:11
establishing 106:10
estimate 111:15
  118:21,24 141:11
Estimated 118:10
et 71:8
ethical 28:5,10
Europe 19:23 48:22
event 20:15 34:24
  41:23 44:25 45:16
  46:8,11 50:18
  56:25 59:24 60:1
  82:12 83:1 85:22
  87:4,16 96:23
  98:19 137:15
events 58:9
everybody 21:1
  46:17 127:5

evidence 3:4 128:7
exact 78:8
exactly 9:20 10:9
  67:9,18
exaggeration 103:1
  103:1
Exall 15:24
examination 2:3
  3:20 14:1
examine 38:21 39:1
  39:4
examined 35:13
  39:21 40:9 71:25
  72:11
examines 35:18
  38:1
examining 37:17
  89:3 117:9
example 32:14 39:8
  43:4 45:1 53:16
  67:20 83:4,7
  85:22 86:19 88:10
  89:12 93:6 103:10
  104:12,16,17,20
  113:2,4,25 116:7
  121:6 122:3
  144:17
examples 34:18
exceed 89:13,21
exceeding 94:24
exceeds 43:5 45:16
  46:8,12
exception 134:6
exceptions 9:15
  52:24
excess 24:9 43:11
  43:15 46:13 48:6
exchanged 7:9
exclusive 16:6,24
  30:3,11,12 46:1
exclusively 16:8,11
  111:25 142:17
exclusivity 30:7,8
Excuse 105:22
executed 29:6
executive 50:7
exhibit 6:4,8 15:11
  52:1,4 53:8 54:1
  55:3,6,7,11 56:7,9
  56:9,12 62:5,7,10
  62:19 71:5 76:16
  76:20 77:24 79:16
  80:2,3 89:3 95:13
  97:6 101:22,24
  102:1 117:6,9,14
  118:9 124:16

129:4,7,9,21
  136:13 138:17
  145:12
exhibits 2:9 102:2
existence 7:19
existing 95:4
expand 42:2
expanded 71:16
expect 28:16 75:17
  75:19 82:6 83:15
  95:25 96:4,12,14
expected 114:2
experience 35:1
  73:3 97:1
expert 20:8
expires 95:3 147:17
explain 5:3,18
  66:20
explanation 82:17
explanatory 66:20
  98:13
expose 46:6
exposure 18:23
  49:18 73:4
exposures 20:21
express 127:24
expressed 11:10,13
  11:14 96:17,19
expressing 55:15
expression 19:23
  80:5 84:25
expressly 53:25
  54:5
extend 56:24
  137:11
extended 34:25
  97:3 98:10
extensive 51:10
  111:21
extent 16:7 24:24
  25:8 28:24 39:4
  60:5 88:20 107:4
  113:12 114:19
extraordinary
  41:13 84:23
extremely 49:6
  78:12
e-mail 109:13,16

F

face-to-face 70:1
facilities 9:19
facility 43:8,11,22
  46:13
fact 29:8 44:13
  46:24 47:21 48:14

85:6 89:4 91:8
  97:8 102:15 132:8
  143:16,24
facts 102:19 108:23
failed 102:14
fails 97:7
failure 97:12
fair 123:6
fairly 30:24 32:21
  47:17
fall 37:7
familiar 17:1 23:7
  71:10 73:12
  121:19 126:15
  132:11,23 138:24
  138:25 139:6
  143:19
far 11:23 32:2
  34:12 48:22 68:25
  71:20 73:1,4
  74:12 80:21 89:15
  101:17 105:2,3
  106:3,10 118:15
  119:18 122:17
  139:20 142:20
  143:24
faster 128:16
favor 61:14
February 1:12 3:12
  15:22 16:1 55:25
  70:25 94:17,18
  147:1,13
Federal 120:22
fee 42:5,19 131:16
  131:22
feels 49:20
fees 130:6,10,15
fell 84:12
felt 32:20 72:17
  107:18 131:3
field 113:5
figure 41:7
file 28:8 49:2 60:2
  61:1,7,9,15 72:8
  109:8 116:23
  117:20 121:7
filed 18:4,19,19
  102:3
files 60:20 61:3,4,5
  61:13
filling 65:21
fills 95:14
final 124:23 125:17
  129:23 130:5
financial 10:15,16
  10:17 14:7,12

17:20 18:2 20:1
30:22 31:23 48:2
51:13 142:5,9,12
**financially** 146:25
**find** 47:17 124:17
134:17
**fine** 31:13
**fire** 66:2
**fired** 140:24
**firm** 14:14 15:6
19:17,18 44:19
**firms** 77:10
**first** 2:17 3:17 4:5
7:21 8:22 13:20
13:25 14:17 15:18
22:2,4 50:24
109:3,22 126:7,7
129:10,23 140:6
**fit** 5:8 64:21
**five** 20:14 51:1
52:15 56:3 63:22
68:12 70:2,11
88:11 130:25
**flat** 2:18 42:5,19
**fleet** 20:18
**Florida** 1:1,11 3:8
3:10,11 11:24
12:1,17,18,23
13:2,4,16 26:8,22
29:13,14 31:15
33:7,12,22,24
83:12 89:20
111:17,22,24
141:12 142:1,3
146:11 147:9,16
**focus** 114:18
**following** 6:3 44:9
55:2 105:8 124:8
130:24 134:22
**follows** 3:19
**follow-up** 73:11
**foregoing** 146:4,17
**foreseen** 49:16
**Forgive** 71:24
**form** 5:7 14:18
30:22 32:4 35:5,8
36:14,17 38:13,14
47:13 52:24 54:8
62:24 63:6,14,16
63:19 64:2,13,16
65:3,9 66:14,22
66:23,24 67:7
72:15 74:5,19
75:16 77:2,6,12
77:20,25 78:4,7,9
78:24 80:3,22

81:11 82:18,24
91:4,9 94:15,19
95:6,12 97:17
98:17,20,22 99:8
99:15 100:2
101:13 105:5
108:9 109:15
115:11 120:2,2
130:16 135:12
**formal** 7:21 13:20
14:1 20:5 113:21
**formally** 6:18
**format** 34:15 50:25
51:2 77:23 78:22
79:2,11
**formed** 16:8 136:4
**former** 9:13 48:13
**formerly** 6:16
**forming** 21:3
**forms** 31:22 62:17
66:13 77:5,9,17
79:13 109:15
**formula** 46:10
**formulas** 46:14,18
**Fort** 1:11 3:11
29:21,22 32:14,17
32:19 70:6,8,14
**Fortunately** 100:15
**forward** 31:16
45:23 114:12
**found** 130:21
**four** 51:1 63:22
88:11,24 141:19
**fourth** 62:14 64:6
**Frank** 32:16
**fraudulent** 62:16
64:7
**French** 19:24,25
20:4
**frequency** 107:2
**frequently** 27:9
34:9 42:9 66:12
77:6 103:4 106:11
139:25 143:17
**front** 53:18 59:9
**full** 4:2 12:4 18:11
48:25 54:13 97:1
108:23 126:17
127:2,5
**fully** 35:9 63:3
66:25 96:20
143:19
**function** 26:23
27:24 37:11 61:24
116:2 139:7
**functions** 13:17

22:25 61:23
**fundamental** 73:5
**fundamentally** 9:20
63:24
**further** 34:23 66:20
80:23 120:24
122:9 134:7
137:19 145:13
146:6,21

_____

### G

**gain** 114:6
**Galladay** 32:15
**gathering** 66:9
**gender** 143:6
**general** 5:2 13:7
22:13 23:4 24:18
25:4 26:16 29:18
31:2 39:15 42:15
51:8 52:7 54:11
60:16,19,20,23
61:17 62:22 68:18
69:2 72:21 77:23
78:12,22 79:2,11
81:1 85:25 87:15
88:14 144:8
**generally** 21:17
22:10 26:22 78:15
116:14
**generates** 15:17
**gentleman** 23:17
37:23 132:11
**gentlemen** 36:12
37:13
**geographically**
29:18
**geography** 32:13
**German** 15:6 47:4
47:5,18
**Germany** 47:18
**getting** 64:21
**Gil** 140:20
**Gilhooly** 36:9
**Gilt** 132:12
**give** 6:7 15:10
34:16,18 46:24
105:7 109:8
**given** 22:11 78:5
80:23 105:20
107:2 120:11
143:18 146:19
**gives** 17:9 31:22
**giving** 67:24 93:11
**glad** 5:18
**global** 131:10
**go** 5:14 6:16 14:5

15:4,12 26:14,16
33:12 67:6 70:7
73:8 74:15 89:14
103:23 112:1
121:17 122:16
128:14,16,16
**goes** 135:12
**going** 17:22 19:2
20:25 21:2 46:24
50:18 55:5 69:13
73:7,8 76:13
80:10 82:7 83:1,6
84:8 86:4 88:4,21
88:23 95:15,21
96:16 102:15
103:19,25 104:21
105:14 106:7
108:4 110:17
115:21 118:18,19
120:19,21,23
122:8,10 124:17
127:10 128:18
134:6 138:16,17
**Goldman** 1:15 5:7
5:11,24 7:13,17
47:2 57:9,20
66:22 74:5 77:25
78:11,21 79:2,5,8
81:11 97:17 99:8
99:15,21 108:9,12
120:19 121:20
122:2,14 125:24
126:2,6,11 130:16
134:2,13,16
136:19 145:6,9
**good** 3:22 5:22 32:9
40:25
**governed** 23:20
**government** 142:11
**governs** 60:16
**graded** 48:8
**graduated** 13:22
**Grammar** 13:23
**grant** 17:14
**granted** 50:12
129:2 131:11
137:19
**granting** 105:11
**Great** 1:4 3:4,24
9:18 11:20,22
12:1 19:9 22:20
26:5,12,19,25
27:2 42:5,17,18
42:21,24,24 43:3
43:7,9,12,14,18
43:21,25 44:13,21

