UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

GREAT LAKES REINSURANCE
(UK)PLC,

     Plaintiff,

                               CASE NO. 08-CIV-60399-JORDAN

vs.

                               Magistrate Judge McAliley

ELAINE Y. ROSIN, *et al*,

     Defendants.

_____/

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

     COMES NOW the Plaintiff, GREAT LAKES REINSURANCE (UK) PLC, by and through its undersigned attorneys, and files this its proposed Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

     The Plaintiff in this declaratory judgment action is a UK-based surplus lines insurer which at all times material hereto had authorized T.L. Dallas (Special Risks) Ltd., also based in the UK, to underwrite and issue policies of marine insurance affording various coverages on pleasure vessels located in the United States. The Defendant is a now-retired cardiologist licensed and residing in Ohio but maintaining a condominium residence in Boca Raton, Florida where the vessel which is the subject of this coverage litigation was kept moored at a marina. That vessel is a 2003 36 ft Doral vessel with twin inboard engines which Dr. Rosin purchased in 2003 for $260,000.00.

The Defendant has owned and operated numerous vessels prior to her purchase of the 2003 36 ft Doral, and she has to her credit many courses offered by the United States Coast Guard and the US Power Squadron on the safe operation and navigation of pleasure vessels.

USI Florida/Kolisch Insurance had been assisting the Defendant as her marine insurance broker ever since she had purchased the vessel back in 2003, having obtained coverage for the vessel first from Royal Insurance Company and then from Safeco Insurance Company. It was only when Safeco advised the Defendant, via Kolisch in late December 2006, that it would not be offering to renew the existing coverage that Kolisch made the decision to approach TLD's facility in order to seek a policy from Great Lakes Re.

Because it deals directly with members of the public such as the Defendant, Kolisch is what is termed a "retail broker" and the evidence at trial demonstrated that Kolisch acted at all times as the agent for the Defendant, with no authority to bind or take any other action on behalf of the Plaintiff marine insurance company. The evidence at trial further established that Mr. Kolisch in particular was fully aware at all times of the existence and the meaning of all of the relevant provisions in the policy and on the application form.

On January 10, 2007, the Defendant signed an application for marine insurance which was submitted via her brokers at USI Florida/Kolisch Insurance to T.L. Dallas (Special Risks) Ltd., the Plaintiff's UK-based marine underwriting agent. The material facts required by the underwriter in order to calculate the risk, and determine whether and on what terms to issue a policy, were all set forth in that signed application.

Elaine Y. Rosin was identified as a medical doctor who was the sole owner and the sole operator of the 2003 36 ft Doral power vessel which she had purchased for $260,000.00 and which was said to have an insured value of $175,000.00. The Defendant was represented as having 25 years of experience in both the ownership and the operation of watercraft, with only a single minor loss in 2005 related to the passage of Hurricane Wilma. The Defendant represented that she had attended classes sponsored by the Pompano Power Squadron, and she reported no history whatsoever of violations, suspensions or convictions.

Having previously obtained marine insurance policies on this same vessel via the services of Kolisch, the Defendant had received, reviewed and completed other application forms. At least one (1) of these earlier forms had requested disclosure of material information expressly limited to other persons who would be "regular operators" of the vessel. However, in contrast to this earlier application form utilized for the Safeco policy, the form

3

that the Defendant completed and signed on January 10, 2007, which resulted in issuance of the Great Lakes re policy of marine insurance, stated clearly and unambiguously that "all operators must be detailed – use separate sheet if necessary."

The Defendant testified that she took note of this distinction between the prior applications and the form that she was completing and which she signed on January 10, 2007, and she called and spoke with an unnamed individual at Kolisch in order to ask obtain direction regarding the information that was required to be disclosed. The Defendant testified that she informed her broker that her adult son who was and is a resident of Dania, Florida, Paul Rosin, was likely to operate the vessel only on those infrequent but foreseeable occasions when some emergency situation arose in which the vessel required urgent attention for repair or maintenance, but when the Defendant herself would not be in a position to be the person operating the vessel at such time. The Defendant made no further disclosure concerning her son's background or qualifications, and claims to have been assured by the broker that only regular operators needed to be disclosed and that since Paul Rosin was clearly not going to be a regular operator, there was no need to list him or to detail his background and/or his qualifications at the place on the application where this otherwise material information would have appeared.