44:23 45:1,7,12
45:13,15,21,22,25
46:6,14,20,21,22
47:8,10,22 48:3,3
48:8,12,15,23,25
50:1,4,6,9,10,16
50:18 56:23 62:2
65:1 66:10 74:4
102:3 109:4 142:5
143:11
**greater** 49:19
**grew** 16:5
**group** 6:22,23,25
7:7,25 38:21
139:5
**Guard** 87:14
**guess** 113:22
**guessing** 59:6 73:22
129:14
**guests** 91:12
**guidance** 64:8
67:25 63:8 80:23
144:21
**guided** 105:3
**guiding** 86:3
**Gulf** 89:20
**guy** 32:15
**G-I-L-H-O-O-J.-Y**
36:10

_____

### H

**halt** 88:13
**Hampshire** 26:15
26:21 27:4
**hand** 68:10,13
147:13
**handed** 90:9 92:3
**handle** 42:6 112:3
116:5 143:1
**handled** 23:20
112:16
**handling** 112:17
117:12 143:12
**hands** 94:6,8
**happen** 29:1 31:12
46:11 73:20 85:4
87:10
**happened** 52:17
58:10 106:11
109:17 114:19,20
**happens** 11:20
61:19 131:14
**happy** 21:1 31:13
63:14
**hard** 65:3 102:20
**Harvey** 97:10,23,25

Hathaway 21:19
hauled 83:6
hazard 49:19
  143:24
head 68:20 73:20
  84:7
headed 55:14
hear 78:16
heard 32:8 132:14
heart 84:12
Hearts 109:5
hell 103:1
helm 81:3 88:2,16
  88:18 92:21 93:4
  93:8,10,17,25
  96:14 106:8 114:8
high 36:21
higher 43:24 53:2
highest 48:5
Highlands 14:10,11
highlight 39:9
highly 108:3
HIIN 35:6
hire 111:7
hired 111:10,14
  112:20,24 140:21
hiring 110:19
history 41:17
  126:18
hold 13:5
holdings 6:23,25
  7:10,19,22,25 8:6
  8:21 9:7
Holland 15:7,8
home 83:23
honestly 113:1
honesty 44:9
honors 61:20,22,22
hour 89:16
hours 89:16
House 4:15
hull 43:9,14 46:7,9
hundred 111:16
hundreds 113:4
hurricane 35:3 40:5
  41:23 44:9 68:12
  72:18 82:12,14,21
  82:23,23 83:1,6,7
  83:9,11,15,16,19
  83:23
hurricanes 84:1
  113:4,6
Hutchinson 58:19
  112:12,20,24
  113:10,13 114:3
  114:15,24 115:13

116:19 117:23,25
119:13,17 120:4
Hutchinson's
  114:12 118:5,21
  118:24 119:8

                 I
. . . . . I . . . .
idea 77:11 130:18
  141:2
identification 2:10
  6:5,8 52:2 55:4
  62:11 76:17
  101:25 117:7
  129:8 145:11
identified 90:3
  139:3,16
identify 52:7
identity 105:20
Ilkley,I-L-K-L-E-Y
  4:15
ill 96:12
illness 104:15
  105:10
imagine 88:7
immediate 85:7
immediately 13:24
  31:18 60:2,3
  61:10 96:25 110:5
  114:9
impact 86:12
impending 82:12,21
  82:23 83:2
implication 67:8
important 91:7
importantly 74:22
impose 21:2 30:15
imposed 53:22
improper 121:11
  134:4
inaccurate 113:7
inadequate 128:7
inappropriate
  88:12 121:11
  122:4,6
inasmuch 24:21
  28:22 63:10 91:17
  96:19 101:11
  106:1 126:25
inboard 24:11
incapable 85:9
incapacity 84:9
incarnations 22:6
inception 2:18
incident 58:18,24
  59:1 85:20 105:18
  107:21 109:7,10

109:12,14 110:4,7
110:23 112:19
113:12,17,24
114:9 120:25
121:2 124:9,14
135:5 136:7,8,10
140:22
incidental 42:3
incidents 86:19
include 31:21 81:9
  97:3 106:8 137:11
included 59:9 90:13
  132:4,8
including 11:7,8
  17:23 18:2 124:1
inclusive 17:2,6
  142:14
incomplete 34:11
  35:15
incorporated 54:1
incorporates 54:5,7
  54:12
incorrect 97:5
increase 57:2,6
  141:22
increased 24:17
  141:17,18 143:11
  143:23
indemnity 14:22
  30:19 31:24
independent 115:3
  115:4,5
indicate 66:12
indicated 35:20
indication 35:9
  78:5
individual 17:11,18
  44:19 58:12 61:10
  62:16 103:15,19
  107:3 121:15,22
individuals 58:25
  110:25
industry 10:15 14:4
  20:1 28:6 31:24
  77:7 85:16
infer 90:22
influence 127:19
influential 126:22
information 18:5,9
  28:6,7,8 34:10
  35:7,10 39:6,7
  62:18,20 63:1,3
  66:10 68:1 80:1,2
  82:25 111:9 114:6
  130:5,6 136:8
  143:18

informational
  66:17
informed 138:4
informing 98:16
initial 38:20 40:22
  72:8 95:2 107:19
  110:11
initially 40:3 58:19
  109:25 114:18
  128:5
injure 85:4
injured 84:12,15
input 64:19,20 65:4
inquire 31:6
inquired 11:2
inquiring 31:2
inquiry 106:6
  120:24 122:6,9
inside 58:13 141:19
insist 63:14
inspect 116:9,11
inspecting 38:13
instance 65:23
  89:12 106:21
instant 11:17
instigated 50:11
instigating 19:3
instructed 59:21
  120:3
instructing 5:12
  122:12 134:15
instruction 143:5
  144:20
instructions 28:13
  28:18,23 29:2,6
  29:11 30:15 31:18
  32:1 67:3,13 68:3
  93:12 113:9
  119:20,23
insurance 2:19
  10:12,15,18 11:21
  11:24 13:10,14
  14:3,6,8,11 17:25
  18:10,21 21:1
  22:11 25:5 26:4
  29:5 30:20 31:8
  31:17 32:5,16,19
  33:19,20 41:22
  42:16 43:2,23
  44:11,20 47:5,6,7
  47:12,15,20 48:17
  48:24 49:3,7,11
  49:12 54:13 63:15
  66:11 68:7,16
  76:9,22 77:15,18
  77:19,19 85:2,15

85:24 86:2,11,14
86:18,21,22,24
100:18 102:13
128:19,20 129:1,3
129:22 131:9
137:1,4,23,25
138:11 139:3,5,8
139:14,21 140:1,4
142:13 144:19,24
145:10
insure 28:7 44:12
  127:13
insured 9:25 11:14
  31:11 33:17 53:5
  53:15,16 55:16,17
  64:13 66:1 71:8
  74:4,23,25 75:5
  75:23 76:1,7
  77:23 80:14 84:25
  85:11 86:7,20
  90:2 93:15 96:18
  96:23 102:16
  113:23 114:6
  130:4 131:16
  132:9 137:20
  138:20 143:24
  144:8
insureds 65:17
  83:12 144:20
insured's 74:10
  76:5
insurer 10:10 11:25
  17:10 21:14 26:20
  27:8 31:4,8 42:18
  48:5,9 49:5 85:24
  87:1,2 95:23
  104:10 121:3
insurers 13:4 17:5
  17:17 21:5 22:17
  27:10 30:23 31:3
  33:3 42:19,22,23
  44:12,16,21 45:8
  45:24 46:10,15
  51:3 52:20 87:22
  108:8,22 109:1
insuring 39:2 51:12
  54:12,16
integral 136:5
intend 83:10 92:24
  105:6
intended 80:12
  98:24,25 103:11
intending 80:11
  96:24
intentional 100:9
  100:13,15

intentionally 99:13
interceding 25:21
interest 31:7,10
  34:2 132:9 140:11
  140:14
interested 134:14
  146:25
interests 32:24
interfere 120:20
  121:9
interference 60:4
intermediary 68:20
interpretation
  65:16 122:25
  130:14
interrupt 120:20
interrupted 103:22
interview 58:25
  102:21,21 105:3
  113:18 114:4
  123:17 132:22
  133:23 135:20
interviewed 114:3
  123:12,14
interviews 110:23
  111:23 113:21
intimately 8:15
intracoastal 87:8
  88:10,25
introduced 69:23
invariably 19:5
  24:15 25:25 32:5
  144:23
investigate 58:21
  108:16 110:1,6,22
  112:1 119:23
  123:7
investigating
  132:19
investigation 58:23
  102:11 106:13,19
  107:17,22,25
  108:3,19,23
  111:15 112:10
  115:14 120:6,10
  120:13,18,25
  121:3,7,16 122:19
  127:2,4 136:2,5
  136:11
Investigations
  57:12 110:6,12,16
  110:20 111:7,10
  111:14 112:11
  114:10 119:21
  120:1,5,9 121:25
  123:4,12,13

132:16,17,22
140:21 141:3
investigator 102:20
  128:6
invitation 63:4
invite 45:17 67:1
involve 43:25 45:24
  127:3
involved 14:18 19:3
  38:3 52:19 58:25
  65:25 110:9 116:6
  116:7 127:5,6
involvement 7:25
  43:18 114:12,22
involving 20:19
  60:22,24 109:5
  123:18
irrelevant 105:21
  105:25 107:25
  108:2 119:5
  125:13
issuance 35:18,20
  35:22 36:7,11
  37:12,17,20,25
  38:22 39:18,22
  44:20 56:14 66:10
  72:12
issue 13:1,12 21:11
  25:14,16 26:4,13
  36:16,20 37:22
  44:1,22 52:21
  53:4 56:12 66:14
  66:20 68:5 85:22
  99:22 104:14
  106:14 108:25
  110:18,20 114:21
  122:18,21,23
  123:21 135:8
  140:3,4
issued 40:3 43:16
  49:23 54:6,14,19
  56:3,8 72:9 96:2
  137:9 140:6
issues 25:4 32:2
  33:19 38:19
  114:15 120:18
issuing 33:8 52:11
  72:1
i.e 35:5

_____

J

Jacksonville 29:24
James 1:17,18 3:22
January 51:7
Jim 32:15
job 124:13

Joe 57:13 68:21
  69:15 70:11 77:21
Johns 13:22
joined 6:23 14:6,9
  14:14,17 15:5,14
  16:1
Joseph 68:14,15,19
  69:3
journey 88:21
Judging 56:6
July 56:13 70:24
  103:7 127:17
Jupiter 29:25
juris 121:1