4

At trial the Plaintiff's underwriter, B.A. Usher, testified with regard to the material information that needed to be disclosed via the information sought in the application form, asserting that the underwriting decision was impacted by all of the various material facts as these were set forth on the application form signed by the Defendant on January 10, 2007. However, the said underwriter testified that amongst the most critical information considered by a marine underwriter must always be the matter of who it is that might possibly be operating the vessel for which he is going to issue an insurance policy, since the history and the skills of such persons bears directly on the risk assumed by the marine insurance company. This is the reason why the application inquires into this specific information, and why all prospective operators must be disclosed.

The Defendant therefore placed her signature on the application, dated January 10, 2007, omitting any reference to Paul Rosin as an operator, and this completed application was submitted to the Plaintiff's underwriter, via the Defendant's broker at Kolisch. Satisfied by the material facts set forth on the application, TLD issued a Quotation to Kolisch which the latter accepted on February 8, 2007 by sending a request to bind on those terms which had been set forth in the Quotation. A Cover Note for Policy No. 200/658/91059 was issued to Kolisch, and consistent with practice amongst surplus lines carriers offering policies of marine

insurance, this document was sent to the broker acting for Dr. Rosin. Also sent to the broker was a complete copy of the policy language inclusive of all definitions, warranties, exclusions, etc.

The policy of marine insurance issued by the Plaintiff to the Defendant contained a provision commonly termed a "Named Operator Warranty," stating "[i]t is warranted that the scheduled vessel will be operated only by covered persons." The DEFINITIONS section of the policy defines "covered person" as "mean[ing] you, or any person detailed on your application form which has been submitted and approved by us."

The policy also contains the following provision which has the effect of directly incorporating onto the policy the well established federal admiralty law principle of *uberimmae fidei*, or "utmost good faith":

> This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance.

The policy also contains the following provision pertaining to the status of any broker who is assisting the prospective insured in seeking marine insurance coverage from the Plaintiff:

> If you have used a Broker to effect coverage, it is hereby agreed that your brokers or any substituted brokers (whether surplus lines approved or otherwise) shall be deemed to be ex-

6

clusively the agents of you and not of us in
any and all matters relating to, connected
with or affecting this insurance. Any notice
given or mailed by or on behalf of us to the
said brokers in connection with or affecting
this insurance, or its cancellation, shall
be deemed to have been delivered to you.

The policy also contains a Choice of Law clause stating as follows:

It is hereby agreed that any dispute arising
hereunder shall be adjudicated according to
well established, entrenched principles and
precedents of substantive United States Fed-
eral Admiralty law and practice but where no
such well established, entrenched precedent
exists, this insuring agreement is subject
to the substantive laws of the state of New
York.

As noted, the Defendant was a citizen of the state of Ohio, and the policy allowed navigation of the insured vessel anywhere along the entire East Coast of the United States and the Gulf of Mexico, up to 75 miles offshore, and also including the (international) waters of The Bahamas.

As stated, *supra*, the evidence at trial established that the Defendant's broker, Joseph Kolisch, was fully aware at all times of the existence and the meaning of all of the relevant provisions in the policy. The evidence also established that Kolisch was free to seek insurance coverage from other sources, and that the Defendant was free to have sough the services of other brokers working in the Florida marine insurance market.

7

The Defendant claimed throughout the course of this litigation, in summary judgment pleadings and on the witness stand under direct examination by Plaintiff's counsel, that she had never received any documents from her broker which might have placed her on notice as to the referenced contents of the policy of marine insurance which had been sought and obtained on her behalf. Copies of documents in the file maintained by Kolisch indicated that the Defendant had in fact received the proposal with which TLD had responded to the Quotation request, including a letter from Kolisch which contained a clear and explicit reference to the fact that the policy contained a Named Operator Warranty. Other documents in the broker's file indicated that the Defendant had received the original Cover Note and 13 pages of policy terms and language. On the second day of trial, after she had completed her direct examination and notwithstanding her repeated denials, the Defendant suddenly reported that she had "found" the letter from Kolisch enclosing the proposal, as well as the original Cover Note that TLD had sent to Kolisch and which the latter had very obviously then turned around and dispatched to Elaine Rosin.