_____

K

Kasko 15:6
Katrina 44:9 49:16
keep 134:16
kind 6:6 9:10 12:25
  27:13,15 30:8
  44:1 47:9 50:19
  53:4 60:17 64:10
  77:17 111:15
  117:24 120:12
  124:3 133:20
kinds 45:23 78:23
  83:25
Kingdom 4:24 27:1
  48:22 51:13
  142:13,21
knew 138:11
knots 88:11,11
know 5:17 23:13
  26:7 27:2 29:8
  32:19 39:20,25
  44:5 46:20 50:6
  56:17 57:23 68:11
  68:25 71:20 73:20
  73:23 75:3 78:2
  79:4,8 83:22
  95:14,19,20,22,23
  97:15 99:16,24
  100:1,5 101:17
  103:25 108:13
  109:1,11,13
  117:12 119:14
  123:3,6,11,15,23
  129:11 134:5
knowing 129:25
  138:6
knowledge 97:4
  102:18 108:6
  144:12
known 6:18 9:23
  55:24 90:20 97:19

97:20,22 103:9
  119:14
knows 46:17 50:4
Kolisch 57:13 68:14
  68:15,19,22,24
  69:3,10,15,18
  70:1,11 77:21
  79:14 80:19 109:7
  109:11,24 112:4
Kolisch's 69:17

_____

L

L 3:8 146:15 147:4
  147:16
Lager 15:6
Lakes 1:4 3:5,24
  9:18 11:20,22
  12:1 19:9 22:20
  26:5,12,19,25
  27:2 42:6,17,18
  42:21,24,25 43:3
  43:7,9,12,14,18
  43:21,25 44:13,21
  44:23 45:1,7,12
  45:13,15,21,22,25
  46:6,15,20,21,22
  47:8,10,22 48:3,3
  48:8,12,15,23,25
  50:1,4,6,9,10,16
  50:18 56:23 62:2
  65:1 66:11 74:4
  102:3 109:4 142:6
  143:11
Lamb 19:11
Large 3:10
largely 21:19 111:2
larger 64:23 114:24
  131:17,20
latitude 34:4,5
  120:21 121:10
  122:7
Lauderdale 1:11
  3:11 29:21,22
  32:14,17,19 70:6
  70:8,15
law 19:17,18 20:6,9
  121:1
lawful 3:17
lawyer 60:3 61:19
  61:24 62:3
layman's 49:10
lead 110:15
learned 109:4
leave 38:11 140:15
leave-it 53:5

LeBoeuf 19:11
led 21:19 110:11
left 41:2
legal 17:23 19:6,8
  48:25 50:20 61:25
  62:3
lender's 137:12
lengthy 59:3
letter 49:3
let's 73:15 98:22
  101:19
Leum 36:9
level 13:23
liability 10:21
  14:23 15:8 17:20
  20:20 43:9,10,12
  43:13,13,15 44:25
  46:8,12,13 57:2,6
liaise 21:2,14
license 13:6 27:21
  30:21 31:25 33:21
  115:20,20 119:16
licensed 26:1,23,24
  27:1,2,7,8 33:13
  79:10 116:4,15
licenses 12:16,20
  18:1 115:12
life 85:6
light 56:19
likewise 21:14
  28:16 63:11 83:18
  107:24
limit 45:17 46:6,12
  89:8,9
Limited 6:13,19
  8:20 14:15 139:19
limits 53:22 55:20
  89:20,22 90:2,22
  91:13
line 11:25 13:4
  26:20 27:22 33:13
  49:5 134:4
lines 13:5 27:10,21
  30:21 122:9
linking 38:13
list 19:24 20:2
  30:23 37:9 71:7
  79:19 83:9 97:16
  98:5 137:24
listed 82:16 89:5,23
  90:18 98:13
listen 133:13
literal 122:24
literally 114:13
litigation 19:2 60:1
  60:22,24 62:1

64:25 65:5,7,10
65:12 99:17
little 37:4 75:10
136:10 141:16
live 74:11,17,22,22
Lloyds 8:4 9:19
15:15,23 21:20
22:17 43:8,10,13
43:14 45:13
local 26:1 58:19
62:1 88:23 141:19
locate 76:11
located 29:22 83:12
location 35:3 73:7
132:25 133:1
locked 61:14
locking 60:25
locks 61:7
log 40:19 123:5,9
logging 61:8
logo 63:11,12
London 15:16 70:4
long 7:18 43:20
51:16,16 63:18
88:5 109:20
longer 32:7 94:20
94:22
longstanding 32:12
look 15:12 21:21
32:13 52:4 54:24
55:8 56:6,11
58:20 59:7 71:6
72:17 74:16 79:17
90:21 116:22
118:8,9 120:16,17
124:16,19 125:16
126:14 129:10,23
136:12 137:8
138:18 139:2
looked 40:18
138:22
looking 106:18
139:21
loose 135:2
lose 59:22
loss 34:22 36:18
40:14 44:11 45:1
56:5,21 58:22
65:25 66:3 72:15
72:18 110:1
116:13 118:19
137:4,10,12,14
losses 10 55:24
65:24
lost 84:11
lot 139:11

toud 124:22
lower 131:15
LS296JQ 4:12
LS2991.A 4:16
lunch 88:16,19
L.L.B 61:20
L.T.D 6:14,15

_____ M

machine 64:22,22
MacRae 19:11
main 53:24
maintain 142:4,6
maintaining 18:1
maintenance 60:20
major 20:18 26:9
47:18 49:18
majority 37:6 69:11
144:23
making 18:2 62:16
108:24 133:16,17
manage 13:12
management 17:12
17:16,19 42:5,19
60:17
manager 38:5
manages 62:1
manual 67:17,24
68:2,6 75:11
130:8 132:4
manuals 80:18
marina 83:5 113:25
123:25 124:12
marine 13:9 14:22
14:23 15:8,18
32:5,18 65:25
66:3 85:15 86:7
102:13 108:8
115:16,18 121:3
137:4 139:5,13
Mariner's 70:7,15
maritime 10:13
mark 23:16 52:19
57:22 58:7,9 60:2
61:14,16 62:7
64:18 65:4,8
76:14 101:21
112:5 117:3
119:14 129:4
marked 6:4,8 52:1
55:3 62:10 76:16
101:24 117:6
129:7 138:17
141:22 145:11
market 8:3,3,11
21:20 27:22 30:13

31:12,12 32:5
33:5 42:2 44:7
52:14 130:21
131:10
markets 41:21
Marshall 131:1
Massachusetts
26:15,22 27:5
massive 52:14
material 51:6 52:14
65:6 100:21,23
127:9
materiality 106:14
108:18
materially 97:5
maternity 38:11
matter 17:7 19:2
21:22 22:19 50:13
62:20 114:11
118:6 120:7 123:8
128:18
matters 4:20,24 5:1
17:19,24 19:1
21:6 25:17 59:20
60:24
Matthew 36:8
maximum 46:5
McClain 36:9
McCree 19:14,16
McCreedy 19:16
McLennan 131:1
mean 5:9 16:12,18
25:19 43:1 58:17
67:3,22 69:22
79:3 80:20 81:6
81:12,14 82:20
89:7 91:9 92:24
93:2,3,5 97:24
98:1 103:3,5,7
113:3,14 121:18
122:23 133:22
meaning 5:17 10:7
21:22 66:21 75:14
104:25
means 19:24 20:2
67:19 79:9 91:3
92:17,20 101:12
meant 75:19 79:11
79:12 137:15
measures 83:17
mediation 58:2,10
member 7:24 39:20
members 36:5
39:20
memory 5:4 37:10
Menston 4:11

mental 89:4
mentioned 52:18
75:11
mentor 20:23
merely 6:20 8:12
39:2,16 114:15
merger 9:10
met 69:25
Mexico 89:20
Miami 29:23 70:8
139:6
Middle 142:20
midway 71:6
midwest 69:7,9
73:12,21 74:7
midwestern 73:16
mid-ocean 88:5
miles 87:10 88:6,24
89:13,16,21
million 43:5 46:6,7
46:9,12
mind 66:4 119:17
127:10 135:8
136:5
minds 135:3
minimum 28:14
ministerial 39:16
minor 40:5 63:20
116:8
minute 134:20
minutes 88:5
misled 99:23
misrepresentation
64:7 97:13 100:9
100:12,22 106:17
107:4 108:21
111:3 126:23
135:13 138:8
misrepresented
99:13,23
missing 53:10
misstate 107:11
mistake 125:25
126:6
mistaken 136:17
misunderstood 7:14
Mocatta 15:15,23
22:16
modern 53:3 67:23
modified 53:15
modify 59:22,25
moment 38:12
50:11 58:16 64:15
93:21 98:23
129:18
monitor 20:13

manahull 24:11
month 58:3
monthly 18:17
months 56:3 59:18
morning 3:22 72:6
144:7
motor 24:11
move 82:15 83:2,8
83:10
moving 81:16,24
82:22
multiple 127:23
Munchener 46:25
47:13
Munich 46:23
47:12,16,21,24
mutually 45:25
M-C-R-E-E 19:14
M-E-N-S-T-O-N
4:11
M-U-N-C-H-E-N...
46:25
M.D 6:2

_____ N

N 2:1
name 3:25 4:2,5
5:23,25 6:17,20
8:24 9:5 10:1,5
11:20 19:4,11,13
19:20 40:2 46:20
48:12,19,21 49:4
49:4,8 50:11
55:15,16 72:9
74:10 75:6 95:10
96:15 132:14
137:14 138:12
named 17:11 36:13
37:14 56:20 57:15
65:24 91:8,11,16
91:19,19 96:20,22
98:5,7,9 99:3
101:5,6,8,15,16
101:16 106:4
110:13,15 132:11
137:3,10,14,17
names 12:14 19:15
69:16,22
naming 56:4 96:2
NAMS 115:17
National 115:18
nationwide 111:19
nature 21:24 65:6
75:18 78:9 87:5
122:6 131:6,8
NAUGHT 145:13