As noted above, although the Defendant is registered to vote in Ohio, has an Ohio driver's license and is licensed to practice medicine in Ohio and Kentucky, her 2003 36 ft Doral vessel was kept moored at the Boca Raton Yacht & Racquet Club, where the Defendant

8

has purchased a condominium unit. At some point prior to November 3, 2007, the Defendant testified that she was informed by an unnamed "expert" that an emergency situation existed requiring that the bottom of her vessel be painted immediately, and in order to have this apparently urgent situation attended to, just as she had done in the past, she asked her son, Paul Rosin, to bring the vessel to Govan Marine in Fort Lauderdale where the work was going to be done. As noted, this was not the first time that such an emergency situation had arisen since her purchase of the vessel in late 2003 or early 2004. On 3 or 4 occasions in the past several years, the Defendants acknowledged that she had asked Paul Rosin to operate her vessel in order to have its repair or maintenance needs attended to when she herself was unavailable to do so.

The Defendant claimed to have no knowledge of any other problems that her vessel may have had which might also have required the attentions of a marine repair facility.

Paul Rosin testified that he traveled to the marina in Boca Raton where the vessel was kept, and then navigated the vessel the approximately 20 or so miles to his home in Dania, where he kept it moored for several days at a dock located at the rear of the property. On Saturday, November 3, 2007, Paul Rosin navigated the vessel the approximately four (4) miles from his residence to Govan Marina located at 2200 Marina Bay Drive in Fort Lauderdale, traveling west through the Dania Cut-Off canal and then turning

north into the South New River Canal. Paul Rosin brought his girlfriend, Kiffeny Arredondo, along with him for the ride.

Paul Rosin testified that the only reason he was bringing the vessel to Govan Marine was to have its bottom painted, denying that the vessel had any other problems or issues that might have required Govan's attentions.

According to his testimony, somewhere between 6:30 p.m. and 6:45 p.m., at a point approximately 100 yards away from Govan Marine, in the canal, with Paul Rosin at the helm, the vessel struck rocks or some other underwater obstruction, sustaining damage which caused the vessel to quickly sink at the dock where Mr. Rosin had secured it. Mr. Rosin insisted that it was still daylight at the time that the incident occurred, and he also acknowledged that he telephoned the 911 emergency number after the incident.

Govan Marine's facility was located in Fort Lauderdale, along a portion of the New River, and in practice was reachable via either of two alternative but highly distinguishable routes. Mr. Rosin chose not to bring the insured vessel to Govan Marine via the route which would have taken him north through the Intracoastal Waterway and then west through the New River. Instead, Mr. Rosin chose to travel west through the Dania Cut-Off Canal until reaching

the South New River Canal, where he turned northeast and headed toward Govan Marine.

In March 2002, Paul Rosin had been sentenced by a state court in Ohio to a year of probation and a fine for reckless operation of a watercraft.

Paul Rosin has never taken any course(s) on boating safety or the safe operation of a vessel, such as the courses listed by the Defendant on her application for marine insurance, or the even more thorough review of courses in both Ohio and in Florida to which the Defendant ant testified at trial.

Although Paul Rosin had operated the 2003 36 ft Doral previously, he had never before operated the vessel in the narrow, shallow, unmarked and unlighted waterway where the incident of November 3, 2007 took place.

On November 9, 2007, Paul Rosin willingly provided a statement to the Plaintiff's investigator in which he boasted of being "very familiar" with the Defendant's vessel as a result of having previously operated that vessel 40 or 50 times. However, on January 12, 2009 Paul Rosin gave a deposition in which he admitted lying to Plaintiff's investigator with regard to his experience with the operation of the 2003 36 ft Doral vessel. At trial and under oath, Paul Rosin stated that he had operated the vessel only 3 or 4 times previously, and pronounced himself only "familiar" with the vessel rather than "very familiar."