Nautilus 57:11,16
58:16,21 60:10
110:5,12,15,19
111:7,10,14
112:11 113:2
114:10,16,23
119:21 120:1,5,8
121:7,24 123:3,11
123:13 127:4
132:16,17,21
140:21 141:3
navigate 55:23
92:20
navigating 81:22
88:9
navigation 34:24,25
53:22 81:8,9,15
81:18 82:3 87:19
87:23 88:3,21
89:8,9,17 92:4
93:3
navigational 55:19
89:19,22 90:2,22
nearly 11:5 23:23
necessarily 25:19
65:11 103:7,8
114:4 120:14
necessary 56:12
138:12
needed 99:3
negotiate 18:23
21:12 33:24 34:11
131:15
negotiated 16:15
22:16 51:3
negotiating 33:18
34:3
negotiation 16:13
25:14
negotiations 25:6
25:21
Neil 36:9 39:24
72:3,6,9
net 131:15,22
never 26:14,16 31:9
32:23 34:14 59:25
85:5 115:21
117:18 132:14
136:25 140:6
Nevertheless 145:2
new 19:7,8 26:15,21
27:4 39:7 41:11
56:22 64:11 65:3
74:19 95:3,24
130:24
Newfield 4:10

Nick 23:18 36:8
52:19 64:18
night 59:12 90:5,14
nighttime 90:6
nominal 3:24
non 110:13,15
normal 127:1
normally 10:17
20:20 21:10 23:25
25:13 32:6 35:9
70:7 74:9,18
82:14 85:21 86:15
86:16 88:20 90:4
90:8 94:23,24
95:4,5 111:23
116:4 131:17
144:16
North 14:21 15:18
Notary 3:9 147:16
notation 51:23 63:6
76:20
notations 90:16
note 2:13 55:14
61:12 76:19 89:4
90:10,13,17,22
91:7
noted 57:1 90:10
notes 40:22 64:8
notice 49:22 146:5
notification 109:6
109:23
notified 9:25
noting 56:25
November 52:12,13
117:23
number 4:10,14,15
6:4 19:11,15 24:3
24:4 29:20,22
35:6 41:21 52:1
55:3 56:2 62:10
71:8 76:16,20
77:9 101:24 104:5
112:25 113:7
117:6 129:7
136:14 141:18
numbers 142:7
numerous 20:19
111:12
N-E-W-F-I-E-L-D
4:10

_____
O
_____
oath 3:19 147:8
object 66:22 74:5
77:25 78:24 81:11
97:17 99:8,15

108:9 130:16
objected 79:5
objection 5:9,13,14
7:13 78:9,9,21
99:20 120:23
121:10 122:2
134:19
objections 5:8
obligations 28:5,5
28:10
observe 109:1,2
observed 86:13
obtain 48:5 97:2
144:21
obtaining 131:5
obviously 18:6
29:23 39:13 73:5
88:1 91:11 96:10
105:7,8 124:15
131:3 143:16
occasion 25:24 70:4
70:20 112:23
123:24
occasionally 25:13
25:19 43:24 60:7
94:25 131:13
occasions 25:23
70:10 111:11,12
113:1
occurred 8:18 19:1
58:18 64:24
113:15,17
October 8:17 68:11
70:6,15,21,25
103:7
odd 94:24
odds 135:18
offer 24:14,15
94:22
office 12:22 47:23
49:23 68:20,21,23
68:25 69:4,7,8,12
69:14,17 70:8,9
73:17,17,21
111:22 112:14
117:13
official 147:13
Oh 44:5 64:4 84:2
84:11 97:24 126:4
142:2
Ohio 56:4
okay 7:17 8:15 10:3
12:21 27:6 30:6
40:6,24 42:12
50:1 51:17 54:10
59:13 63:23 79:16

84:6 86:8 87:6
93:9 100:4 106:23
122:22 126:5
128:23 132:7
136:24 138:23
140:9 144:12
old 67:22 85:5,8
omissions 30:20
once 70:12 98:10
101:8 103:24
104:1,19 114:7,20
119:4 125:13
ones 127:22
Ons 61:21
onwards 50:12
open 130:14
operate 12:17 67:10
80:10,11,12,15
82:8 87:15 93:5
96:9,24 97:23
98:21,24 99:1
101:7 103:11,15
103:19,25 104:8
104:21 105:6,8,12
operated 23:5
81:25 85:5 87:20
102:22 104:6
106:2 125:1
operates 81:2
operating 16:3
28:13,18,22 29:2
29:6,10 30:14
31:17,25 67:3,12
68:3 74:14,14
75:11 80:21 81:23
85:9 90:5,14
92:17,20 93:2
95:15,21 96:16
97:25 98:4,11
99:25 100:3,5
103:5,9 105:17
107:21 108:7,10
110:4,7 113:16
114:1 119:25
127:4 136:9
operation 16:14
17:13 67:23 73:12
90:9 107:2
operator 36:20 59:1
65:24 71:8 72:22
80:7,17 81:1,25
84:10 87:2,24
89:5,23 90:3,5,14
90:18,23 91:6,8
91:11,14,16,19,21
91:25 92:5,9,15

93:23,24 94:7,9
94:10 96:3,15,21
97:8 98:7 101:5,8
101:15,16,17
102:7,16 103:3,16
104:5,7,9,11,24
104:24 105:15,19
105:21,24 106:4,4
106:9 107:20
108:19 110:13,15
113:24 114:8,21
127:13
operators 35:1 71:7
71:16 73:2 79:18
79:20 80:3,6,8,16
80:24 82:16,18,20
91:19 93:22 95:10
95:24 96:22 97:8
97:16 98:6,9,13
98:14,18,24,25
99:3,13 101:1,6
105:5
opportunity 21:21
42:1 59:10
opposed 11:25 18:7
25:25 34:17 37:19
42:24 47:22 60:14
64:22 116:12
option 24:13
options 24:14,16
order 33:22 49:23
60:6 97:2 100:22
100:23 106:6
113:18 123:7
127:21
Ordering 145:8
original 38:14 39:9
49:12 56:1,3,14
82:24 137:20
originally 47:11
51:3 64:16 112:12
112:13
originals 60:11
Osprey 6:12,16,23
7:9,10,12,18,22
7:23,24 8:6,7,8,9
8:16,20,21,23,25
9:6,6,12,23 12:7
43:17
outline 120:12
outset 40:4 108:25
outside 37:7 58:13
overall 26:11 49:19
128:15 142:3
overnight 90:8
owned 7:15 46:23

**owner** 25:6,10,12
25:20,25 26:2
33:6,25 82:13
83:8 88:15 95:22
144:10,14
**owners** 22:11 24:20
**owner's** 25:9
**o'clock** 1:12 3:13

**P**
...
**package** 31:21
**page** 2:3,10 55:13
55:19 56:2,11
62:14 64:5,5,6
71:6,6 79:17
90:21 118:8
129:24 136:12,17
136:18,19,21,22
**pages** 51:15,16 55:7
55:8 59:6 129:10
129:12
**paid** 64:11 86:5
105:14 106:7
116:17 128:19,20
128:24 137:16
**paint** 124:13
**panel** 21:18
**paper** 61:4 64:23
**papers** 59:2
**paragraph** 102:8
102:19 103:3
104:25 124:20,23
125:16,18 126:15
126:16 129:23
130:2,5,19 136:16
136:22,24
**parameters** 45:14
45:20
**Parasquadron**
87:14
**parcel** 127:1
**Pardon** 128:13
**parent** 47:21
**parenthesis** 79:19
**part** 16:4 49:13
50:17,23 53:10,14
55:11 67:3,12
82:20,25 83:3,5,7
91:1 97:13 106:6
126:16 127:1,4
128:24 136:5
**partially** 118:16
135:24
**particular** 10:18
11:10 21:11 53:16
62:20 63:18 65:20

72:22 112:2,6
123:24
**particularly** 49:15
62:15 64:8 74:7
**parties** 22:13,21
145:15 146:3,23
146:24
**partly** 46:2
**partner** 49:14
**parts** 26:3
**party** 84:15 137:3
**passed** 114:10
**passengers** 20:19
36:24
**patterns** 45:9 48:20
**Paul** 57:13 97:10,22
97:24 102:15,22
119:24 123:23
124:11 125:1
126:18,21 132:19
134:9 137:24
143:11,25
**pay** 42:19 45:1,3
72:21 131:6
138:20
**payable** 137:13
**payee** 56:5,21 137:4
137:11,15,17
**paying** 130:15
131:7
**payment** 57:1
116:17 137:17,18
**payor** 130:10 132:2
**pays** 42:18
**pending** 3:7
**people** 15:25 32:9
32:21 36:16 38:3
38:12,21 52:18
63:10 65:22 83:22
96:8,24 98:21
110:9 113:25
115:7
**perceived** 126:24
**percent** 7:6,8,8,9,10
7:11,15 8:19,21
26:11 46:22 48:16
48:17,17 118:16
131:24 132:2
141:20,22,25
142:14
**percentage** 23:19
42:20 131:11
141:11,14 142:7
142:22
**perform** 26:23
111:14 123:4

**performance** 36:21
**performed** 115:13
116:3
**performing** 22:25
**performs** 13:17
39:16 139:7
**period** 22:18 93:13
94:13 95:2 127:16
137:4 141:20
**periods** 94:20,22
95:1
**permission** 12:25
96:16 98:1 105:8
**permissions** 12:16
**permit** 98:21
120:21 121:10
**permitted** 121:4,5
131:11
**permitting** 96:8
**person** 50:4 69:10
82:15 85:23 91:2
91:3,3,5,10,18
95:14,15 96:14
99:10 101:11,12
101:14 105:18,20
105:24 106:8
112:2,15 127:3
**personal** 17:20
**personally** 20:12
21:8 74:8 117:11
147:11
**personnel** 137:23
**Phoenix** 14:6,7
**phone** 32:7,14 58:6
96:12
**phonetic** 15:7,9
32:15 43:23
**photocopies** 60:10
60:14
**photograph** 35:2
**phrase** 85:13 91:21
92:13 101:8,10
125:17
**phraseology** 67:18
67:19
**physical** 92:21
127:20
**physically** 88:18
94:5
**Picking** 41:2
**place** 30:13 31:11
31:12,13,14 45:11
45:12 52:14 82:17
123:17 130:21
131:10 132:24
140:7