11

Having been provided by Plaintiff's counsel with extracts from *The Miami Herald* and *The Fort Lauderdale Sun-Sentinel* newspapers, the Court took judicial notice of the fact that sundown on November 3, 2007 occurred at 6:38 p.m. Having been provided by Plaintiff's counsel with an original and notarized document from the Broward County Sheriff's Office of the latter's 911 records, this Court also accepts that Paul Rosin telephoned 911 from Ms. Aradondo's cell phone number at 8:30 p.m. and at that time reported that his vessel was sinking. The incident clearly occurred in the dark, well after sundown and far later than Mr. Rosin testified.

Donald Govan appeared at trial as a witness and testified that Paul Rosin came to his facility at some time prior to November 3, 2007 in order to discuss having some work done on one of the vessel's two inboard engines. Govan testified that he inspected the vessel after it had sunk and then been raised on the night of November 3, 2007 and he was able to discern that indeed one of the two engines would not have been working properly, and that the key in the ignition of that engine was in fact turned to the OFF position, indicating that the engine had not been in use.

Mr. Govan also testified that the route chosen by Mr. Rosin was dangerous to the point of reckless since, in stark contrast to the conditions extant in the Intracoastal Waterway and the New River, the route through the South New River Canal traveled by Mr.

12

Rosin has neither lights nor channel markers. The latter is particularly noteworthy in view of the now established fact that Mr. Rosin was operating his mother's vessel well after sundown and indeed in the dark. Govan testified that the South New River Canal can rapidly narrow to as little as 12 feet, and is populated by numerous rocks and coral outcroppings. Govan testified that the depth of the South New River Canal can fall from six feet to only one foot so quickly that a vessel operator will not be able to respond even if utilizing his vessel's depth finder. Finally, Govan also testified that the route through the South New River Canal would have been even more dangerous than usual given the fact that Mr. Rosin was attempting to navigate his mother's vessel using just one engine, since this makes such a vessel harder to steer.

As noted, Elaine Y. Rosin was identified as a medical doctor who was the sole owner and the sole operator of a 2003 36 ft Doral power vessel insured by the Plaintiff. The Defendant acknowledged at trial that she had allowed Paul Rosin to operate the vessel on a number of previous occasions in order to have repair or maintenance work done. Despite the self-evident fact that Paul Rosin had operated the vessel, the Defendant failed to disclose this material fact on the application. Dr. Rosin admitted that in her alleged telephone conversation with the Kolisch broker, during the course of which she maintains that she was assured that she did not need

to list her son as an operator, she did not mention anything about his March 2002 conviction for reckless operation of a watercraft.

Plaintiff's underwriter, Mr. B.A. Usher, described for the Court why this non-disclosure was material and why it therefore voids the coverage under the federal admiralty law doctrine of *uberimmae fidei* or "utmost good faith." Plaintiff's application form expressly asked for disclosure of all details regarding all operators, and not merely those who would be regular operators of the vessel to be insured. The background and qualifications of the vessel's prospective operators is information that any reasonable marine underwriter would require in order to properly evaluate and assess the nature of the risk being proposed for his review and consideration. Paul Rosin had operated the vessel for his mother in the past and the Defendant clearly anticipated that he would do so again in the future after January 10, 2007 on those occasions when she would be unable to operate the vessel herself in order to bring it in for maintenance or repairs. The Defendant was under an obligation to make full disclosure of this material fact. By failing to list Paul Rosin as an operator, the Defendant created a situation in which the marine underwriter was unable to evaluate Mr. Rosin's background and qualification, with specific reference to his conviction in March 2002 for reckless operation of a watercraft. Neither Mr. Usher nor any other reasonable marine

14

underwriter would have agreed to insure the Defendant's vessel if this most critical and therefore material fact had been disclosed.

Per Mr. Usher's testimony, it is clear that Great Lakes Re is a surplus lines carrier able to engage in the marine insurance business in the United States only via the services of an authorized surplus lines broker such as Kolisch or the other approximately 165 such brokers that seek to obtain marine insurance coverage for their clients from the Plaintiff. The first state in which Great Lakes Re became an admitted surplus lines carrier was New York, which was described to this Court and which this Court accepts as both the historic and the present center of the marine insurance industry in this country. Great Lakes Re maintains its Trust Account in the sum of One Hundred Million Dollars in New York, and its authorized agent for receipt of service of process as set forth in the policy of insurance itself is a law firm with its office in New York City.