**placed** 45:15
131:10
**placing** 60:5 131:16
**Plaintiff** 1:5,16 3:5
50:19 102:12
**plaintiff's** 102:17
137:3
**plan** 23:4 35:3
82:14,23 83:1,3,7
83:9,11,15,19,23
**planned** 9:9 124:9
**platform** 74:14
**PLC** 1:4 3:5 12:2
**pleadings** 21:22
22:2
**please** 3:25 4:4,7
5:17 14:24 15:4
35:25 52:7 54:10
62:7 101:21 117:3
122:16 124:19,22
126:14 129:4
**pleased** 127:6
**pleasure** 23:24
55:21
**plenty** 87:19
**plus** 32:17 42:20
48:4,9
**point** 50:12 74:3
76:6 85:19 87:22
107:19 114:23
120:19 122:7,8
123:19 129:21
**police** 60:8
**policies** 13:1,13,14
17:2 23:21 25:2
26:6,13 34:13,17
43:16 52:12,25
69:12 95:1 142:7
**policy** 10:5,10,11
10:19 22:10 23:7
23:14,24 24:1,2,3
24:5,7,13,17,19
24:22,23,24 25:5
25:7,15 31:25
34:4,15,15,16,25
35:19,23 37:7
38:1,24 39:3 44:2
44:14,18 49:4
52:9,11,13,21
53:2,4,17,19,24
53:25 54:2,4,5,6
54:19,22 55:12,13
55:15 56:1,3,7,13
60:16,19,21,24
64:19 66:14,24,24
74:11,23 75:7,15

75:24 85:2 86:2
86:11,18,21,24
89:19 90:12,25
91:1,15,22 92:1,2
92:10,11,14,18,23
94:12,23 96:21
98:7 99:4 100:18
100:22,24 101:5,6
101:9,9,17 102:17
104:3,17 111:3
115:24 116:1,18
120:2 122:25
131:20 137:3,11
137:16,18,18
**pooling** 45:4
**poor** 79:23
**portfolio** 21:13 46:5
**portion** 26:9,10
102:6 125:4
**portions** 64:1
124:18
**position** 8:1,2
106:16,20 107:19
108:5 127:11
144:18
**possession** 127:19
**possibility** 79:14
**possible** 78:2,4
128:10,15,16
**possibly** 118:1
122:4
**post** 120:24 121:2
**potential** 30:16
31:15 33:17 37:7
38:15 75:23 76:1
77:23
**potentially** 32:10
97:8
**pounds** 48:6
**power** 81:17,21
**Powerline** 1:11
3:10
**practical** 143:10
**precise** 78:17 123:3
**precisely** 7:2 16:11
43:1 58:17 81:5
81:14 109:8
131:23
**preclude** 63:10
**precluded** 131:7
**precludes** 61:6
**prejudicing** 144:19
**premier** 24:3,7,12
24:16,18,24 53:2
**premium** 24:17
28:8 42:4,20

53:21 55:18 63:4
128:24 131:12,15
131:16,22,24
preparation 57:20
58:14
prepare 57:8
prepared 139:13
preparing 38:24
presence 110:14
present 6:11,12
28:1,6 34:6 56:22
129:3
presented 34:10
39:7 40:13 52:20
74:19 114:15
Presumably 56:19
139:15
presume 103:14
pretty 121:14 144:1
prevails 105:4
previous 40:10
51:15 59:15 74:3
76:9 111:11
112:23
previously 71:18
pre-planned 104:15
price 35:6
primarily 15:7
23:15 41:22 47:15
69:22 74:20 84:8
primary 43:12
45:24
principal 43:22
principle 86:3
printed 60:13 63:6
printer 77:16
printing 77:10
prior 40:17 43:21
51:13 54:17 70:20
70:22,25 74:25
private 23:24 55:21
probably 26:6 41:8
51:15 59:5,7,19
64:19 66:5 70:10
74:8 84:18,19,20
88:22 115:2
118:18
probation 127:21
problem 12:9 46:25
56:23 118:4
problems 60:6
procedure 59:24
74:9 108:8,10
120:22 127:1
proceedings 50:11
134:22

process 31:18 32:3
130:19,20 138:7
processing 41:4
produced 117:22
producer 15:16
31:21 139:2
producing 32:7
product 10:18 46:2
63:7 134:6,11
production 121:6
products 30:4
professional 30:19
31:24
profit 42:8
profits 42:9,21
program 21:12
prohibited 33:16
prolonged 88:21
promise 100:19
promote 83:21
promulgated 17:24
property 124:11
proposing 31:1
proprietary 63:7,9
63:17 77:20
prospective 39:12
60:21 62:18
protect 21:13 83:18
137:13
protected 60:2
protection 14:22
18:25 49:18 134:5
137:19
provide 13:11 18:5
18:10,11,15,17,22
28:12,19 30:10,12
30:18 34:6,13
61:24 63:2,4
67:16,24,25 68:6
136:7
provided 45:21
67:14 72:16 76:22
80:17,18 91:5
101:14 114:5
129:21 130:9
137:2
provides 48:2
providing 31:7
44:16 86:16 91:11
91:18 94:9
provisions 54:16
83:14
prudence 121:22
prudent 83:17
84:13,25 85:6,11
85:17,21 86:1,25

87:11,21 144:9,14
144:20
prudently 86:10
87:3
Public 3:9 147:16
purchase 21:15
35:6
purchased 35:6
47:12
pure 105:16 110:21
111:8
purely 20:2 24:4
43:23 46:4 47:14
purpose 3:3 31:2
32:22 33:18 39:2
62:25 64:10 67:12
72:25 80:25
105:13 107:16
110:19 111:6
122:18 124:7
purposeful 135:6
purposes 66:17
68:5 71:2 103:13
109:18 133:16
pursuant 9:5 50:15
put 37:13 45:23
52:13 63:11,12
120:23
putting 41:8 60:8
PYP 24:2
PYP2 25:5 52:25
P.A 1:17
P.L.C 49:1
p.m 145:17

_____ Q _____
qualifications 119:9
qualified 60:3
61:19 110:25
qualify 24:12,20
qualify 31:4
quarters 118:9
Queen 109:5
question 5:6,10,11
5:14,16 16:23
17:8 22:19 64:4
65:23 75:23 76:1
76:5 78:1,11,16
78:18,24 92:6,7
97:18 99:9,16
107:12 122:4,13
135:3,11,23
139:22 143:2
144:16 145:3
questioning 134:4,7
questionnaire 95:6

95:9
questions 5:5 13:19
67:2,5 71:17
73:10 75:12,18,19
120:20 121:9
128:16 144:6
quick 54:24 56:11
quickly 128:14
quite 29:20,23
63:14 78:2,4 87:9
118:1
quizzed 126:8
quotation 34:7
35:21 36:7,11,17
37:12,17,20,22
38:20 39:23 40:2
40:10,13 63:2
72:2,11 94:16
quotations 72:9
quote 40:7 74:22
106:8,9 126:17
137:5 139:16,17
quoted 40:7
quotes 41:9

_____ R _____
racing 64:9
raise 75:20
rare 19:25
rate 41:13
rated 48:4
rates 21:4
rating 48:5
reach 116:19
reached 128:10
read 11:18 14:24
15:2 35:24 36:3
54:8 57:11,12
59:12 66:24 67:4
78:19 102:9,23
107:10,13 118:2
119:23 124:22
127:11 130:2
133:11
reading 145:6
146:4
real 116:6 132:2
really 75:3 99:18
105:16 106:10
111:20 123:22
140:16
reason 20:3 41:19
66:4 107:16 112:6
118:20 119:2
125:6 138:24
Reasonably 29:25

recall 40:12 57:23
58:1 59:3 64:16
65:2,18 69:16,21
70:3,22 71:23
72:8,15 102:6
112:21 113:20
115:1,10 116:22
117:19 118:7
123:9 127:14,22
133:3,15,18,19,22
144:7
receive 19:5 42:5,8
117:25 130:22
131:5
received 19:6 79:12
109:6,23
receiving 40:21
recess 41:1 73:9
101:20 144:4
reckless 127:20
recognize 52:5 55:9
102:3 117:14
129:16
recognized 53:13
recommend 65:12
87:14
recommendation
116:16
recommendations
34:21
recommends 75:12
reconcile 18:20
record 4:1 5:4,8,13
5:23 34:23 36:18
40:16 51:19 66:6
73:24,25 76:19
107:9 120:23
121:11,15 126:11
126:12,18 128:11
140:18,19 146:18
recorded 15:3 36:4
61:9 78:20 102:21
107:14 113:21
132:19,22 133:3,4
133:5 134:8
135:20 142:6
recording 132:24
133:17 135:19
records 60:17,20
142:4,6
recourse 76:7
refer 12:7 16:21
18:12 19:1,4
20:17 21:10 25:16
28:12 36:15 39:10
45:4 52:15 61:19

65:11 80:20 109:8
reference 72:19
referenced 58:16
referred 15:1 23:25
30:19 36:2,19,21
36:22,25 37:1,2,4
38:16 39:8 40:3
51:25 56:1 62:9
76:15 78:18
101:23 107:12
117:5 129:6
145:10
referring 7:2 8:6
9:1 12:13 17:20
25:17 28:10 34:19
55:12 61:3 79:22
80:9 86:16 98:19
refers 102:7 125:18
126:16
reflect 53:15
reflected 44:13
133:24,25
reflective 23:4
reflects 39:3 48:19
63:7 91:1
refrain 134:7
refresh 5:4
regard 18:6,10 25:7
33:25 61:23 69:2
135:9 141:7
regarding 59:23
60:24 61:13 69:6
69:12 75:13
123:20 140:11
regardless 60:1
regards 60:19,22
64:21 67:7 86:6
90:4 108:8,24
113:14
registered 49:5
regular 36:24 79:20
80:6 84:9 102:7
102:16 103:3,8,16
104:5,7,9,24
105:14,21,24
106:9 108:19
regularly 103:4,6,8
regulation 51:18
regulations 28:24
reinsurance 1:4 3:5
11:21,22 12:2
18:25 21:12,15,18
44:10 46:21,22,23
47:4,5,5,7,10,19
48:11,12,15,17
49:1,11,12

reinsurer 11:25
21:16,17 47:25
reinsurers 22:22
reject 49:6
relate 28:6 64:8
relationship 28:4
42:15
relative 146:22,23
relevant 62:15
107:3 108:3 111:9
120:15 124:7
relic 48:12
relied 120:8
religion 143:7
rely 99:6
remainder 41:10
remained 14:12
remaining 7:8 55:7
remains 10:6
remember 59:17
65:23 69:19 70:5
114:7
remuneration 42:4
render 87:9 104:24
renewal 95:5,9
renewals 41:10
renewed 9:16
repaint 124:1
Repair 118:10
repeat 35:25 90:7
92:6 101:11
105:22 107:8
repeatedly 141:6
rephrase 5:18 92:6
report 18:12,16,25
57:16 58:17 59:3
109:14,15 110:11
117:23,24 118:25
120:3,5 130:24
146:17
reported 55:24
109:12
reporter 3:9 5:24
6:5 15:2 36:3
52:2 55:4 62:11
76:17 78:19
101:25 107:13
117:7 129:8
134:21 146:16
147:4
reporting 14:19
109:9
reports 18:18,22
57:11 60:10 118:2
118:6 121:7
Report/Hutchinson