## CONCLUSIONS OF LAW

Regardless of the Choice of Law clause contained in the policy, with respect to the Plaintiff's cause of action seeking rescission for misrepresentation or failure to disclose the material facts regarding Paul Rosin as an operator, this Court is bound to apply the doctrine of *uberimmae fidei* or "utmost good faith" as an established and well entrenched principle of federal

15

admiralty law per the authority of the 11th Circuit's ruling in the case of *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 2000 A.M.C. 1817 (11th Cir. 2000). Since the ruling by the 11th Circuit in 2000, the case has been consistently recognized by this and other district courts within the circuit as binding authority, regardless of any state law to the contrary. *See, Great Lakes Reinsurance (UK) plc v. Arbos*, 2009 A.M.C. 334 (S.D. Fla. 2009); *Great Lakes Reinsurance (UK) plc v. Barrios*, 2009 A.M.C. 482 (S.D. Fla. 2008); *Great Lakes Reinsurance (UK) plc v. Atlantic Yacht & Marine*, 2008 A.M.C. 1041 (S.D. Fla. 2008).

*Uberimmae fidei* requires that the insured fully and voluntarily disclose to the marine insurer all facts material to a calculation of the insurance risk. This duty to fully disclose extends even to facts not directly inquired into by the insurer, and misrepresentation or non-disclosure, even if completely innocent, or due to mistake, accident or forgetfulness, is attended by the most rigorous consequences in that the policy is deemed void. Neither may the insured avoid rescission for failing to disclose another operator's conviction for reckless operation of a watercraft via the all too transparent and simple expedient of relying on her own voluntary or even willful ignorance of such a critical fact. *See, Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d

869, 1985 A.M.C. 956 (11th Cir. 1984), where the 11th Circuit stated:

> Nothing is better established in the law of marine insurance than that a mistake or commission material to a marine risk, whether it be willful or accidental, or result from mistake, negligence **_or voluntary ignorance_**, (emphasis added) avoids the policy, and the same rule obtains even though the insured did not suppose the fact to be material.

*Id.*, 1985 A.M.C. at 964-65.

Materiality is defined as that which could possibly influence the mind of a prudent and intelligent insurer in determining whether to accept this risk, or on what terms. *HIH Marine Services, Inc. v. Fraser, supra.*

The Defendant failed to disclose the manifestly material fact that Paul Rosin was going to be an operator of her vessel, as required by the clear and unambiguous terms of the application form that she reviewed and signed, and the Plaintiff's unrebutted evidence from Mr. Usher was that disclosure of Paul Rosin and his March 2002 conviction for reckless operation of a watercraft would have resulted in a flat-out refusal to issue any policy, or an offer to issue coverage but only on the certain assurance that Paul Rosin would never operate the vessel. Even were this Court to credit the Defendant's assertion that she was personally unaware of her son's March 2002 conviction for reckless operation of watercraft in her home state of Ohio, she would not be relieved of

17

the onerous obligation to have disclosed this to the marine underwriter who was in no position to be aware of this critical fact. As noted, under the federal admiralty law doctrine of *uberimmae fidei*, such voluntary ignorance of a material fact may not be relied upon to avoid the consequences of such a non-disclosure. The burden of full and voluntary disclosure is always upon the insured in the context of marine insurance.

Rescission would be granted, and coverage held void, even assuming that this Court were to credit the conversation that the Defendant alleges took place between herself and some unnamed person employed at Kolisch's office, in which Rosin contends that notwithstanding the application's clear demand for disclosure of all operators, she was assured that she need only disclose regular operators. Aside from the fact that the Defendant by her own admission failed to inform the broker of her son's March 2002 conviction for reckless operation of a watercraft, the facts clearly demonstrate that Kolisch acted at all times in the routine manner of such an surplus lines broker, as an agent of the insured, *see, e.g., Essex Insurance Co. v. Zota*, 985 So.2d 1036 (Fla. 2008); *Markel American Insurance Co. v. Madonna*, 2006 A.M.C. 1758 (D. Mass. 2006); *Certain Underwriters at Lloyd's v. Giroire,* 1998 A.M.C. 2153 (S.D. Fla. 1998); *Wimberg v. Chandler,* 986 F. Supp. 1447 (M.D. Fla. 1997), and such a conversation between the insured