2:17
represent 3:23 13:3
13:10 26:10 42:22
42:23 50:9 117:21
129:20
representation
100:17,21 101:2,3
representative 50:3
58:6 87:1
representatives
19:7,8
represented 8:3
77:24 80:3 95:13
representing 14:11
represents 8:4 26:9
42:17 48:16 49:19
request 54:15 82:25
requested 117:10
137:1
requesting 56:16
requests 94:25
95:10
require 12:20,25
28:22 30:20,21
36:11 67:8 68:1,4
80:22 83:11 95:3
95:5
required 44:23
46:12 56:20 98:9
100:10 114:5
115:19
requirements 24:8
28:15 30:15
research 110:21
residence 4:9
residents 79:19
resigned 15:25
respect 13:14 35:14
89:11 120:24
respective 44:17,17
146:3
responsibilities
17:10 28:3,15
51:11
responsibility 13:15
16:25 20:22
responsible 14:7
17:12,15,19,25
18:5 38:24 44:20
142:12
restaurant 88:24
restraining 127:1
restrictions 89:18
90:4
result 64:25 65:4,7
65:9,12,15 90:17

114:20
resulting 128:11
results 107:25
108:2 110:10
retain 47:22
retained 115:8
returns 18:2,3,3
revamp 52:13
review 36:6 40:20
59:4,10 65:5
75:16 115:24
reviewed 40:16
57:17 59:2,7,14
59:15 60:9
reviewing 37:11
39:17 40:12 41:11
128:13
right 5:19 12:6
15:12 39:3 48:4
50:21 75:6 93:12
99:21
rights 20:24
risk 18:16 20:17,19
34:6,8 36:16 37:4
37:7,21 39:4,5,14
45:17 47:20 49:2
49:6,12,13,14,19
63:5 73:4 74:11
74:17 95:4 143:10
risks 6:13,19 7:7,9
7:12 8:20,23,25
8:25 9:3,12,16,21
9:23 10:21 12:7
16:8 18:3,18
20:15 22:20 28:1
43:7,9,17 45:7,23
47:22
river 83:8
Road 1:11 3:10
rock 125:2,7,11
Rosin 1:7 3:6,23,25
6:1 23:9 54:21
56:8 57:13,13
74:3,25 76:10
90:14 93:15 97:10
97:23,24 99:12,25
100:2 102:14,15
102:22 103:11
113:23 114:3
117:9 119:24
123:12,14,17,18
123:20,23 125:1
126:19,21 127:6
127:12 128:6,22
128:25 129:22
132:19 133:16,21

134:9 135:10,17
135:17,21 136:1,4
136:6,11,25
137:22 138:11,12
140:11 141:5
143:11,25 144:13
Rosin's 39:21 41:5
61:13 72:1 97:13
97:25 124:11,19
131:19 135:16
140:25
rough 78:5
Royal 43:6 45:2,12
75:5 139:5,13
Ruck 46:25
Ruckversicherung
47:3,4,14
rules 28:24 45:9,20
120:22
R-U-C-K 47:1
—————
S
safe 88:7
safety 82:15 83:14
91:12
sailboat 24:11
Saint 29:25
SAITH 145:13
146:6
sake 12:10 107:8
salvage 84:3,8 85:7
85:22 104:14
Samantha 38:6
SAMS 115:15
satisfactory 34:20
35:11
satisfied 135:25
saying 37:3 93:13
106:1 108:15
109:17
says 10:9 71:7
77:14 79:18,18
98:5,14 101:1
118:10,12 130:6
135:17,18 139:18
scanner 61:6
scenario 86:9
scenes 49:14
schedule 53:17,19
53:25 54:5,7,22
55:12,13,15 56:1
89:19 90:24
scheduled 91:6
92:21 101:15
School 13:23
Schultz 69:20

scope 18:9 33:23
  120:10
script 109:16
scrivener's 126:3
se 47:23
sea 84:3,11 85:3,23
seal 147:13
second 71:6 79:17
  79:17 90:21
seconds 88:4
section 44:17 46:3
  54:11 71:7,10,14
  71:22 72:22 79:17
  79:21 80:4 91:2
  92:19 95:10
security 10:5,7,9,14
  10:17,24 11:11
  13:17 22:25 44:15
  44:16 45:3
see 22:1 49:22 64:5
  64:7,15 70:11
  74:3,20,25 79:21
  89:17 97:24 108:6
  118:12 140:16
seeing 41:24 117:19
seek 97:1
seeking 141:6
seen 11:5 40:23
  72:5,7,16 76:24
  77:2,4 78:14,14
  117:18 118:5
sees 5:8
self 98:13
send 120:4
senior 19:2 38:3
  112:8
seniority 37:15
sense 47:25 65:13
  93:16 122:5
sent 29:3 78:3
  109:16 120:1
  128:25
sentence 101:18
  124:23 125:4
separate 38:20
  60:21,23 68:2
  69:3 93:25 129:12
  129:14 142:22
series 5:5 114:15
  127:18
seriously 96:12
seriousness 36:19
serve 28:18 119:9
Service 142:5
services 10:17
  51:13 84:3 142:9

set 31:17 45:9,14,20
  46:10,14
settlement 25:21
set-up 47:18
seven 88:11 141:22
sex 143:6
share 42:2,8,20
  43:6 44:17,24
  45:2,3
shareholder 7:4,6
shares 8:20
sharing 49:13
sheets 64:12 66:20
shipping 81:19
shore 87:10 89:14
  89:21
shorter 95:1
Shorthand 3:9
  146:15 147:4
shortly 109:7
show 51:21 54:22
  55:5 62:5 76:9,18
  102:1 129:9
  138:16
showing 18:22 23:8
shown 44:15 141:22
shows 72:6 94:17
sick 93:16,16
side 14:7,13
sign 28:22 68:4
  126:10
signature 145:16
signed 15:21 29:10
  31:17 66:15 100:2
significance 76:2,21
  105:15
significant 25:1
  109:18 123:20
signing 30:14 145:7
  146:4
similar 77:2 79:13
  139:8
simple 137:4
simply 5:13 11:23
  20:2 30:13 46:5
  48:23 49:9 52:16
  80:5 105:16
  107:20 109:16
  110:21 111:8
  122:10
single 18:16 49:20
  87:20 89:4 90:5,5
  90:9,14 91:21,24
  92:3,5,9,15
  129:11 130:1
sink 144:21

Sir 13:22
sit 75:3 128:14
situation 45:11
  96:10 103:10
  104:13,17 106:12
  114:4 124:15
  145:1
six 36:23 59:18 70:2
  136:15
size 16:6
slash 4:15
slightly 51:2 64:23
  141:17
small 14:14 15:5
  32:6
Smith 38:4
Society 115:16
sole 106:24
solely 56:8
somebody 15:16
  50:1 66:1 73:17
  81:3 84:13 85:14
  87:3 88:15,22
  93:7 96:11 104:13
  104:21 105:7,10
  108:19 112:9
somebody's 87:8
somewhat 80:6
son 99:25 100:3
  104:18 127:8
  137:24
son's 135:19
soon 109:23 112:19
  112:21
sorry 4:4 27:7
  32:10 44:5 47:15
  65:18 103:20,22
  103:23 116:10
  135:17 136:16
  140:17
sort 115:12 140:1
sought 80:1,2 94:12
  136:25
sounds 19:19
  134:18
source 28:9 30:12
south 55:23 89:14
Southern 1:1 3:7
space 71:16
speak 57:19 69:15
  114:5 117:10
speaking 21:17
  57:9 86:16 90:4
  99:19 111:24
  116:14 134:18
special 6:12,19 7:7

7:9,12 8:20,23,25
  8:25 9:3,12,21,23
  12:7,16,25 16:8
  22:20 43:17
specializing 14:21
  15:17
specific 17:10,15
  24:8 53:23 59:24
  64:1 100:19
specifically 67:7
  75:16 92:1 110:14
  138:20
specifics 90:20
specifies 130:10
spell 4:4 38:8
spelling 46:25
spells 28:14
split 45:4
spoke 73:11
spoken 113:22
  132:17
spot 135:1
spread 30:1
Spritzer 130:24
SS 146:12 147:9
St 13:22
staff 36:6
stage 116:16
standard 24:10,23
  28:5 34:17 52:9
  108:7,10 144:19
standards 28:10
standing 31:23,23
  32:7 85:25 86:7
  86:12 93:12,14
  120:23
start 52:21 96:8
  117:8
started 22:15 100:5
Starts 124:23
state 3:10,11,25
  12:1,17,18,22
  13:1,4,15 17:24
  18:1,2,4,21 29:13
  29:14 33:22
  111:17 115:22
  136:6 141:12
  147:9,16
stated 89:22 90:1
  136:3
statement 14:25
  15:1 64:7 85:10
  102:25 133:4,16
  134:8 139:22
  140:25