18

and her broker can in no sense be binding on the marine insurer. *See, Jefferson Insurance Co. v. Roberts*, 349 F.Supp.2d 101 (D. Mass. 2004) where the district court held that the broker was not the agent of the marine insurer and therefore any alleged statement made by the broker to the insured regarding the extent of the coverage afforded by the policy could not be binding on the marine insurer.

Similarly, Mr. Kolisch's admission that he was completely familiar with the terms and provisions of the policy is binding upon the Defendant, and the broker's knowledge of the policy, specifically his knowledge of that the policy contained a Named Operator Endorsement which would void coverage if breached, is imputed by operation of law to Elaine Rosin. *See, Jefferson Insurance Co. v. Cassella,* 2004 A.M.C. 1443 (E.D.N.Y. 2003), where the federal district court stated:

> [T]he Court concludes that [the broker's] knowledge is imputable to [the insured] and that the knowledge was effective to put him on notice of the [named operator] Endorsement. These con- clusions are made solely upon the undisputed ev- idence of the relationship between [the insured] and [the broker] and the knowledge possessed by [the broker]... The Court realizes that this is a harsh result for [the insured]. After all, the parties have identified no evidence that the in- sured received any actual notice from [the brok- ers] nor Plaintiff of the restrictions institute- ed by the Endorsement. Nonetheless, the law on Michael Cassella's imputed knowledge is clear and the outcome of this motion is inevitable.

*Id.*, at 1447.

19

Operation of the vessel by Paul Rosin was a self-evident breach of the Named Operator Warranty expressly set forth in the Plaintiff's policy of marine insurance. Based upon the apposite and recent cases which Plaintiff has cited, and the testimony of Mr. Usher with regard to the connections which are maintained with New York State by Great Lakes Re, this Court concedes and accepts the validity of the Choice of Law clause contained in the policy. *See, Great Lakes Reinsurance (UK) plc. V. Durham Auctions, Inc.*, \_\_\_\_\_ F.3d \_\_\_\_\_ (5th Cir. 2009); *AGF Marine Aviation & Transport v. Cassin*, 544 F.3d 255 (3d Cir. 2008); *Great Lakes Reinsurance v. Sea Cat I, LLC*, 2009 WL 2778754, _____ F.Supp.2d _____(W.D.  Okla. 2009); *Great Lakes Reinsurance (UK) plc v. Southern Marine Concepts, Inc.*, 2009 A.M.C. 1093 (S.D. Tex. 2008). In a case such as the instant matter, commenced by the Plaintiff under federal admiralty jurisdiction and Rule 9(h) of the Federal Rules of Civil Procedure, federal law governs the enforceability of the choice-of-law provision. As noted by the district court judge in the *Sea Cat* case, "under federal law, the policy's choice-of-law provision is *prima facie* valid and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances." *Great Lakes Reinsurance v. Sea Cat I, supra.*

20

Under federal maritime choice of law rules, such provisions are generally recognized as valid and enforceable. *See,* 2 Schoenbaum*, Admiralty and Maritime Law* (4th ed. 2004), at 276 stating "A choice of law provision in a marine insurance contract will be upheld in the absence of evidence that its enforcement would be unreasonable or unjust." The Defendant has not carried its burden of showing that application of New York law, as provided in the policy, would be unreasonable or unjust. There has been no showing of any lack of a reasonable basis for the Choice of Law clause in the policy issued by Great Lakes Re, a UK-based surplus lines insurer whose most substantial relationship is manifestly with New York; where the insured resides in Ohio; the vessel is based in Florida; and where the policy expressly contemplates navigation of an ocean-going vessel expected to travel up to 75 miles offshore along the entire East Coast and the entire Gulf Coast of the United States, and into the international waters of The Bahamas.