statements 62:17
states 1:1 3:7 4:22
  4:24 11:8,9 23:20
  26:3,7,7,8,13,18
  26:19,21,25 27:3
  27:9,11,13,16,25
  30:3,4 44:2 54:12
  62:16 70:10,20
  71:3 77:18 101:11
  131:14 142:18,19
  142:23
stating 80:24
stationary 81:20
statistical 14:20
  46:3,4
status 30:22,25
statutes 17:24
stealing 98:1
stenographically
  146:17
steps 57:8
STEVE 1:15
Stewart 58:19
  112:12 114:12,24
  115:12 117:23
  119:13,17 120:4
stipulated 145:15
  146:2
STIPULATION
  145:14 146:1
stock 8:21
stockholder 8:1
stocks 10:16
stolen 116:12
Stop 88:1
storage 83:4
storm 83:2
straight 32:21
straightaway 29:4
  32:4
straightforward
  36:15 37:9
strength 10:17 48:3
stress 59:25
stressing 45:10
strictest 47:25
strictly 22:24
strike 81:14 123:10
  125:5
strong 67:8
struck 125:2,7,11
structures 21:5
Stuart 29:25
stuck 66:4
studied 13:25
stuff 143:6

subject 34:20,22,23
34:25 35:2,3,4,10
51:8 78:6,23
121:12 128:18
134:4
subjectivities 34:9
34:19 35:12
submerged 118:16
118:18
submission 102:13
submit 77:21
submitted 38:14
83:15 91:4 94:16
101:13
submitting 62:25
subpoena 121:8
subsequent 98:20
98:25
subsequently 6:21
102:23 125:3,8
subsidiary 46:23
48:1
substance 134:8
substantial 79:25
substantially
135:18
subtract 61:1
suffered 44:10
sufficient 106:15
sufficiently 72:18
suggested 48:18
suggestion 11:19
83:19 128:5
suit 19:3
sum 55:17
summaries 59:4,8
summary 59:9
SunAlliance 43:6
45:2,12 75:6
sunk 125:3,7
supervisor 38:6
supplementary
64:12 82:24
supplied 32:1 35:11
supply 5:6
support 128:7
supported 21:20
suppose 88:25
supposed 83:21,21
140:3
sure 21:1 54:25
79:8 102:10
143:18
surplus 11:25 13:3
13:5 26:20 27:10
27:21,22 30:21

33:13 49:5
surprise 119:12
surrounding 58:21
110:22 120:7
survey 34:20 67:20
67:21,22 113:10
surveyor 26:1
58:20 110:1,3,11
110:25 112:13
115:16,18 119:9
119:19
surveyors 113:6
115:17,19
surveyor's 34:21
surveys 115:6
survive 118:18
Susan 38:3
suspect 128:3
suspicious 128:8
swapped 8:19
sworn 3:18 147:12
system 21:3 61:6,8

--- T ---

table 103:8
take 52:4 54:10,24
56:6,11 57:8 71:5
73:8 76:11 83:17
84:14,17,24 87:4
87:16,24 88:7,12
88:15 93:13,17
96:14 101:19
104:18 105:11
114:23 116:15
118:8 124:19
125:16 126:14
129:10,23 134:20
138:18
taken 3:2 4:18
15:23 16:24 40:7
41:1 50:21 73:9
101:20 109:22
114:11 137:7
taker 47:20
takes 86:20
take-it 53:5
talk 124:18
talking 92:3,5
104:12 108:12,14
140:11
Tampa 39:24 68:23
68:25 69:4
tape 60:8 132:19,24
133:9,13,17
task 39:17
tax 18:4,19,20 28:8

team 20:14,23
technical 21:3
Technically 128:22
tell 54:4,8 55:9 58:9
64:1 81:5 113:1
119:22 129:11
135:15
telling 142:3
temporarily 93:18
ten 24:10 65:25
tend 68:21
tended 59:4
tender 116:8
tenure 141:3
term 10:13,13,13
10:24 11:3,11
17:1,23 47:25
67:14 76:2 78:22
80:8 91:25 92:8,9
92:10,13,13,16
94:12,17 95:2
103:2,3 104:4
105:14 122:22
terminated 114:22
terminology 27:9
65:16 67:10,17
105:2
terms 20:23 21:2
25:7 28:15,19
34:3,3,7,12 35:10
35:21 37:11,15,16
39:15 45:17 49:10
49:17 51:8,10
52:8 60:23 62:22
63:4 66:13,21
78:5,5 90:12
92:24 94:20,22
108:18 115:20
138:7 143:10
TERRI 3:8 146:15
147:4,16
territories 26:14,17
30:3,11
testified 3:18
testimony 135:19
146:18
testing 71:1
Texas 73:22
thank 5:25 38:10
55:1 79:1 108:11
109:3 129:18
135:24 136:15
137:21 140:9
theft 116:7 125:19
125:23
thefts 141:18

thing 69:6 93:1
132:8
things 5:3 21:23
32:2 57:17 92:24
93:5,10 108:17
113:13 123:5
think 5:24 7:13
15:10 19:12,14,16
24:11 26:6 29:14
40:24 60:12 63:20
64:4 65:5 66:3
67:6 68:11 71:15
77:9,10,15,17
78:11,12,22 79:12
80:6,22,23 84:6
87:11 91:7 94:2
98:15 105:1 107:8
108:22 109:1
113:3 115:2,15,17
119:16 120:11,14
121:14 123:6
136:4 137:10
138:23 143:19
144:1
Thomas 23:16 38:5
52:19 57:22 58:8
58:9 60:2 61:14
61:16 64:18 65:4
65:8 112:5,15
113:10 114:2
119:7,14,17,20
120:8,11
thought 83:21
120:14 130:18,20
three 5:2 48:7 55:7
55:8 57:24 74:21
89:15 92:24,24
102:24 103:15,20
103:21 118:9
124:13 140:21
141:10,14,16,24
143:22
time 9:9 14:18 16:3
22:17,18 35:22
37:25 38:2,22
39:17,22 40:10,12
40:18,21,22,25
41:5,20 51:5
54:10 56:13 59:1
59:14,15 61:10,12
70:1,19 72:1,11
74:24 81:16,19,24
82:11 93:14,18
94:16 98:22,23
99:1 100:1 102:12
103:8 104:1,2

105:17 107:21
109:3 110:4 111:7
113:17,24 114:1,9
114:11 115:13
116:5 117:1
119:25 121:24
124:24,25 126:7
132:25 133:2,4
136:6,9,25 141:5
143:12
times 4:25 5:2
19:11,15 34:2
41:16 69:25 70:3
70:11 82:3 94:5
102:23,24 103:16
103:20,21 104:5
106:2 111:14
112:23 113:2,7
117:10 143:20,22
Tindall 38:12
title 12:4 46:24
48:25
TLD/5/PPO 51:24
52:10 55:21
TLD5PPO 23:25
24:7 25:5 33:8
today 15:20 29:2
40:17 48:14 50:2
50:25 57:17 97:5
137:8 140:15
today's 57:20
141:22
toilet 88:8
told 57:24 65:8,19
97:21 108:18
113:15 138:11
Tony 36:9
top 40:2 84:7
139:17
total 116:13 118:19
totally 69:3 93:10
143:20
towed 82:1,4
trademark 19:20
trades 48:21
trading 48:21
traditional 20:4
131:9
train 20:22
training 20:5 62:4
transact 42:5 73:16
transactions 69:14
142:12
transcribe 133:9
transcript 133:11
133:15,19,24

134:1 146:18
transcripts 57:16
transmitted 60:13
travel 87:11
traveling 87:19
treading 134:2
treat 144:8
treated 144:13
tried 65:22 66:1
trigger 46:13 64:12
Tropic 55:23 89:14
true 83:24 146:18
truthfulness 135:10
trying 70:5 128:14
Tuesday 103:6
turn 18:20 112:9
   130:4
turned 40:6
two 13:25 23:24
   25:2 26:17,18
   34:13,18 48:6
   57:23 88:4 93:10
   93:21 97:8 102:24
   103:15,20,21
   124:13 129:10,12
   129:12,14 140:25
   143:22 144:6
two-page 28:14
tying 135:2
type 23:21 29:6
   45:17 63:15 73:6
   137:2
types 23:24 24:15
   24:16 25:2 77:17
   79:13
typing 125:25
typo 125:24 126:1
T-I-N-D-A-L-L
   38:12
T.I. 6:18,22,25 7:6
   7:7 8:25 9:3,13,20
   9:23 11:21 12:7
   12:12,13,17,25
   13:7,15,16 16:1,4
   16:7 20:12 22:20
   23:1,5,15,20 25:4
   26:4,5,12,22,24
   26:25 27:12,24
   28:20 29:12 30:4
   30:9 33:15 35:13
   35:17 42:15 43:16
   46:15 52:18 56:23
   58:6,13 59:23
   60:17 61:17,23
   63:7,19 65:1
   66:10,19 73:14

74:4,24 75:8,12
75:21 76:6 80:19
84:17 100:7,11
106:24 107:3
109:4,23 112:2,15
112:24 115:8
116:3 118:20,23
119:7 121:25
123:19 124:2,6
125:6,10,21
126:22 127:15,24
130:3,9 132:1
135:4,9,25 139:10
139:19,23 140:10
141:12,25 142:25

___ U ___

UK 1:4 3:5 12:2
   142:10,15,16
ultimate 10:21
   47:20
unambiguous 98:18
unapproved 114:8
unclear 65:21,23
   67:2
uncomfortable
   20:16
undersigned 147:11
understand 5:15,19
   5:21 10:12 11:18
   12:15 16:23 17:8
   67:9,14 79:11
   123:25 124:10
   130:20 132:15
   133:1
understanding 9:6
   9:22 10:23 12:24
   27:23 33:15,23
   87:13 100:16
   103:13 107:1
   114:14 132:18
understood 67:5
   141:23
undertaken 102:11
undertaking 67:4
underway 81:16,21
   88:2
underwrite 13:11
   20:24
underwriter 44:24
   72:11
underwriters 8:5
   9:19 20:14 37:19
   43:15 72:21 89:2
   97:2
underwriting 7:24