Under that valid Choice of Law clause, this Court is obliged to have reference to the law of New York State in order to resolve the effect of the acknowledged breach of the policy's Named Operator Warranty. New York state law voids a policy of marine insurance regardless of the lack of any causal connection and regardless of the lack of any increased hazard due to such breach, much as the old federal rule of strict or literal compliance with

21

express warranties functioned in federal admiralty law prior to the

Supreme Court's ruling in the case of *Wilburn Boat Co. v. Fireman's*

*Fund Ins. Co.*, 348 U.S. 310 (1955). *See, e.g., Hartford Fire Ins.*

*Co. v. Mitlof*, 2002 A.M.C. 1901 (S.D.N.Y. 2002); *Advani Enterprises*

*v. Underwriters at Lloyd's*, 1997 A.M.C. 1851 (S.D.N.Y. 1997), where

the district court stated:

> The effect of *Wilburn Boat* is that the breach
> of warranty rule upon which defendants at bar rely
> to avoid coverage would give way to a contrary New
> York statute, if one existed. But in point of fact,
> it does not. On the contrary, at least in respect
> of contracts of marine insurance, the New York stat-
> ute is consistent with the line of lower federal
> court cases previously discussed.

*Id.*, at 1856.

*See also, Royal Insurance Co. of America v, Harbor Shuttle,*

*Inc.*, 1999 A.M.C. 929 (E.D.N.Y. 1999), holding that under New York

law and Sec. 3106(c) of New York Insurance Law, breach of a marine

insurance warranty voids coverage even if the warranty violation

did not materially increase thee risk or actually cause the loss.

Finally, the evidence presented at trial compels this Court to

find that operation of the vessel by Paul Rosin, in breach of the

Named Operator Warranty, clearly increased the hazard and therefore

also voids coverage under the terms of the Florida state law and

Fla. Stat. sec. 627.409(2) which Defendant's counsel calls upon

this Court to refer to in order to resolve the coverage dispute. As noted above, Paul Rosin has a documented history of reckless operation of a watercraft; Unlike Elaine Rosin, Paul Rosin has never completed any approved or recognized course teaching safe boating operation; By his own admission Paul Rosin had operated the vessel on no more than perhaps three or four prior occasions and was far less familiar with the vessel and its operation that was the Defendant herself; Paul Rosin had never before operated this particular vessel in the particularly hazardous waterway where the vessel came to grief; Mr. Rosin himself conceded on the witness stand that his ill-considered decision to travel to Govan Marine via the South New River Canal, the latter lacking lights and channel markers and being narrow and generally more treacherous to navigate, rather than via the far safer and far more commonly traveled route provided via the Intracoastal Waterway and the New River, made more likely the very grounding incident that did in fact occur.

Although Paul Rosin testified that the incident occurred between 6:30 and 6:45 p.m. on November 3, 2007 and that it was still light at that time, the evidence clearly illustrates that it was in fact completely dark when Mr. Rosin attempted to navigate his mother's vessel through the shallow, narrow, unmarked and unlighted confines of the South New River Canal, with the vessel having only the single working engine to rely upon and therefore

23

being more difficult to steer than otherwise. The increased hazard resulting from Paul Rosin operating the vessel, in breach of the policy's Named Operator Warranty, is clear and is sufficient under Florida law to render the Plaintiff's policy of marine insurance void as a result.

Dated:     October 29, 2009
           Fort Lauderdale, Florida


                         GOLDMAN & HELLMAN
                         Attorneys for Plaintiff
                         800 S.E. 3rd Avenue
                         4th Floor
                         Fort Lauderdale, Florida 33316
                         (954)356-0460


                         By:   /s/ Steven E. Goldman
                               STEVEN E. GOLDMAN, ESQ.
                               FLA. BAR NO. 345210

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 29, 2009 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to each of the following:

James W. Beagle, Esq.
3550 N.W. 9th Avenue, Suite A
Fort Lauderdale, FL 33309

                          GOLDMAN & HELLMAN
                          Attorneys for Plaintiff
                          800 S.E. 3rd Avenue
                          4th Floor
                          Fort Lauderdale, Florida 33316
                          (954)356-0460


                          By:  /s/ Steven E. Goldman
                               STEVEN E. GOLDMAN, ESQ.
                               FLA. BAR NO. 345210