8:2,4,8,10,16 9:6
9:18 13:9 14:10
14:11,19,20 17:4
17:16 20:13,23
28:17 37:18,21
38:17,19 39:11,12
39:13,21 40:1
42:6,8,9,20 71:25
72:8
undue 109:9
unethical 109:2
unfamiliar 143:21
unfortunately 49:2
   85:19 127:8
unilaterally 37:22
uninsured 85:1,11
   86:1,25 144:9,14
   144:21,23
Unionam 14:15,17
United 1:1 3:7 4:22
   4:24,24 11:8,9
   23:20 26:3,8,19
   26:25 27:1,3,13
   27:16,24 30:2,4
   44:2 48:22 51:12
   70:10,20 71:3
   77:18 131:14
   142:13,17,19,20
   142:23
unnamed 107:20
   114:8
unsure 144:18
unsurprising
   118:13,14
unusual 39:10
urgency 124:3
urgent 96:5,9
use 3:3 11:10 12:5
   24:6 45:18 52:24
   55:21 63:17,19,20
   66:9 67:17 78:21
   80:7,8 83:16
   84:24 91:25
   111:20 116:4
useful 49:15
Usher 1:23 2:4 3:1
   3:16 4:3,17 6:6
   38:4 41:3 49:22
   52:3 76:18,25
   79:10 126:8
   137:22 140:20
   147:11
USI 29:5 68:6,16,20
   68:23,25 69:7,15
   73:21 74:7 76:22
   128:19,20 129:21

130:3,9,11 131:23
132:1 137:23
138:11 139:8
USI's 73:12
USI/Rosin 76:20
usually 37:1 116:2
U-S-H-E-R 4:3
U.K 5:1 10:25 33:7
   48:23 49:1 61:20
   112:16
U.S 5:1 11:7 27:19
   44:7 87:13 130:21
U.S.A 57:13 89:20

___ V ___

Vacation 71:4
vague 78:12,22
vaguely 69:19
value 43:4 46:9
   55:17 116:20
   118:16
valued 24:9 43:24
   53:3
vanilla 36:15 37:7
   37:21
varied 54:16
various 13:10 48:24
   49:7 51:11 54:15
   77:17
vast 37:6 69:11
   144:23
verbatim 119:22
verbose 37:3
Versicherung 47:1
version 24:4 52:16
versus 3:24 42:22
vessel 24:8 35:2,4
   36:21,22,22,25
   43:4 46:8 53:16
   53:20 55:17,17,20
   55:22 64:9,9,10
   73:2,6,6,7,7 80:15
   81:8,10,13,15,16
   81:23,24 82:13,15
   82:22 83:2,4,5,6,8
   83:10 84:2,14
   86:17 88:13 89:13
   91:6,10,13 92:22
   93:6,6,7 94:3,4,4
   96:9,24 98:21,24
   99:1,14 100:1,3,6
   101:7,15 102:7,16
   102:23 103:5,9,12
   103:15,17,19
   104:6,8,14 105:9
   107:2,21 110:2,4

110:8 113:12,16
113:17 116:15,21
118:15,17 119:25
123:24 124:4,10
125:2,7,19,23
127:4 136:9 143:2
143:17,19,21,25
144:9,13
vessels 20:18 23:24
   24:15,16 29:22
   43:24 53:3
vessel's 35:6
view 42:1 76:6
   87:22 123:19
violations 126:18
violence 127:20
virtually 43:2
virtue 19:6 104:10
visibility 88:6
visit 71:2
visited 70:9,19
vitae 2:11 6:7
void 100:22,23
   106:15
volume 42:4 130:22
voluntary 133:23
voyage 87:5 93:16
vs 1:6
V-E-R-S-I-C-H-...
   47:1

___ W ___

waive 106:16,17,20
   106:20,22 107:4
   107:19 108:4,20
   111:3 122:20
   126:23 127:10
   145:6
waived 145:16
   146:5
waiving 138:7
Walter 13:22
want 13:19 18:8
   35:21 63:12 91:12
   95:19,20,22,23
   102:9 108:20
   111:3 120:16,16
   120:17 133:21
   144:2
wanted 104:18
wants 80:14
warnings 133:20
warranted 55:21,22
   55:24
warranties 53:23
   55:22

warranty 83:19,22
100:17,19,20
101:1,4 106:16
137:12
Warren 15:24
wasn't 73:18
103:10 124:8
136:9 145:1
water 81:22
Watercraft 2:15
77:4,22 78:3
79:13
way 20:4 30:7 37:3
46:5 55:14 57:3,6
63:17 69:23 70:8
87:10 128:4
129:24,25 131:9
144:9,14
ways 109:19
week 124:12
weekend 104:19
weeks 57:24 124:14
140:25
went 13:24 70:14
74:12
west 1:7 3:6 4:11,16
56:4,20 137:10
we're 15:19 31:1,13
31:13 33:11 34:7
60:18,25 67:9
73:1,4 74:13,18
86:23 89:15
100:10 106:1,3,11
106:11,15,18
109:21 119:3
122:8,17 143:17
we've 10:4 11:12
18:11 21:5 67:6
113:2
wheel 93:13 94:6,8
wide 120:21 121:10
122:7
widely 10:14 11:3
20:1 26:7 49:17
85:15
widely-used 19:23
wife 38:4 127:20
wildly 113:7
willing 34:8 63:5
66:12
Wilma 40:5 41:23
49:16 68:12
wish 121:8
withdrawal 44:7
withdrawn 41:21
witness 2:3 3:2,17

121:20,21,22
125:25 126:9
145:16 146:3,19
147:13
witnesses 110:24
woman 143:1
wooden 37:2
word 10:7,14,24
11:20 19:24 35:21
47:2,3 48:11 80:7
93:1,17 143:8
wording 52:11
64:19 71:21 75:15
99:4 105:4
words 10:20 19:25
78:13
work 13:25 114:24
121:25 123:4
124:1,3 134:6,11
world 10:25 11:1,4
11:6
wouldn't 40:21
63:9 65:11 73:20
74:17,17 88:19
106:1 114:5
115:19 120:15
131:19 138:14,15
WRIGHT 3:9
146:15 147:4,16
write 18:16 34:15
34:16 42:23 43:6
43:15 47:6,7,9,15
47:16,19 72:19
142:16,19
writes 43:8,9,10,11
43:12,13 44:24
writing 41:22 43:2
43:14 82:17 90:1
96:17
written 16:19,22
17:2,7,9 18:18
50:15 54:17 69:12
74:20 92:1 98:7
142:7
wrong 49:3 76:5
wrongdoing 131:1
wrote 43:24 52:12
52:22

X
x 1:9 2:1 18:13 20:3

Y
Y 1:7 3:6,23 6:1
102:14 136:25
yacht 2:14 15:19

16:2,3,5,6,9,11,14
16:16,25 17:4,6
17:16,22 22:2,9
22:11,14,21 23:4
23:19 24:3,7,11
24:13,16,19,24
25:5 26:4 31:16
36:6 41:22 44:11
50:23 52:9,23
53:2 62:24 63:18
67:14 78:6 82:6
87:3 97:6
Yeah 6:15 12:11
15:14 78:11 79:12
105:1 107:15
125:15
year 42:13 52:15
70:11,12,13,17
85:5,8 94:25
95:16 141:21
years 11:5 14:1
24:10 32:17 36:25
51:1 63:21,22,25
64:2,25 65:25
71:14,21 74:21
119:14 127:16
141:10,14,17,24
York 19:7,9 130:24
Yorkshire 4:11,16
Y-O-R-K-S-H-I-...
4:12

Z
Zip 4:12

$
$160,000 118:12
$250,000 24:9
$4000 72:19

0
0099 76:20
0860399-CIV-JO...
1:3

1
1 2:11 6:4,8 55:13
1st 94:17,17
10th 15:22
10:00 1:12 3:13
100 7:9,11,15 8:19
46:22 76:21
101 2:16
11 85:4,8
117 2:17
12th 4:8 147:1,13

120 33:21
129 2:18
13 124:20 136:12
136:16,17,18,19
136:21,22
130 59:6
140 59:6
145 2:19
15 29:15,17 48:4,9
63:24 64:2,25
71:14,20 113:3
125:16 131:24
132:2 134:20
16 51:15 88:6
16A 4:10
160 41:11
17 102:8 104:25
170 41:12
18 13:25 88:6
126:15
19th 68:11
1953 4:8
1968 47:11
1971 13:23
1972 14:6
1973 14:9
1980 14:17
1984 14:14 15:5
1987 15:14 127:16
1988 15:10
1990 15:21,22 22:3
22:4,10 50:24
51:4
1991 15:22 16:15
1992 7:20 77:14
1993 16:1 70:18
1995 7:25 8:10
1999 16:7

2
2 2:12 24:4 52:1,4
54:1 55:13,19
56:9 118:8
20 113:3 127:16
200 40:21 41:4,8
200/658/91059
102:17
2003 74:15,15 75:1
2004 76:11 130:25
2005 43:21 52:12
52:17 68:11
2006-2007 141:20
2007 51:7 55:25
70:17,25 94:17
117:23 127:17,18
141:17,21

2008 8:17,24 52:13
70:16,21,24,24,25
94:18 141:21
2009 1:12 3:12
147:1,13
2010 147:17
220 41:9
25 7:10 8:20 36:25
89:16 113:3

3
3 1:12 2:6,13 55:3,6
56:2,7,9,11 64:5,5
3rd 3:12
3.86 141:25 142:14
3.96 141:13
3:00 103:6
3:30 145:17
30 11:5 26:7,11,13
59:7 94:24 147:17
3550 1:11 3:10

4
4 2:14 62:8,10 64:6
71:5 80:3 89:3
95:13 97:6
40 4:21 26:6,13
32:17 41:9 59:7
102:23 143:20
48 27:10 136:22
49 7:6

5
5 2:15 4:14,15
76:14,16 77:24
79:16 80:2
50 41:9 87:10
102:23 143:20
508762 147:17
51 7:8,8
52 2:12
55 2:13
57 51:16

6
6 2:11,16 4:14,15
101:22,24 102:2
124:16 136:14
62 2:14

7
7 2:17 117:4,6,9,14
7th 8:17
75 89:13,21
76 2:15

| 8 | | | | |
|---|---|---|---|---|
| 8 2:18 117:23 129:5 | | | | |
| 129:7,9,21 | | | | |
| 8th 55:24 | | | | |
| 9 | | | | |
| 9 2:19 54:11 138:17 | | | | |
| 145:12 | | | | |
| 9th 56:13 | | | | |
| 90 88:4 118:16 | | | | |
| 91 7:20 | | | | |
| 99 48:16 | | | | |